**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MLEA, INC.,** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 02-CV-4393** |
| | : | |
| **ATLANTIC RECYCLED RUBBER** | : | |
| **INC., RECOVERY TECHNOLOGIES** | : | |
| **GROUP INC., AND CASELLA** | : | |
| **WASTE SYSTEMS, INC.** | : | |
| | : | |
| **Defendants.** | : | |

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2004, upon consideration of

defendant Casella Waste Systems, Inc.'s  Motion for Summary Judgment, and any responses and

replies thereto, it is **HEREBY ORDERED** that the motion is **GRANTED**, and that plaintiff's

Complaint against defendant Casella is dismissed with prejudice.

_____
JAMES MCGIRR KELLY
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MLEA, INC.,** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No.  02-CV-4393** |
| | : | |
| **ATLANTIC RECYCLED RUBBER** | : | |
| **INC., RECOVERY TECHNOLOGIES** | : | |
| **GROUP INC., AND CASELLA** | : | |
| **WASTE SYSTEMS, INC.** | : | |
| | : | |
| **Defendants.** | : | |

## ORDER

AND NOW, this _____ day of _____, 2004, upon consideration of

defendant Casella Waste Systems, Inc.'s  Motion for Partial Summary Judgment, and any

responses and replies thereto, it is **HEREBY ORDERED** that the motion is **GRANTED**, and

that plaintiff's claim as to damages for certain "design/specifications/drawings" and "process

design/specifications" is **DISMISSED** and that plaintiff MLEA is **LIMITED** to only seeking

damages for those amounts listed on the three purchase orders at issue.


_____
JAMES MCGIRR KELLY
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MLEA, INC.,** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 02-CV-4393** |
| | : | |
| **ATLANTIC RECYCLED RUBBER** | : | |
| **INC., et al.** | : | |
| **Defendants.** | : | |

**DEFENDANT CASELLA WASTE SYSTEMS INC.'S MOTION FOR SUMMARY
JUDGMENT OR, ALTERNATIVELY, FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, defendant Casella Waste Systems Inc.

("Casella") hereby moves this Court to enter summary Judgment in its favor on all counts of the

Complaint based on plaintiff's inability to "pierce the corporate veil" of three separate corporate

entities to reach Casella.  Alternatively, Casella moves for partial summary judgment and

requests that this Court dismiss plaintiff's claim for damages as to certain engineering plans and

limit plaintiff's remaining claims for damages to the amounts listed in thee three purchase orders

at issue.  Casella incorporates herein the accompanying memorandum of law in support of this

motion.

_____
Antoinette R. Stone, I.D. No. 23464
Brian J. McCormick, Jr., I.D. No. 81437
BUCHANAN INGERSOLL PC
1835 Market Street, 14th Floor
Philadelphia, PA 19103
(215) 665-8700
(215) 665-8760 (fax)

Attorneys for Defendant Casella Waste
Systems Inc.

Dated:  February 10, 2004

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MLEA, INC.,** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No.  02-CV-4393** |
| | : | |
| **ATLANTIC RECYCLED RUBBER** | : | |
| **INC., RECOVERY TECHNOLOGIES** | : | |
| **GROUP INC., AND CASELLA** | : | |
| **WASTE SYSTEMS, INC.** | : | |
| | : | |
| **Defendants.** | : | |

**DEFENDANT CASELLA WASTE SYSTEMS INC.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR,
ALTERNATIVELY, FOR PARTIAL SUMMARY JUDGMENT**

Defendant Casella Waste Systems Inc. ("Casella") moves this Court to enter summary judgment in its favor on all counts of the Complaint based on plaintiff's inability to "pierce the corporate veil" of three separate corporate entities to reach Casella.  Alternatively, Casella moves for partial summary judgment and requests that this Court dismiss plaintiff's claim for damages as to the value of certain engineering plans and limit plaintiff's remaining claims for damages to the amounts listed in the three purchase orders at issue for the equipment allegedly ordered. Casella's Motion should be granted because, fact discovery having been completed, there are no genuine issues of material fact which preclude summary judgment.

I.      **INTRODUCTION**

Plaintiff MLEA, Inc., as successor in interest to Engineered Gas Systems, LLP and Main Line Engineering Associates, instated this action against Atlantic Recycled Rubber, Inc. ("ARR"), Recovery Technologies Group, Inc. ("RTG"), and Casella alleging that the defendants failed to pay for certain "design/specifications/drawings" and "process design/specifications"

(collectively, "engineering plans") and equipment with an alleged value of approximately $1.6 million.  Plaintiff's sole allegation against Casella for liability in this action is that "[o]n information and belief, at all times relevant hereto, Defendants Atlantic [ARR] and Recovery Technologies were acting on behalf of Casella."  [Complaint, at ¶6].

Both the Supreme Court of Pennsylvania and this Court have recognized that the remedy known as "piercing the corporate veil" should be reserved for the exceptional case.  Piercing the corporate veil undercuts the limited liability protection of the corporate form that provides the principal reason why businesses elect to incorporate.

Here, a plaintiff who allegedly entered into an agreement with one corporation is attempting to pierce the corporate veil of not only the contracting party, but also two intermediary corporate parents, on a record that is utterly devoid of any evidence to justify that corporate veil piercing.

Casella is the "great-grandparent" corporation, a company three levels up the ownership chain.  Plaintiff is attempting to hold Casella liable for ARR's alleged obligations, even though Casella had no direct ownership interest in, or control of, ARR, the party with which MLEA had contracted.  Under Pennsylvania law, it is inappropriate for a plaintiff to leapfrog up the corporate chain of ownership in this manner to impose liability on a party several levels up the corporate ladder.  Accordingly, defendant Casella should be dismissed from this lawsuit.

Casella also moves for partial summary judgment on two grounds.  The first is that MLEA's claims for damages related to its drafting services of certain "engineering plans" is fatally flawed because no defendant ever agreed to reimburse MLEA for those services. The second ground is that MLEA is limited to the amount of damages stated in the three purchase orders at issue.

2

MLEA's own Vice-President of Engineering, Manuel Menendez, has testified that neither ARR nor RTG ever agreed to pay for MLEA's services in drafting the engineering plans. In addition, MLEA never delivered the entire set of plans to any of the defendants, and Mr. Menendez testified that the plans are worthless without the entire set.

MLEA also claims that defendants are liable for the full purchase price of each piece of equipment listed on three purchase orders between ARR and MLEA. However, the dollar amounts listed on two of the purchase orders and the invoice for the other purchase order are merely down payments. Indeed, MLEA never even informed ARR of the full purchase price of the majority of these items before the purchase orders were requested. Therefore, MLEA's recovery is limited to the amounts listed on the purchase orders, not the full purchase prices.

## II.   FACTUAL BACKGROUND

### A.   RTG's And ARR's Business

RTG is a provider of tire recycling services throughout North America, through a network of collection, transfer and manufacturing subsidiaries and facilities. ARR is one of these subsidiaries.[1] RTG collects used/scrap rubber tires, transfers them to one of its recycling sites and manufactures crumb rubber and other rubber-derived products from the tires.

RTG and its subsidiaries utilize a patented and unique commercial process to recycle the used tires. *See* Deposition Transcript of Richard Kelley, October 15, 2003, attached hereto as Exhibit "B," at 66-74 ("Exhibit "B," Kelley Transcript"). First, the scrapped tires are transported

---

[1] ARR is a separate corporate entity, formed under the laws of Nova Scotia, Canada. [Complaint, ¶3; Answer and Affirmative Defense of Defendants Recovery Technologies Group, Inc. and Atlantic Recycled Rubber, Inc. and Counterclaim of Recovery Technologies Group, Inc., ¶3]. ARR is a wholly–owned subsidiary of Recovery Technologies Canada, Inc. ("RTI – Canada"). *See* Deposition Transcript of James Bohlig, October 27, 2003, attached hereto as Exhibit "A," at 22-23 ("Exhibit "A," Bohlig Transcript"). RTI – Canada is not a party to this lawsuit.

to RTG processing facilities.  *Id.* At these locations, the scrap tires are  shredded into much

smaller pieces, then frozen in liquid nitrogen cryogenic chambers, and finally, the frozen rubber

pieces are "hammered" into "crumbs" of various sizes.  *Id.*  The crumb rubber is then sold to

manufacturers for use in the fabrication of a number of different items, *i.e.*, playground and

running track surfaces, shoe soles, carpet underlay, and tires.  *Id.*

**B.**    **RTG-Casella Relationship**

Casella is a regional solid waste services company that provides collection, transfer,

disposal and recycling services to residential, industrial and commercial customers, primarily in

the eastern United States.

In December 1999, Casella acquired KTI, Inc., as well as certain of its subsidiaries,

including various tire recycling assets and commercial recycling facilities.  *See* Exhibit "A,"

Bohlig Transcript, at 12-15.   RTG was formed by Casella in July 2000 to consolidate the newly

acquired tire recycling assets of Casella (formerly of KTI).  *See* Exhibit "A," Bohlig Transcript,

at 17-18, 19-20.  RTG and its subsidiaries (including ARR) focused on the collection,

processing, and recycling of scrap tires into rubber-derived products, and operated as separate

and independent companies during the brief time they were Casella subsidiaries.[2]  *See* Exhibit

"A," Bohlig Transcript, at 17-18, 19-20.

**C.**    **Factual Background**

In the summer of 2000, ARR began to transform its traditional tire-recycling operation in

Truro, Nova Scotia, Canada (the "Truro facility") into a cryogenic facility using RTG's

technology.  *See* Exhibit "B," Kelley Transcript, at 40-41, 64-65.   However, to utilize the

cryogenic procedure, ARR was required to purchase, and ship, liquid nitrogen for the Truro

---

[2] In August 2001, Casella sold 80.1% of its interest in RTG and its affiliates, including ARR, to Crumb Rubber Investors Co., LLC as part of Casella's divestiture of its tire recycling business.  *See*  Exhibit "A," Bohlig Transcript, at 26-27.

facility from a vendor in Maine.  *Id.* at 44-45.  The shipment of liquid nitrogen to Truro was cost-prohibitive, and ARR began to investigate more cost-efficient methods to supply liquid nitrogen for the Truro facility.  *Id.  See also* Deposition Transcript of Steven Benison, October 14, 2003, attached hereto as Exhibit "C," at 47 ("Exhibit "C," Benison Transcript").  One option was to have a plant built on-site that would produce liquid nitrogen for use in the Truro facility.  *See* Exhibit "B," Kelley Transcript, at 57.

Messer Advanced Gas Systems, Inc. ("Messer") (predecessor to plaintiff MLEA),[3] through its consultant, George Timberlake, submitted a written offer to construct such a plant in August 2000.  *See* Deposition Transcript of George Timberlake, November 18, 2003, attached hereto as Exhibit "F," at 18-19, 20-21 ("Exhibit "F," Timberlake Transcript).  Messer submitted a revised offer on September 13, 2000.  *See* Exhibit "G" attached hereto.  Realizing the necessity of third-party financing to this project, the offer letter from Mr. Timberlake stated, falsely, that a lease had already been  "arranged . . . through National Fleet Leasing, . . .."  *See* Exhibit "G."  As will be shown below, that lease financing was never obtained by MLEA.

RTI – Canada responded to the September 2000 offer that same day.  *See* Exhibit "H" attached hereto.  In its response, RTI – Canada stated that "this purchase is contingent on the completion of a leasing agreement and acceptance by Canadian and Local authorities."  *Id.* (emphasis added).  *See also* Deposition Transcript of Manuel Menendez, August 15, 2003, attached hereto as Exhibit "I," at 103 ("Exhibit "I," Menendez Transcript") (acknowledging that turnkey contract was contingent on lease); Exhibit "F," Timberlake Transcript, at 43 (same); Deposition Transcript of Theodore DelGaizo, August 27, 2003, attached hereto as Exhibit "J," at 101-02 ("Exhibit "J," DelGaizo Transcript") (same).

---

[3] As will be described more fully below, in January 2001, Messer AGS (now Generon IGS, Inc.) assigned the Truro project to Engineered Gas Systems ("EGS"), a subsidiary of MLEA, Inc.  *See* Exhibits "D" and "E."

RTG also stated on several occasions during these early negotiations that it did not wish to own or manage any plant built for its Truro facility. *See* Deposition Transcript of Martin Sergi, November 14, 2003, attached hereto as Exhibit "K," at 118-19, 147-48 ("Exhibit "K," Sergi Transcript"); Exhibit "J," DelGaizo Transcript, at 85-86. Rather, ARR would consent to having a plant built on-site, but operated by an outside vendor.

The parties exchanged numerous draft contracts is September and October 2000, but no agreement was ever executed by any defendant. *See* Exhibit "I," Menendez Transcript, at 73; Exhibit "J," DelGaizo Transcript, at 33-34, 92; Exhibit "F," Timberlake Transcript, at 50. *See also* Trial Transcript from *Generon IGS, Inc. v. Engineered Gas Systems, LLP, et al*., Court of Common Pleas, Chester County, September 22–23, 2003, attached hereto as Exhibit "L," at 149, 152-53, 174, 186 (in a related case, Messrs. DelGaizo and Menendez repeatedly testified that neither ARR nor RTG ever entered into a formal turnkey contract with Messer, MLEA or EGS). In October 2000, RTI – Canada circulated a Request for Proposal ("RFP") to a number of gas and energy companies requesting bids for the supply of liquid nitrogen to the Truro facility. A copy of the RFP sent to Messer is attached hereto as Exhibit "M."

RTI – Canada received at least three responses to the RFP, but ARR continued to negotiate with Messer. However, several major stumbling blocks prevented the parties from reaching agreement, including the size of the plant, Messer's insistence that ARR purchase the plant after construction, and Messer's inability to obtain suitable lease financing. *See, e.g.,* Exhibit "C," Benison Transcript, at 42-43, 126-27 (parties were debating size of the plant in Fall 2000). Indeed, on November 20, 2000, George Timberlake admitted, for the first time, that Messer was having a "great deal of trouble" with the lease. *See* Exhibit "N." Messer then

6

requested that RTG agree to purchase certain "long lead and critical use items" so that the suggested timetable for construction would be protected. *Id.*

On December 1, 2000, upon Messer's request, ARR issued Purchase Order No. 715258 to Messer for three items: a cryogenic storage vessel, a feed breaker, and a transformer. *See* Exhibit "O". The letter from ARR accompanying the purchase order clearly stated that the equipment would be returned to Messer if the lease did not proceed. *See id.* ("Should the lease not proceed, this equipment may and will be returned to Messer for full credit.").

Similarly, on December 12, 2000, ARR issued two more purchase orders (nos. 715260 and 715261) (the "second purchase orders") to fund down payments on certain other equipment necessary for construction of the plant. *See* Exhibit "P" (Purchase Orders Nos. 715260 and 715261). Again, the letter accompanying these purchase orders made clear that the equipment would be returned to Messer for full credit if the lease did not proceed. *See id.*

In January 2001, Messer assigned control and responsibility for the Truro project to EGS.[4] *See* Exhibits "D" and "E." As part of the transfer of the Truro project, EGS hired a number of former Messer employees who had been working on the project for Messer. *See* Exhibit "I," Menendez Transcript, at 8-10, 12-13, 39-40.

In or around late February 2001, RTG requested that Rick Kelley, a Casella employee, assist ARR with the negotiations relating to the Truro project because he had experience with gas and energy companies. *See* Exhibit "B," Kelley Transcript, at 106.[5] Until this time, representatives of ARR alone had negotiated with EGS and had acted without Casella's

---

[4] EGS was formed in January 2001 as a subsidiary of Main Line Engineering Associates of Exton, Pennsylvania ("Main Line Engineering") to assume responsibility for the Truro project. *See* Exhibit "I," Menendez Transcript, at 8-10; Exhibit "J" DelGaizo Transcript, at 20-24. Messer was disbanding the division of its company handling the Truro project, and EGS was formed by a number of former Messer employees. *Id.* MLEA, Inc. was incorporated as the parent company of both EGS and Main Line Engineering in January 2002. *Id.* EGS and Main Line Engineering are now divisions of MLEA. *Id.*

[5] Mr. Kelley is now an employee of RTG. *See* Exhibit "B," Kelley Transcript, at 11-13.

supervision or direction.  *See* Exhibit "I," Menendez Transcript, at 89-90, 99 (never dealt with a Casella employee until Rick Kelley got involved in February 2001); Exhibit "J," DelGaizo Transcript, at 114-17.  By the time Mr. Kelley became involved, EGS had already issued purchase orders to vendors for the equipment for which it is now seeking damages.  *See* Exhibit "Q."  *See also* Exhibit "I," Menendez Transcript at 36-37.

In his first correspondence to Mr. Kelley regarding the Truro project, Mr. Timberlake admitted that EGS's "<u>first problem . . . is that we do not have an order for the plant in Nova Scotia</u>."  *See* Exhibit "R" (emphasis added).  Mr. Timberlake also admitted that EGS had not even applied for the necessary lease yet, and that EGS was "<u>way over-committed</u>."  *Id.* (emphasis added).

Over the next several months, EGS continued to attempt to negotiate a contract with ARR.  *See* Exhibit "I," Menendez Transcript, at 46-48; Exhibit "F," Timberlake Transcript, at 62-63, 68.  However, the parties did not reach an agreement on many of the essential terms, such as the size of the plant and the warranties.  *Id.* and Exhibit "R."[6]  Although the parties never reached agreement, EGS continued to order equipment and perform engineering and design work without ARR's, RTG's or Casella's knowledge.[7]

RTI – Canada paid EGS $100,750.00 on March 9, 2001 as payment for EGS's January 25, 2001 invoice for $100,750.00.  *See* Exhibit "T" (copy of RTI – Canada check and EGS invoice).  This invoice, which was directed to ARR, corresponded to the down payments for the

---

[6] For example, EGS continued to propose a 30-ton capacity plant, even though representatives of ARR had repeatedly stated that it only needed a plant with a 15-ton capacity.  *See* Exhibit "C," Benison Transcript, at 43-44.  A 30-ton plant would have required ARR to purchase liquid nitrogen at a higher per pound price than a 15-ton plant and would have required ARR to sell the excess liquid nitrogen.  *Id.* at 43-44, 68, 108-09.  ARR consistently told EGS that it was not in the "gas-selling business", and wanted no part of a plant that would force it to sell liquid nitrogen.  *See* Exhibit "J," DelGaizo Transcript, at 85-86.

[7] For example, in addition to the items included on the purchase orders, MLEA is claiming that ARR is also liable for certain equipment worth approximately $15,000 that was never included on the purchase orders.  *See* Exhibit "S."  EGS ordered the equipment from AMSCO Sales Corp.  *Id.*  This equipment was purchased without ARR's knowledge, and was not listed on ARR's purchase orders to EGS.  *See* Exhibit "I," Menendez Transcript, at 32.

8

feed breaker and transformer, and purchase and installation of the storage tank from the first purchase order. *Id.*

In April 2001, plaintiff admitted that "[t]here never was a written contract or signed purchase order for the entire facility between Messer or Generon and ARR" in a letter to MG Generon, one of its vendors. *See* Exhibit "U". EGS further admitted that "[s]ince January [2001], we have finished the facility design and have ordered essentially all the equipment <u>in spite of the fact that we have yet to obtain a written contract or signed PO for the facility</u>, and have been paid on only the smaller of the two initial POs." *Id.* (emphasis added). Mr. DelGaizo also admitted that the "[Truro] project . . . has collapsed." *Id.*

During the spring and summer of 2000, EGS continued to send ARR drafts contracts. On at least one occasion, in April 2001, EGS forwarded an executed copy of a proposed contract to RTG. *See* Exhibit "V", at 17. None of these proposals were ever agreed to or signed by RTG or ARR. Nor were any of these proposals ever directed to Casella. EGS continued to negotiate with RTG through April 2002.

## III.    <u>LEGAL ARGUMENT</u>

### A.    <u>The Standard For Granting Summary Judgment</u>

Summary judgment is proper where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Adena, Inc. v. Cohn*, 2002 WL 1832839, Civ. A. No. 00-3041 (E.D. Pa. Aug. 7, 2002) (McGirr Kelly, S.J.). As this Court has explained, Rule 56 "requires the entry of summary judgment 'after adequate time for discovery . . . . against the party who fails to make the showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the non-moving party "to do more than simply show that there is some metaphysical doubt as to the material fact." *Bailey v. United Airlines, Inc.*, 101 F. Supp. 2d 311, 315 (E.D. Pa. 2000) (Reed, S.J.) (*citing, Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). To meet this burden, the non-moving party may not rely merely upon bare assertions, conclusory allegations, or suspicions, *Id.* (*citing, Fireman's Ins. Co. v. Du Fresne*, 676 F.2d 965, 969 (3d Cir. 1982)).

Although the movant has the initial burden of demonstrating the absence of a genuine issue of material fact, the non-movant must then establish the existence of each element on which it bears the burden of proof. *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir. 1990) (citing *Celotex*, 477 U.S. at 323). The non-moving party may not rest on his pleadings but must come forward with competent evidence from which a reasonable jury could return a verdict in his favor. *Anderson*, 477 U.S. at 248.

### B.   <u>Applicable Law</u>

It is undisputed that the parties never entered into a turnkey contract. Accordingly, no express choice of law provision exists in this lawsuit. Various drafts of the proposed contract included choice of law provisions for the laws of Nova Scotia, Pennsylvania and New York.

Pennsylvania courts apply a hybrid conflict of interest analysis, which combines the approach of the Restatement (Second) of Conflict of Laws, known as the "most significant relationship" test, and the theory known as "governmental interest analysis." *Celebre v. Windsor-Mount Joy Mutual Ins. Co.*, 1994 WL 13840, No. Civ. A. 93-5212, at *2 (E.D. Pa. Jan.

14, 1994) (Cahn, J.). The object of this analysis is to "determine which jurisdiction has the greater interest in the application of its law." *Teledyne Techs. Inc. v. Freedom Forge Corp.*, No. 3398 May Term 2000, 2002 WL 748898, at \*4 (Phila. CCP April 19, 2002) (citations omitted).

In a contract action, courts review the following factors: place of contracting, place of negotiations, place of performance, where the subject matter of the contract is located and the place of incorporation and place of business of the parties. *Benevento v. LIFE USA Holding, Inc.*, 61 F. Supp.2d 407, 414-15 (E.D. Pa. 1999) (Joyner, J.). Based on these factors, as well as Pennsylvania's interest in protecting its corporate entities, such as MLEA, for purposes of this motion only, Casella assumes that Pennsylvania law would apply.

### C.    Casella Is Not Liable For Any Damages In This Lawsuit

MLEA's claim that Casella can be held liable for any alleged liability of ARR is directly contrary to governing Pennsylvania law, which provides that piercing the corporate veil is an extraordinary remedy that should be invoked only when justice permits no other alternative.

Both this Court and the Supreme Court of Pennsylvania have repeatedly explained that piercing a corporation's veil is an extraordinary remedy reserved for the exceedingly rare situation in which the existence of the corporate form was used to defraud, and justice demands the remedy's invocation. *Ziegler v. Delaware County Daily Times*, 128 F. Supp.2d 790 (E.D. Pa. 2001) (Dalzell, J.) ("In Pennsylvania, there is a strong presumption against piercing the corporate veil."); *Lumax Indus., Inc. v. Aultman,* 669 A.2d 893, 895 (Pa. 1995) (same); *Sams v. Redevelopment Auth.,* 244 A.2d 779, 781 (Pa. 1968) ("The corporate entity or personality will be disregarded only when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime."). *Compare United States v. Best Foods*, 524 U.S. 51, 55-56 (1998) (holding a parent liable for the actions of a subsidiary is the exception rather than the rule). Under Pennsylvania law, a subsidiary is generally regarded as a "separate and independent

entity" from the parent corporation. *Commonwealth v. Vienna Health Prods., Inc.*, 726 A.2d 432, 434 (Pa. Commw. 1999). Accordingly, a parent corporation is not generally liable for the contractual obligations of a subsidiary, even if the parent wholly owns the subsidiary. *Quandel Group v. Chamberlin Co., Inc.*, Civ. A. No. 98-5762, 1999 WL 386602, at *2 n. 1 (E.D. Pa. June 14, 1999) (Waldman, J.) (citing *Botwinick v. Credit Exch., Inc.*, 213 A.2d 349, 353 (Pa. 1965)).

Pennsylvania law allows the corporate form to be disregarded in limited situations where there is gross undercapitalization of the subsidiary, failure to adhere to corporate formalities, substantial intermingling of various corporate affairs, and the use of the corporate form to perpetrate a fraud. *Saint Joseph Hosp. v. Berks County Board of Assessments*, 709 A.2d 928 (Pa. Commw. 1998) (citations omitted). None of these factors applies here. Other factors that are relevant under Pennsylvania law to establish alter-ego liability include: non-payment of dividends; siphoning of funds from subsidiary by dominant shareholders; non-functioning of other officers and directors; and absence of corporate records. *Lumax*, 669 A.2d at 895.

The reason why piercing a corporation's veil is limited to the exceptional case is obvious. A principal goal of organizations that operate using the corporate form is to limit the corporation's liability to the assets that are invested in the corporation. Indeed, in *Wedner v. Unemployment Compensation Bd. of Review*, 296 A.2d 792, 794-95 (Pa. 1972), the Pennsylvania Supreme Court quoted with approval from a ruling of the U.S. Court of Appeals for the Third Circuit that stated:

> In applying this test [for piercing the corporate veil], however, any court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception. . . . . Care should be taken on all occasions to avoid making the entire theory of the corporate entity * * * useless.

*Id.* at 795 (citing *Zubik* v. *Zubik,* 384 F.2d 267, 273 (3d Cir. 1967), *cert. denied,* 390 U.S. 988 (1968)) (internal quotations omitted).

12

Additionally, the law recognizes that the corporate veil may more readily pierced when involuntary creditors are involved than when the claims of voluntary creditors are at stake. *See, e.g., Miners, Inc.* v. *Alpine Equip. Corp.,* 722 A.2d 691, 695 (Pa. Super. 1998) (recognizing this distinction between voluntary and involuntary creditors), *alloc. denied,* 745 A.2d 1223 (Pa. 1999). An example of an involuntary creditor of a corporation is someone who has a tort claim against the company as the result of having been injured by the company's allegedly negligent business practices.  For example, someone who is injured in a collision with a truck would qualify as an involuntary creditor of the trucking company. An example of a voluntary creditor, by contrast, is someone who voluntarily agrees to enter into a contractual relationship with a trucking company. Such a voluntary creditor has the option to choose both whether and with whom to contract, and voluntary creditors can require that a debtor provide security for the debt. MLEA is undoubtedly a *voluntary* creditor in this case.

A plaintiff bears the burden of proof, and must meet a very high threshold, in order to establish that the court should pierce the corporate veil.  *See Garden State Tanning, Inc. v. Mitchell Mfg. Group, Inc.*, 55 F.Supp.2d 337, 344 (E.D. Pa. 1999) (Katz, S. J.).  The parent must be shown to have a complete domination of not only finances, but of policy and business practice with respect to the transaction.

The principal issue presented in this case could not be more straightforward.  In the fall of 2000, MLEA attempted to enter into a turnkey contract with defendant ARR.  *See* Exhibit "J," DelGaizo Transcript, at 28-29, 101, 104.   Additionally, plaintiff, although aware that RTG, and possibly Casella, were located up the corporate ladder, chose to contract with ARR.  *See* Exhibit "F," Timberlake Transcript, at 178-79 (admitted that he knew that ARR and RTG were wholly-owned subsidiaries of Casella, and that Casella did not guarantee any action by ARR or RTG);

13

Exhibit "L," Trial Transcript, at 146-47, 181 (Messrs. Menendez and DelGaizo testified that they knew ARR was a subsidiary of RTG). Further, MLEA accepted the purchase orders from ARR alone on two separate occasions, and did not request a guarantee or any other acknowledgement from RTG, RTI – Canada or Casella. *Id.* Further, at this early stage of the negotiations, Casella was not involved in this project. *See* Exhibit "B," Kelley Transcript, at 31 ("Casella wasn't involved in the ARR programs at all.").

At the time MLEA was negotiating the proposed turnkey contract with ARR, RTI – Canada owned ARR. *See* Exhibit "W; " Exhibit "A," Bohlig Transcript, at 23. And at that same time, defendant RTG owned RTI – Canada. *Id.* Thus, Casella was essentially three rungs up the corporate ladder from ARR.

> Q. Just so I understand this chart, again, we're on the April 30, 2001 chart, does the solid line that runs from Recovery Technologies Group, Inc., to Recovery Technologies Canada, Inc., does that indicate that the Recovery Technologies Canada, Inc., is a wholly owned subsidiary of Recovery Technologies Group, Inc.?
>
> A. Recovery Technologies Canada, Inc., was held by Recovery Technologies Group, Inc., and I believe that Atlantic Recycled Rubber was wholly owned and, and held by Recovery Technologies, Canada.
>
> Q. When you said that Recovery Technologies Canada, Inc., was held by Recovery Technologies Group, Inc., did you also mean that to mean a wholly owned subsidiary of Recovery Technologies Group, Inc.?
>
> A. I, I believe that that is -- I believe that this chart attempted to reflect both organizational space as well as how the entities were actually held.
>
> Q. And so is it your understanding that the Recovery Technologies Canada, Inc., as of this date was wholly owned by Recovery Technologies Group, Inc.?
>
> A. I believe it was.
>
> Q. Same question or similar question actually. Was Recovery Technologies Group, Inc., wholly owned by Casella Waste Systems, Inc., as of April 30, 2001?
>
> A. Yes.

Exhibit "A," Bohlig Transcript, at 23-24.

Plaintiff voluntarily chose to accept the purchase orders from ARR, and plaintiff obtained in return no security from RTG, let alone RTI - Canada or Casella, to ensure payment of ARR's obligations to it.  *See* Exhibits "O" and "P."  *See also* Exhibit "F," Timberlake Transcript, at 178-79.  A plaintiff such as MLEA who has voluntarily entered into contractual relations with one company cannot be permitted to hold that company's *great-grandparent* corporation liable without having demonstrated any evidence whatsoever to justify piercing the corporate veil of that corporation.

Pennsylvania law does not permit plaintiff to hold Casella liable simply because its corporate "great-grandchild", ARR, may have owed money to the plaintiff.  No facts warrant piercing the corporate veil to reach RTG, let alone Casella.  Accordingly, this Court should grant Casella's motion for summary judgment and dismiss MLEA's claims against defendant Casella in their entirety.

**D.    MLEA Is Not Entitled To Damages Flowing From Its Preparation Of Engineering Plans/Drawings**

MLEA claims that defendants breached a contract  for MLEA to "create plans, including foundation plans, and equipment specifications for the Truro Facility."  [Complaint, ¶18]. Plaintiff further claims that defendants owe $234,050.00 and $81,864.00, respectively, for these so-called "design/specifications/drawings" and "process design/specifications," that were completed by MLEA.  *See* Exhibit "S."  However, neither ARR nor RTG ever authorized or agreed to MLEA's design of these plans.  As Casella was not involved in the project at that point, as described above, it could not have given approval to prepare these engineering plans.

MLEA also claims that it can somehow recover from defendants for these engineering plans based on the equitable theories of promissory estoppel and unjust enrichment.   Plaintiff cannot recover on either theory, as will be shown below.

15

1.      **The Parties Never Entered Into Any Agreement Regarding The
Engineering Plans**

MLEA cannot recover for the engineering plans under a breach of contract theory
because no contract or agreement ever existed between the parties regarding these plans.  Indeed,
Manuel Menendez, one of MLEA's owners and its Vice-President of Engineering, has testified
that no one from ARR or RTG "ever agree[d] to pay for the services that went into" the
engineering plans.  *See* Exhibit "I," Menendez Transcript, at 93-94.

It is black letter law that in order to form an enforceable contract, there must be an offer,
acceptance, consideration or mutual meeting of the minds.  *See Jenkins v. County of Schuylkill*,
658 A.2d 380, 384 (Pa. Super. 1995) (citing cases).   A breach of contract claim requires proof
that the defendant breached a duty imposed under the contract, and further proof of actual loss
resulting from the defendant's alleged breach.  *See, e.g., Corestates Bank, N.A. v. Cutillo*, 723
A.2d 1053, 1058 (Pa. Super. 1999) (claim for breach of contract must be established by pleading
(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the
contract and (3) resultant damages).

Under Pennsylvania law, contracts are enforceable when the parties reach a mutual
agreement, exchange consideration, and set forth the terms of their bargain with sufficient
clarity.  *See SDK Investments, Inc. v. Ott*, No. Civ. A. 94-111, 1996 WL 69402, at *6 (E.D. Pa.
Feb. 15, 1996) (Giles, J.).  Similarly, "the test for enforceability of an agreement is whether both
parties have manifested an intention to be bound by its terms and whether the terms are
sufficiently definite to be specifically enforced."  *Channel Home Ctrs. v. Grossman*, 795 F.2d
291, 298-99 (3d Cir. 1986) (relying on and citing Pennsylvania cases).  This is clearly not the
case here.

Indeed, all three of MLEA's witnesses concur that the parties never agreed to the terms of any turnkey contract. *See* Exhibit "I," Menendez Transcript, at 73; Exhibit "F," Timberlake Transcript, at 189 ("I didn't believe that we had an order for a turnkey plant."); Exhibit "J," DelGaizo Transcript, at 33-34. Moreover, two of these principals, Messrs. Menendez and DelGaizo, testified during trial in a related case that ARR did not sign a turnkey contract with Messer, MLEA or EGS. *See* Exhibit "L," Trial Transcript at 149,152-53, 174. In fact, under questioning from the Honorable Jacqueline C. Cody, Mr. DelGaizo admitted that MLEA accepted the transfer of the Truro project from Messer knowing that "there was no signed contract for this [Truro] project." *Id.* at 174-75.

Plaintiffs have also repeatedly admitted that the parties reached no agreement regarding the engineering plans:

> Q.   Your counsel has produced with you today what we've marked as DelGaizo-1, 2 and 3 which are construction drawings and some specifications. . . . **Did anyone from ARR or RTG ever agree to pay for the services that went into those drawings --**
>
> A.   **No.**
>
> Q.   **-- or specifications?**
>
> A.   **No, but the point is without doing this work, you can't really order the equipment**. I mean,  in other words, until you know a lot of this information, including the specifications which you go out with on the purchase order, you know, you just can't order that in a vacuum, so there's a certain amount of this work that has to go on just to buy the equipment.
>
> Q.   When you talk about buying the equipment, are you referring to the equipment that was the subject of the purchase orders that were sent out in December and January?
>
> A.   Yes.  Right.
>
> * * * * *
>
> Q.   **At the time that you did the foundation drawings, was there an agreement by RTG or ARR to pay for your services in making those drawings**?
>
> A.   **No.**

17

Exhibit "I," Menendez Transcript, at 93-96 (emphasis added).  Mr. DelGaizo also admitted that

no one from ARR or RTG ever agreed to pay for the services that went into the engineering

plans.  *See* Exhibit "J," DelGaizo Transcript, at 93-94.

Accordingly, there is no basis for a breach of contract claim regarding MLEA's claim for

damages as to the "engineering plans," and MLEA's claim for recovery of the engineering plans

should be dismissed.

### 2.    No Defendants Made Any Promise Regarding The Engineering Plans

MLEA also asserts that defendants are liable to pay for the engineering costs based on a

promissory estoppel theory.

A cause of action for promissory estoppel arises when a party relies on a promise which

could be reasonably be expected to influence the action or forbearance of a party.  *See Murphy v.*

*Burke*, 454 Pa. 391, 398 (1973) (applying the principles of the RESTATEMENT (SECOND)

CONTRACTS §90);  *Rinehimer v. Luzerne Cty. Com. College*, 539 A.2d 1298, 1306 (Pa. Super.

1988).

In Pennsylvania, to support a claim based on promissory estoppel, the plaintiff must show

that:

> 1) the promisor made a promise that he should have reasonably expected to
> induce action or forbearance on the part of the promisee;
>
> 2) the promisee actually took action or refrained from taking action in reliance
> on the promise; and
>
> 3) injustice can be avoided only by enforcing the promise.

*Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000).  To recover under the theory of

promissory estoppel a <u>plaintiff must allege an express promise</u>.  An implied promise is

insufficient to support a claim for promissory estoppel. *Constar, Inc. v. National Distribution Center, Inc.*, 101 F.Supp.2d 319, 324 (E.D. Pa. 2000) (R. Kelly, J.) (applying Pennsylvania law).

MLEA admits that neither Casella, nor RTG, ever expressly promised EGS to pay for the engineering plans, or to enter into a binding contract for their completion. Indeed, the two MLEA employees who primarily dealt with ARR during the relevant time period admit that their first dealings with Casella came in late February or early March 2001. *See* Exhibit "I," Menendez Transcript, at 43, 90, 99; Exhibit "F," Timberlake Transcript, at 49-50, 67-68. *See also* Exhibit "B," Kelley Transcript, at 95-96. The engineering plans were completed by that date. *See* Exhibit "I," Menendez Transcript, at 93.

Casella was not involved in these negotiations until February 2001, and, even then, only on a very limited basis. EGS had already ordered the equipment at issue in this litigation by that time, and had mostly completed the engineering and design work. Moreover, no Casella employee ever made any promise that MLEA can claim to have relied on to its detriment.

### 3.    Casella Was Not Unjustly Enriched By MLEA's Services

MLEA also claims that it should be rewarded for its engineering services under a theory of unjust enrichment.

Pennsylvania law provides that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to another." *D.A. Hall Co. v. Clevertrust Realty Investors*, 573 A.2d 1005 (Pa. 1990) (citing RESTATEMENT OF RESTITUTION § 1). To assert an unjust enrichment claim, a plaintiff must allege that (1) it conferred a benefit on the defendant, (2) the defendant appreciated the benefit, and (3) it would be inequitable for the defendant to accept and retain the benefit without paying the plaintiff for the value of the benefit conferred. *Styer v. Hugo*, 619 A.2d 347, 350 (Pa. Super. 1993), *aff'd,* 637 A.2d 276 (Pa. 1994).

The unjust enrichment doctrine does not apply where the defendant may have benefited as a result of the actions of the plaintiff. *Meehan v. Cheltenham Township*, 189 A.2d 593 (Pa. 1963); *Ameripro Search, Inc. v. Fleming Steel Co.*, 787 A.2d 988, 990 (Pa. Super. 2001). Thus, MLEA cannot merely allege its own loss as the measure of recovery. Instead, it must demonstrate that ARR or RTG or Casella in fact benefited from these services. *See D.A. Hill*, 573 A.2d at 1009; *Meehan*, 189 A.2d at 595. MLEA cannot do this.

MLEA certainly cannot argue that Casella was enriched by MLEA's engineering plans. First, ARR never constructed any liquid nitrogen-producing plant at the Truro facility, with or without the use of MLEA's plans to construct such a plant. Moreover, Casella had no use for the engineering plans and designs completed by EGS since it had divested itself of RTG and ARR by the time the plans were delivered. *Compare supra* footnote 2 (Casella sold RTG and ARR in August 2001) *with* Exhibit "J," DelGaizo Transcript, at 8-10 (engineering plans were delivered to ARR and RTG in September and October 2001).

Further, no benefit ever could have been gained by any defendant because MLEA never delivered the entire set of the engineering plans and drawings to ARR or RTG. Indeed, Mr. Menendez testified that MLEA never delivered all of the engineering plans to ARR or RTG, and that the plant cannot be built, even now, without a full set of those plans:

> Q.    As of September 14, 2001, with the plans that were provided in January or February and these foundation drawings, could RTG or ARR have built or manufactured the plant?
>
> A.    No, not with those drawings.
>
> Q.    **What else was needed?**
>
> A.    **They needed the remainder of the detailed piping drawings.**
>
> Q.    What?
>
> A.    The piping drawings.
>
> Q.    That's a piping drawing?

A.    The piping that goes from one piece of equipment to another, the plumbing.

* * * * *

Q.    So besides the piping drawings there was a lot of other material that was not provided that was needed to build, to manufacture the plant?

MR. KATAUSKAS:  I thought the question was what was provided.

MR. MCCORMICK:  What was not provided.

THE WITNESS:  **Certain specifications were not given to them; electrical drawings, piping drawings, equipment layout** -- actually some equipment layout they did get.  That's the majority of it, that's what encompasses a design for a plan.

BY Mr. MCCORMICK:

Q.    **The material that is not provided to RTG and ARR, was that necessary to construct the plant?**

A.    **Yes**.

Exhibit "I," Menendez Transcript, at 94-96 (emphasis added).  *See also* Exhibit "J," DelGaizo Transcript, at 109 ("Again, there might have been drawings being passed back and forth for comment, but some of them have still never been delivered.  The electrical drawings are still at my place.  And the reason that they really never were delivered is they never were totally finished either.") (emphasis added).  Mr. Menendez testified that ARR could not construct the plant with the incomplete set of plans/designs provided by MLEA.  *Id.*

Thus, MLEA's own Vice-President of Engineering has admitted that (1) there never was an agreement by RTG or ARR to pay for MLEA's services in assembling the engineering plans, (2) Casella never promised to pay for the engineering plans, (3) certain plans and drawings were never delivered to ARR, and (4) the liquid nitrogen plant could not be constructed with the plans as drawn.  Accordingly, MLEA cannot recover for the cost of the engineering plans, and they must be stricken from MLEA's request for damages.

21

### E.      MLEA's Recovery Is Limited To The Amounts Listed In The Purchase Orders

Plaintiff repeatedly claims that the only written contracts that exist between the parties are the three purchase orders issued by ARR.  Two of these purchase orders and the invoice sent out by MLEA relating to the first purchase order reference only prices for down payments.  However, MLEA claims that it is owed the full purchase price for each piece of equipment.

As stated above, in order to form an enforceable contract, there must be an offer, acceptance, consideration or mutual meeting of the minds.  *See Jenkins*, 658 A.2d at 384.  "It is also well-settled that '[a]bsent a manifestation of an intent to be bound, however, negotiations concerning the terms of a possible future contract do not result in an enforceable contract."  *Id.* (citations omitted).

The first essential of any contract is the existence of a "definite and certain" promise or an offer to enter into a contract. *See GMH Assocs., Inc. v. The Prudential Realty Group*, 2000 WL 228918, at *6 (Pa. Super. Mar. 1, 2000) (citation omitted). *See Ingrassia Constr. Co., Inc. v. Walsh*, 486 A.2d 478, 484 (Pa. Super. 1984) (stating that "[a] court cannot enforce a contract unless it can determine what it is.") (quoting I A. CORBIN, CORBIN ON CONTRACTS § 95 (1963)). If the existence of an informal or oral contract is alleged, "it is essential to the enforcement of such an informal contract that the minds of the parties should meet on all the terms as well as the subject matter." *GMH Assocs.*, 2000 WL 228918, at *7.  *See also Courier Times, Inc. v. United Feature Syndicate, Inc.*, 445 A.2d 1288, 1295 (Pa. Super. 1982).  It is well-settled that since an offer to form the basis of a contract must be so complete that on acceptance an agreement is formed which contains all the terms necessary to determine whether the contract has been performed or not, there is no contract where the price is not determined.  *Butler v. Kemmerer*, 67 A. 332 (PA. 1907); *Beachler v. Mellon-Stuart Co.*, 47 A.2d 147, 149 (Pa. 1946) (price is an

22

essential element of a contract, and price must be sufficiently definite or capable of ascertainment from contract).

Applying these principles here, this Court must find that the record fails to establish that the parties had reached an enforceable agreement that ARR would pay MLEA for the entire price of the equipment.  It is undisputed that the parties had never entered into a written agreement for the turnkey project.  *See*  Exhibit "I," Menendez Transcript, at 73; Exhibit "J," DelGaizo Transcript, at 92; Exhibit "R" ("Our first problem is that we do not have an order for the plant in Nova Scotia.").  It is also undisputed that no essential terms as to the price, delivery dates or size of the plant were ever established.  *See* Exhibit "I," Menendez Transcript, at 46; Exhibit "F," Timberlake Transcript, at 186-87; Exhibit "J," DelGaizo Transcript, at 93.  Additionally, Messrs. DelGaizo and Menendez testified that the descriptions of the equipment in the ARR purchase orders were so <u>incomplete</u> that MLEA had to <u>recreate</u> them so as to order the equipment from the vendors.  *See* Exhibit "L," Trial Transcript, at 154-55, 177.

All that exist are purchase orders and invoices reflecting certain amounts for the equipment.  *See* Exhibit "L," Menendez Transcript, at 25, 29; Exhibit "F," Timberlake Transcript, at 161-63, 168-69, 177.  Even Mr. Timberlake admitted that the down payments in the second purchase orders did not correspond to any certain figure:

> These items have been evaluated to the minimum down payment for which the suppliers are willing to begin work.  <u>For example the compressors are at 20%, some items are more some are less</u>.  . . .  The total down payment for these items not including freight or installation for any of the items: $298,000. . . .  Please note that no taxes of any kind have been included.

*See* Exhibit "X" (emphasis added).  *See also* Exhibit "R" ("We do have two limited orders which together <u>constitute approximately</u> 10% of the value of the plant.") (emphasis added); Exhibit "F," Timberlake Transcript at 168-69 (admitting that there were no discussions with anyone at ARR

23

or RTG regarding entering into agreements for amounts above the down payments in the purchase orders).[8]

It is clear here that there was no meeting of the minds as to the final price and terms of the purchase orders.  The purchase orders contain full value for some items (PO no. 715258) and only down payments for other items (PO nos. 715260 and 715261).  *See* Exhibit "I," Menendez Transcript, at 25, 29.   If one were to calculate the amount listed on the purchase order as a down payment for MLEA's claimed damages it would show that the down payments listed on purchase order nos. 715260 and 715261 range from seven percent of the purchase price (membrane system) to 58% of the purchase price (electrical package/transformers).  *Compare* Exhibit "P" *with* Exhibit "S."  In addition, the EGS/MLEA invoice that corresponds to purchase order no. 715258 lists only the down payment amount as due and owing.  *Compare* Exhibit "O" and "T" (purchase order states one price, and invoice states a different price).

It is clear that there was no complete, definite purchase price for the majority of the pieces of equipment listed on the three purchase orders at issue.  Indeed, Mr. Timberlake's own letter indicates that the down payment amounts in the second purchase orders themselves do not contain any relation to the final, unknown purchase price.  *See* Exhibit "X."  Accordingly, since ARR only agreed to pay the down payment amounts, and

IV.   **CONCLUSION**

For all the foregoing reasons, defendant Casella Waste Systems, Inc., respectfully requests that the Court grant its motion for summary judgment, and dismiss the claims against Casella in their entirety.  Alternatively, Casella requests that the Court grant its motion for partial

---

[8] Additionally, Mr. Timberlake told ARR that one of the largest items, the high-pressure membrane, was in stock, and only needed to be kept on "skids" at the manufacturer, and not ordered.  *See* Exhibit "Y."  *See also* Exhibit "F," Timberlake Transcript, at 138-39.  Mr. Timberlake never told ARR that it was ordering a specially-manufactured item worth $475,000.  In fact, Mr. Timberlake never informed ARR of the full purchase price amount before the purchase orders were created.

summary judgment and (1) dismiss plaintiff's claims for damages as to the engineering plans,

and (2) limit plaintiff's damages to the amounts listed in the three purchase orders at issue.

_____
Antoinette R. Stone, I.D. No. 23464
Brian J. McCormick, Jr., I.D. No. 81437
BUCHANAN INGERSOLL PC
1835 Market Street, 14th Floor
Philadelphia, PA 19103
(215) 665-8700
(215) 665-8760 (fax)

Attorneys for Defendant Casella Waste
Systems Inc.

Dated:  February 10, 2004

## <u>CERTIFICATE OF SERVICE</u>

I, Brian J. McCormick, Jr., hereby certify that on February 10, 2004, I caused to be served a true and correct copy of the foregoing Motion for Summary Judgment via first-class mail upon the following:

Philip J. Katauskas
Pepper Hamilton LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103-2799

John F. O'Riordan
Eckert Seamans Cherin & Mellott, LLC
1515 Market Street, Ninth Floor
Philadelphia, PA 19102

_____

Brian J. McCormick, Jr.