IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| MLEA, INC., as successor in interest to | : | CIVIL ACTION |
| Engineered Gas Systems, LLP and | : | |
| Main Line Engineering Associates | : | |
| | : | NO. 02 CV 4393 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Atlantic Recycled Rubber, Inc., et al. | : | |
| | : | |
| Defendants. | : | |

# **O R D E R**

**AND NOW**, this        day of                    2004, upon consideration of Defendant,

Atlantic Recycled Rubber, Inc.'s Motion for Summary Judgment, or, Alternatively, for Partial

Summary Judgment and any response thereto, it is hereby **ORDERED** and **DECREED** that said

Motion is **GRANTED**, and that judgment is entered in favor of Defendant, Atlantic Recycled

Rubber, Inc. and against Plaintiff on all Counts**.**

_____
                                                                                             J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MLEA, INC., as successor in interest to | : | CIVIL ACTION |
| Engineered Gas Systems, LLP and | : | |
| Main Line Engineering Associates | : | |
| | : | NO. 02 CV 4393 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Atlantic Recycled Rubber, Inc., et al. | : | |
| | : | |
| Defendants. | : | |

## DEFENDANT ATLANTIC RECYCLED RUBBER, INC. 'S MOTION FOR SUMMARY JUDGMENT, OR, ALTERNATIVELY FOR PARTIAL SUMMARY JUDGMENT

Defendant Atlantic Recycled Rubber, Inc. ("ARR"), by and through its undersigned

counsel, hereby submits this Motion for Summary Judgment, or, alternatively for partial

summary judgment for the reasons set forth in the accompanying Memorandum of Law.


Dated:  February 10, 2003                    Respectfully submitted,

                                             ECKERT SEAMANS CHERIN
                                               & MELLOTT, LLC


                              By:    _____
                                     John F. O'Riordan, Esquire
                                     Heather E. Rennie, Esquire
                                     Attorney I.D. Nos. 59311 & 69715
                                     1515 Market Street, Ninth Floor
                                     Philadelphia, PA  19102
                                     (215) 851-8400

                                     Attorneys for Defendant
                                     Atlantic Recycled Rubber, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MLEA, INC., as successor in interest to | : | CIVIL ACTION |
| Engineered Gas Systems, LLP and | : | |
| Main Line Engineering Associates | : | |
| | : | NO. 02 CV 4393 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Atlantic Recycled Rubber, Inc., et al. | : | |
| | : | |
| Defendants. | : | |

**DEFENDANT ATLANTIC RECYCLED RUBBER, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT, OR,
ALTERNATIVELY FOR PARTIAL SUMMARY JUDGMENT**

Defendant, Atlantic Recycled Rubber, Inc., by and through its counsel, Eckert

Seamans Cherin & Mellott, LLC, hereby files this Memorandum of Law in Support of its Motion

for Summary Judgment, or, Alternatively for Partial Summary Judgment and states as follows:

**I.      INTRODUCTION**

Plaintiff MLEA, Inc., as successor in interest to Engineered Gas Systems, LLP and Main

Line Engineering Associates, (collectively "Plaintiff" or "MLEA") filed this Complaint against

ARR, Recovery Technologies Group, Inc. ("RTG"), and Casella Waste Systems, Inc. ("Casella")

alleging the failure to pay for engineering plans and certain equipment with an alleged value of

approximately $1.6 million.  MLEA seeks to recover against ARR directly on claims of alleged

breach of contract, promissory estoppel and unjust enrichment, and also seeks to impose liability

upon defendants RTG and Casella through some sort of alter ego/veil piercing theory.  Plaintiff's

claims are wholly without merit.

II.    **FACTUAL BACKGROUND**

A. **The Parties**

Plaintiff, MLEA was formed as a Pennsylvania corporation on January 1, 2002. According to the Complaint, as of January 1, 2002, Engineered Gas Systems, LLP ("EGS"), a Pennsylvania limited liability partnership, became a division of MLEA.  EGS was formed on January 1, 2001 and prior to that time, Engineered Gas Systems was a division of Messer Advanced Gas Systems ("Messer").  MLEA is the successor in interest to EGS.

Defendant, ARR is a Canadian corporation with its principal place of business in Truro, Nova Scotia, Canada.  ARR is a wholly owned subsidiary of Recovery Technologies (Canada), Inc. ("RTI–Canada"), which is not a party to this lawsuit.  RTI–Canada is a Canadian corporation with its principal place of business in Cambridge, Ontario, Canada.[1]

RTI–Canada is a wholly-owned subsidiary of Defendant, RTG.  RTG is a Delaware corporation with its principal place of business in New Jersey.

Defendant, Casella is a Delaware corporation with its principal place of business in Vermont.  Prior to September 7, 2001, RTG was a wholly-owned subsidiary of Casella.  On September 7, 2001, Casella sold an 80.1% interest in RTG to a financial investor.

RTG and its direct and indirect subsidiaries (including ARR) focused on the collection, processing, and recycling of scrap tires into rubber-derived products, and operated as separate and independent companies during the brief time they were Casella subsidiaries.[2]  (See Exh. "A," Bohlig Trans. at 17-18, 19-20).

---

[1] RTI-Canada was formerly known as KTI Recycling of Canada, Inc.

[2]  In August 2001, Casella sold 80.1% of its interest in RTG and its affiliates, including ARR, to Crumb Rubber Investors Co., LLC as part of Casella's divestiture of its tire-recycling business.  (See Exh. "A," Bohlig Trans. at 26-27).

B. **Factual Background**

In the summer of 2000, ARR began to transform its traditional tire-recycling operation in Truro, Nova Scotia, Canada (the "Truro facility") into a cryogenic facility.[3] However, to utilize the cryogenic procedure, ARR was required to purchase and ship liquid nitrogen for the Truro facility from a vendor in Maine. The shipment of liquid nitrogen to Truro was cost-prohibitive, and ARR began to investigate more cost-efficient methods to supply liquid nitrogen for the Truro facility. One option was to have a plant built on-site that would produce liquid nitrogen for use in the Truro facility.

In response to informal discussions between Messer (predecessor to plaintiff MLEA)[4] and ARR, Messer, through its then-consultant and salesman, George Timberlake, submitted a written offer to construct such a plant in August 2000. (See Deposition Transcript of George Timberlake attached hereto as Exh. "D," at 18-19, 20-21).

Realizing how important RTI-Canada considered third-party financing through a leasing agreement, Messer sent RTI-Canada a September 13, 2000 revised offer letter in which salesman Timberlake stated that it had already "arranged a lease through National Fleet Leasing, . . .." (See Exh. "J" attached hereto). As will be shown below, Timberlake's statement was false (see Exh. "D", Timberlake Trans.) and that lease financing was never put in place. (See Exh. "G" Cohen Decl. at ¶ 5)

RTI-Canada responded to Messer's September 13, 2000 letter indicating that it was the intent of RTI-Canada to accept Messer's proposal for the Plant if and only if an operating

---

[3] ARR (formerly known as Atlantic Trucking and Lime Spreading Limited) was purchased by KTI Recycling of Canada, Inc. in June 2000. (See Exh. "E," Wetzel Trans. at 19-22).

[4] As will be described more fully below, in January 2001, Messer assigned the ARR Truro project to Engineered Gas Systems ("EGS"), a subsidiary of MLEA, Inc. (See Exhs. "R" and "U").

lease agreement could be worked out and the Canadian and local authorities agreed to the construction of the Plant.  (See Exh. "K").

Beginning in October 2000, Messer began attempting to make arrangements for the operating lease with National Fleet Leasing which Timberlake had represented was already approved.  (See Exh. "J").  By his letter of November 20, 2000, Timberlake represented that Messer was having difficulty getting information for the envisioned lease and that the "lease approval cycle" would take up more time.  (See Exh. "D", Timberlake Trans. at 148-49, 153-54). Timberlake, therefore, requested that a purchase order be issued for the purchase of "long lead and critical use items" in the amount of $155,000, which was the total purchase price for those items.  The items Timberlake requested that a purchase order be issued for included: (1) a feed breaker; (2) a transformer and (3) a cryogenic storage tank.  (Id. at 154).  In his November 20th letter, Timberlake agreed that Messer would buy back the items described in his letter at the same price as soon as the lease was approved and that the items would then be included in the lease.  (Id.)

On December 1, 2000, in reliance on Mr. Timberlake's representations about having difficulty getting information for the lease and the resulting delay, ARR issued purchase order #715258 with the stipulations that: (1) the items identified in that purchase order would be re-purchased by Messer when the system lease was approved; (2)  that payment of the purchase order would be from the proceeds of the lease; and (3) ARR could return the equipment to Messer for full credit in the event that ARR and Messer did not proceed with the lease.  Id.  (See December 1, 2000 letter and purchase orders; Exh. "O"; Exh. "H", Meckert Decl. at `. "I"; Riordan Decl. at 7-9).  At that point, Timberlake fully understood that ARR was the customer

and the entity with which he was transacting business.  (See Exh. "D", Timberlake Trans. at 159-60).

By his letter of December 11, 2000, Timberlake again represented that Messer was having difficulty getting information for the envisioned lease and that the "normal lease cycle" would "jeopardize [ARR's] April target date."  (See Exh. "D", Timberlake Trans. at 160-61; December 11, 2000 letter, Exh. "P").  Timberlake, therefore, requested that a "second temporary equipment order" be issued for a down payment of $298,000 on various items identified in his letter.  Timberlake never suggested in his letter and never mentioned in any discussion with any ARR representative the idea that he was proposing that either ARR or RTG pay any amount other than the $298,000.  (See Exh. "D", Timberlake Trans. at 167-69; Exh. "I", Riordan Decl., ¶ 10; Exh. "H", Meckert Decl. at 15)  This purchase order was intended to be a "stop-gap measure to allow for the Lease Agreement later on."  (See Exh. "D", Timberlake Trans. at 168-169).  Indeed, in sending his December 11th solicitation, it was Timberlake's intention to secure nothing other than a purchase order for $298,000.  (Id. at 164-65).

In his December 11th letter, Mr. Timberlake agreed that if the proposed $298,000 purchase order issued, Messer would buy back the items described in his letter at the same price as soon as the lease was approved and that the items would then be included in the lease.  (See Exh. "P")  In reliance on Timberlake's December 11th representations about having difficulty getting information for the lease, and that the "normal lease cycle" would "jeopardize our April target date" and that the amount of the purchase order was limited to $298,000, ARR issued purchase orders 715260 and 715261 with the stipulations that: (1) the items identified in that purchase order would be re-purchased by Messer when the system lease was approved; (2)  that payment of the purchase order would be from the proceeds of the lease; and (3) ARR could

return the equipment to Messer for full credit in the event that ARR and Messer did not proceed with the lease. (See Exh. "I", Riordan Decl. at ¶ 12; Exh. "H", Meckert Decl. at ¶ 11).

Timberlake thereafter represented that the leasing company had objected to the stipulation that Messer purchase back the equipment identified in his December 11th letter. (See Exh. "I", Riordan Decl. at ¶¶ 13-14; Exh. "H", Meckert Decl. at ¶¶ 12-13). ARR representatives, John Riordan and Bill Meckert, discussed this issue and relying solely upon the truthfulness of Timberlake's representations about the objections of the leasing company to the Messer purchase stipulation to purchase orders 715260 and 715261, requested that Steve Benison, ARR's General Manager, remove the stipulations that Messer purchase back the equipment identified in his December 11th letter. Id. ARR acted upon that request and did, in fact, remove those stipulations. (Id.)

However, irrespective of ARR's removal of the stipulations in purchase orders 715260 and 715261, Timberlake never proposed and ARR never agreed to pay any amounts over and above the $298,000 that Timberlake proposed in his December 11th letter. (Id.; see Exh. "D", Timberlake Trans. at 164-65, 167-69). Nor did Timberlake ever discuss with any ARR representative any amount other than the $298,000 in connection with his request that ARR issue the "second temporary equipment order." (Id.)

Similarly, MLEA never requested or proposed at any time that ARR pay for engineering drawings and specifications allegedly required for the ordering of the equipment in any of the above-referenced purchase orders. (See Exh. "C", Menendez Trans. at 93-94; Exh. "B", DelGaizo Trans. at 94-96; Exh. "D", Timberlake Trans. at 186-88) It is undisputed that ARR never agreed to pay for such engineering drawings.

In approximately December, 2000, Messer decided to disband its engineering division.  (See Exh. "C", Menendez Trans. at 38-41).  At that point, Timberlake, who was then neither a Messer or an EGS employee, decided that he and Messer employee, Manny Menendez, would attempt to persuade Messer to transfer the Truro project to EGS, which would operate as an affiliate of Plaintiff MLEA.   (See Exh. "D", Timberlake Trans. at 171-73)  Messer then transferred the ARR project to EGS.  (See Exh. "R").  At the same time, on January 18, 2001, EGS became a distributor for MG Generon, Inc., a wholly-owned subsidiary of Messer MG Industries, Inc.  Under the distributorship agreement, EGS was to purchase all of its requirements for membrane equipment systems from MG Generon.  (Id.)

By letter agreement dated January 19, 2001 ("Four Way agreement"), Messer, MG Generon, MLEA and ARR agreed that Messer was undergoing ownership and organizational changes, that Messer was being disbanded and that the Truro project was being transferred to EGS.  (See Exh. "U").  The Four Way agreement confirmed that the purchase orders previously issued by ARR were to be "funded by the lease, when the lease is executed" but that the financial and commercial terms would now be between ARR and EGS.  (See Exh. "U")  Signatories to this letter were ARR, MLEA, Messer and MG Generon.  RTG was not a signatory to the letter. (See Exh. "U").

Upon receiving the executed Four Way agreement, EGS proceeded to develop more formal and detailed purchase orders and engineering plans and specifications for the equipment identified in the ARR purchase orders.  EGS then placed orders with various third party vendors for the purchase of that equipment.  To the extent that Plaintiff relied upon any representations in performing those engineering services, developing plans and specifications, and ordering the equipment identified in the ARR purchase orders, all of those representations were made prior to

and included Plaintiff's receipt of the Four Way agreement on January 19, 2001.  (See Exh. "B",

DelGaizo Trans. at 105-106).  Thereafter, EGS took over responsibility for the Truro project,

including the procuring of the operating lease for the Truro project.  However, because EGS,

unlike Messer, was a small, new company, EGS was unable to obtain the operating lease.

Realizing that the potential deal with ARR was falling apart due to its inability to

obtain an operating lease, EGS acknowledged in a February 27, 2001 letter that there was no

order for the Plant and that an operating lease for the Plant was always intended:

> All along it has been our plan to apply for an operating lease for
> the system and incorporate the two orders in this lease.  Therefore,
> we have intentionally kept the value of the orders small as it was
> our thinking that this was a temporary measure.  The problem is of
> course, that in our zest to hold scheduling we have way over-
> committed our company well beyond the value of the orders.

(See Exh. "V")(emphasis supplied).  At this time, EGS requested that a purchase order be issued

for the entire Plant.  Id.  EGS also requested that payment be made on the previously issued

purchase orders – orders which were supposed to be funded through a lease.  Id.  Moreover, in

response to concerns raised by ARR, RTG and Casella regarding the Plant's warranty, for the

first time, EGS indicated that the proposed Plant might not be able to meet the production

capacity of 30 tons per day.  Id.

In response, RTG paid EGS $100,750.00 on March 9, 2001 as payment for EGS's

January 25, 2001 invoice for $100,750.00.  (See Exh. "W") (copy of RTG check and EGS

invoice).  This invoice corresponded to the down payments for the feed breaker and transformer,

and purchase and installation of the storage tank that were the subject of ARR Purchase Order

#715258, the first purchase order.  Id.  ARR received delivery of the storage tank, but it did not

receive the transformer or feed breaker.  Thus, ARR had a credit of approximately

$12,400.00.

In April 2001, in a letter to MG Generon, one of its vendors, Plaintiff admitted that "[t]here never was a written contract or signed purchase order for the entire facility between Messer or Generon and ARR".  (See Exh. "Y").  EGS further admitted that "[s]ince January [2001], we have finished the facility design and have ordered essentially all the equipment *in spite of the fact that we have yet to obtain a written contract or signed PO for the facility*, and have been paid on only the smaller of the two initial POs."  Id. (emphasis added).  Mr. DelGaizo also admitted that the "[Truro] project . . . has collapsed."  Id.

On April 24, 2001 and on June 12, 2001, EGS forwarded executed copies of proposed contracts to RTG and ARR, respectively.  Neither was signed by ARR or RTG.

In late August 2001, in an attempt to provide plaintiff with some financial assistance while the parties continued to see if a deal could be reached, RTG agreed to loan EGS $150,000. (See Exh. "Z").  RTG's Counterclaim asserts that Plaintiff owes RTG more than $150,000.00 in connection with the loan that RTG made to Plaintiff – a loan memorialized by two promissory notes and a security agreement that Plaintiff duly executed. (Amended Answer And Affirmative Defenses of RTG and ARR at pp. 8-10)  The promissory notes were secured by the engineering plans, modifications thereto and the foundation drawings for the Plant (collectively the "Plans"). Plaintiff's President and CEO, Mr. DelGaizo, admitted that Plaintiff signed the two promissory notes (the "Notes") and the security agreement, and that Plaintiff received two checks for $75,000 each.  (See Exh. "B", DelGaizo Trans. at 66-67)  Pursuant to those Notes, Plaintiff agreed to pay RTG a total of $150,000 plus interest at the rate of 8%, together with all costs of collection, including attorneys' fees.  (See Notes, Exh. "Z")  According to the terms of the Notes, the Notes were deemed to be immediately due and payable upon any "Event of Default."

(<u>See</u> Notes, Exh. "Z")  The Notes defined an "Event of Default" as including "[i]f Theodore

DelGaizo shall fail to deliver a personal guarantee" of the Notes to RTG by September 5, 2001.

(<u>See</u> Notes, Exh. "Z")   DelGaizo admitted at his deposition that, despite the requirement that he

personally guarantee the Notes, DelGaizo never executed any personal guarantee of the Notes.

(<u>See</u> Exh. "B", DelGaizo Trans. at 66-67)   It is therefore undisputed that Plaintiff has not paid

all or any part of the amount due under the Notes and that Plaintiff is in default on those Notes as

a result of DelGaizo's failure to personally guarantee payment of those Notes.

EGS continued to submit proposals to RTG through early 2002, at which time it

became clear to RTG and ARR that EGS was not able to offer a Plant with acceptable terms that

would meet ARR's needs.  Accordingly, the discussions with EGS ceased and this litigation was

commenced.

## III.    <u>LEGAL ARGUMENT</u>

### A.    <u>Legal Standards</u>

#### 1.    <u>The Standard For Granting Summary Judgment</u>

Summary judgment is proper where there is no genuine issue as to any material fact, and

the moving party is entitled to judgment as a matter of law.  <u>Adena, Inc. v. Cohn</u>, 2002 WL

1832839, Civ. A. No. 00-3041 (E.D. Pa. Aug. 7, 2002) (McGirr Kelly, J.).  As this Court has

explained, Rule 56 "requires the entry of summary judgment 'after adequate time for discovery . .

. against the party who fails to make the showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at

trial.'"  <u>Id.</u> (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)).  Thus:

> To demonstrate entitlement to summary judgment, the defendant,
> as the moving party, is not required to refute the essential elements
> of the plaintiff's case.  The defendant need only point out the
> insufficiency of the plaintiff's evidence offered in support of those

> essential elements.  Once that burden has been met, the plaintiff
> must identify affirmative evidence *of record* which supports each
> essential element of his cause of action.  Therefore, in order to
> defeat a properly supported motion for summary judgment, a
> plaintiff cannot merely restate the allegations of his complaint, nor
> can he rely on self-serving conclusions unsupported by specific
> facts in the record.  Plaintiff must point to concrete evidence in the
> record which supports each essential element of his case.  If the
> plaintiff fails to provide such evidence, then he is not entitled to a
> trial and defendant is entitled to summary judgment as a matter of
> law.

Wurst v. Nestle Foods Corp., 791 F. Supp. 123, 124-25 (W.D. Pa. 1991) (citations omitted), aff'd

in part and rev'd in part w/o opin., 975 F.2d 1553 (3d Cir. 1992).

Although the movant has the initial burden of demonstrating the absence of a genuine

issue of material fact, the non-movant must then establish the existence of each element on

which it bears the burden of proof.  J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531

(3d Cir. 1990) (citing Celotex, 477 U.S. at 323).  The non-moving party may not rest on his

pleadings but must come forward with competent evidence from which a reasonable jury could

return a verdict in his favor.  Anderson, 477 U.S. at 248; Williams v. Borough of West Chester,

891 F.2d 458, 460 (3d Cir. 1989); Woods v. Bentsen, 889 F. Supp. 179, 184 (E.D. Pa. 1995).

Under this standard, ARR's motion for summary judgment should be granted.

**2.      Applicable Law**

It is undisputed that the parties never entered into a contract for a turnkey liquid nitrogen

plant.  Accordingly, no express choice of law provision exists in this lawsuit.  Various drafts of

the proposed contract included choice of law provisions for the laws of Nova Scotia,

Pennsylvania and New York.

Pennsylvania courts apply a hybrid conflict of interest analysis, which "combines the

approach of the Restatement (Second) of Conflict of Laws, known as the 'most significant

relationship' test, and the theory known as 'governmental interest analysis.'" <u>Teledyne Techs.</u> <u>Inc. v. Freedom Forge Corp.</u>, No. 3398 May Term 2000, 2002 WL 748898, at *4 (Phila. CCP April 19, 2002) (citations omitted).  The object of this analysis is to "determine which jurisdiction has the greater interest in the application of its law." <u>Id.</u>

In a contract action, courts review the following factors:  place of contracting, place of negotiations, place of performance, where the subject matter of the contract is located and the place of incorporation and place of business of the parties.  Based on these factors, as well as Pennsylvania's interest in protecting its own citizens, for purposes of this motion only, ARR assumes that Pennsylvania law would apply.

**B.      ARR Is Entitled To Summary Judgment On All Three Counts Of Plaintiff's Complaint Because Plaintiff Fraudulently Procured The ARR Purchase <u>Orders Through Timberlake's Lies and Deception.</u>**

The second two ARR purchase orders that form the basis for Plaintiff's claims in this case were procured by the fraudulent misrepresentations of Plaintiff's representative, salesman Timberlake, who falsely represented that the leasing company objected to certain stipulations in the original ARR purchase orders that would have required Messer to accept or buy-back the equipment in those purchase orders in the event that a lease was never approved.  (<u>See</u> Exh. "G", Cohen Decl. at 8-10; Exh. "H", Meckert Decl. at 12-13; Exh. "I", Riordan Decl. at 13-14)  ARR relied upon Timberlake's misrepresentations and agreed to remove those stipulations.  (<u>Id</u>.) Discovery having concluded, there are no issues of material fact regarding the falsity of Timberlake's representations, ARR's reliance on those representations or the fact of this lawsuit, which is the ongoing damage being inflicted upon Defendants as a result of Plaintiff's fraudulent scheme.

In Pennsylvania, a prima facie case of fraud is established by showing the following elements: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." See Gibbs v. Ernst, 538 Pa. 193, 647 A.2d 882, 889 (Pa. 1994). "Pennsylvania law requires 'the trial judge [to] decide as a matter of law before he submits a case to the jury whether plaintiffs' evidence attempting to prove fraud is sufficiently clear, precise, and convincing to make out a prima facie case.'" Mellon Bank v. First Union Real Estate Equity & Mortgage Investments, 951 F.2d 1399, 1409 (3d Cir. 1991)(quoting Beardshall v. Minuteman Press Int'l, Inc., 664 F.2d 23, 26 (3d Cir. 1981)). Thus, clear and convincing evidence of fraud must exist. See Tunis Brothers Co., Inc. v. Ford Motor Co., 952 F.2d 715, 731 (3d Cir. 1991).

ARR issued the original $298,000 purchase orders based upon Timberlake's representation that Messer was having difficulty getting information for the envisioned lease and that the "normal lease cycle" would "jeopardize [ARR's] April target date."  (See Exh. "M"). Relying upon those representations[5], ARR issued the purchase orders with the express stipulation that Messer would buy back the items described in his letter at the same price as soon as the lease was approved and that the items would then be included in the lease, or, in the event a lease was not approved, ARR could return those items to Messer for full credit.  (See Exh. "O").

---

[5]  As with many of Timberlake's statements, discovery revealed that this too was completely false.  At his deposition, Timberlake was questioned about his representation of a project delay due to the "normal lease cycle." (Exh. "D", Timberlake at 153-55; Exh. "N").  Timberlake conceded that he had no idea how long the lease approval cycle would take and never had any discussions with anyone from National Fleet Leasing regarding the lease approval process. (Exh. "D", Timberlake at 153-55, 161).  Incredibly, Timberlake merely offered that "[w]ell, my job was to get orders.  And since I didn't know that the approval cycle would be long or short, I would have to assume that it would be long. . .." (Id. at 153-54).  Timberlake explained that the representations in his letter were merely an effort on his part to obtain a purchase order from ARR.  (Id. at 161).

However, at that same time in December, 2000, Messer had decided to disband its AGS division which was responsible for the Truro Project. At that point, facing the prospect of unemployment, Timberlake decided to attempt to persuade Messer to transfer the project to Plaintiff and attempted to persuade DelGaizo, Plaintiff's President, to accept assignment of the ARR project. (See Exh. "D", Timberlake Trans. at 171-72). DelGaizo, however, has admitted that Plaintiff was in no position to accept Messer's obligations under the ARR purchase orders because DelGaizo "knew that I wasn't buying anything back from anybody because I didn't have the money . . .." (See Exh. "B", DelGaizo Trans. at 90).

Acting on Plaintiff's behalf, salesman Timberlake, having successfully procured two earlier purchase orders based upon representations of potential delays due to the "difficulties" with the leasing company, went back to the well one more time. (See Exhs. "M" and "P"). In an attempt to trick ARR into dropping the stipulations to the ARR purchase orders which were interfering with Plaintiff's willingness to step into Messer's shoes regarding the ARR purchase orders, Timberlake represented to ARR that National Fleet Leasing had objected to the stipulations obligating Messer to repurchase or, absent a lease, to accept return of the equipment for full credit. (See Exh. "I", Riordan Decl., ¶¶ 12-14; Exh. "H", Meckert Decl. ¶¶ 13-15). Timberlake's representations were completely false and were made for the sole purpose of inducing ARR to drop the stipulations that Plaintiff, not National Fleet Leasing, had found objectionable.

Bill Meckert and John Riordan, who were working as engineers on ARR's behalf, both provided sworn statements that Timberlake represented to them that National Fleet had objected to the stipulations in the ARR purchase orders regarding Messer's obligations. (See Id.) Both men stated that they relied upon the truthfulness of Timberlake's representations and removed

the Messer stipulations as a result.   (See Exh. "I", Riordan Decl., ¶¶ 12-14;  Exh. "H", Meckert

Decl. ¶¶ 13-15).  Mr. Meckert testified that ARR would have never removed those stipulations

but for Timberlake's representations.   (See Exh. "H", Meckert Decl., ¶ 14).  The facts uncovered

during discovery revealed that National Fleet Leasing had never raised any such objection and

that Timberlake had never even discussed those stipulations with National Fleet Leasing.

Timberlake testified that the person at National Fleet Leasing with whom he dealt was

Alan Cohen, who was then President of National Fleet Leasing.  Mr. Cohen, who now resides in

Florida, provided in a sworn statement not only that National Fleet Leasing did not object to the

Messer buy-back provision but that Timberlake never even discussed any proposed purchase

orders or buy-back conditions with National Fleet Leasing. (See Exh. "G", Cohen Decl., ¶ 8-10).

Indeed, Mr. Cohen emphasized what has become increasingly more obvious during discovery in

this case - that had Timberlake or any other prospective leasing customer informed National

Fleet Leasing of a contingent buy-back provision in a purchase order that became effective only

in the event a lease was not consummated, National Fleet Leasing certainly would not have any

objection. (Id.)

Mr. Cohen's testimony as to the complete lack of any conversation with Timberlake

regarding the ARR purchase orders and the stipulations regarding Messer's contingent

obligations as to those purchase orders is corroborated by the deposition testimony of salesman

Timberlake himself.  Timberlake testified as follows:

> Q.  And the total amount of this purchase order is for $298,000; correct?
> A.  Correct.
>
> Q.  At any point in time after these purchase orders were issued up until the
>      present time did you have any discussion with anyone from National Fleet
>      Leasing regarding those purchase orders?
> A.  Not regarding the purchase orders.

Q. From the time those purchase orders were issued until the present did you have any discussion with National Fleet Leasing about Messer's proposal to buy back that equipment from any lease that was eventually entered into?

A. No.

Q. Let me restate the last question because I misstated it. Did you have any discussion with anyone from National Fleet Leasing regarding Messer's willingness to buy back the equipment if the lease was not entered into?

A. No. See, that restriction was lifted a few days after these orders were issued.

Q. Why was the restriction lifted, if you know?

A. I don't know.

Q. Did you have any discussion with anyone from RTG or ARR regarding the lifting of that restriction?

A. I can't recall.

(See Exh. "D", Timberlake Trans. at 167-68).

Such clear, convincing and unequivocal evidence demonstrates that Plaintiff fraudulently induced ARR to remove the stipulations in its purchase orders and that but for that fraud, ARR would never have agreed to remove the stipulations that would have protected its interests if the envisioned lease was not approved. The purchase orders without the lease contingency stipulations were procured by fraud and therefore should be declared void *ab initio*. On that basis alone, ARR's Motion for Summary Judgment on Plaintiff's Claims should be granted.

**C.    If There Is A Valid Contract Between ARR and Plaintiff By Virtue of the ARR Purchase Orders, That Contract Is Limited To The $298,000 Amount Stated In Those Purchase Orders.**

The undisputed documentary evidence and deposition testimony establish that, if a valid agreement existed between ARR and Plaintiff as a result of the ARR purchase orders, that agreement was limited to the $298,000 down payment requested by Messer and accepted by ARR. (See Exs. "P" and "Q").

In order to form an enforceable contract, there must be an offer, acceptance, consideration and mutual meeting of the minds. Project Development Group, Inc. v. O.H.

16

Materials Corp., 766 F. Supp. 1348, 1352 (W.D. Pa. 1991), aff'd, 993 F.2d 225 (3d Cir. 1993).

"An offer is 'the manifestation of willingness to enter into a bargain, so made as to justify

another person in understanding that his assent to that bargain is invited and will conclude it.'"

Bergquist Co. v. Sunroc Corp., 777 F. Supp. 1236, 1248 (E. D. Pa. 1991), quoting, H. Greenberg,

Rights and Remedies Under U.C.C. Article 2, § 5.2 at 50 (1987); Reilly Foam Corp. v.

Rubbermaid Corp., 206 F. Supp.2d 643 (E.D. Pa. 2002); see also Jenkins v. County of

Schuylkill, 658 A.2d 380, 384 (Pa. Super. 1995). "Absent a manifestation of an intent to be

bound, however, negotiations concerning the terms of a possible future contract do not result in

an enforceable contract.'" Jenkins, 658 A.2d at 384. (citations omitted). See also Philmar Mid-

Atlantic, Inc. v. York St. Assocs. II, 566 A.2d 1253, 1255 (Pa. Super. 1989). See also SDK

investments, 1996 WL 69402, at *6.

    The first essential element of any contract is the existence of a "definite and certain"

promise or an offer to enter into a contract. See GMH Assocs., Inc. v. The Prudential Realty

Group, 2000 WL 228918, at *6 (Pa. Super. Mar. 1, 2000); (See Ingrassia Constr. Co., Inc. v.

Walsh, 486 A.2d 478, 484 (Pa. Super. 1984) (stating that "[a] court cannot enforce a contract

unless it can determine what it is") (quoting I A. CORBIN, CORBIN ON CONTRACTS § 95 (1963)).

If the existence of an informal or oral contract is alleged, "it is essential to the enforcement of

such an informal contract that the minds of the parties should meet on all the terms as well as the

subject matter."[6] GMH Assocs., 2000 WL 228918, at *7. See also Courier Times, Inc. v. United

Feature Syndicate, Inc., 445 A.2d 1288, 1295 (Pa. Super. 1982).

---

[6] Additionally, since the contract is alleged to be for the sale of goods in excess of $500, the statute of frauds applies.
See 13 P.C. S. A. § 2201(1). The statute of frauds provides that a contract for the sale of goods in excess of $500 is
not enforceable ". . . unless there is some writing sufficient to indicate that a contract for sale has been made
between the parties and signed by the party against whom enforcement is sought or by his authorized agent or
broker." Id. Here, the only writing, the purchase orders, are limited to $298,000.

Applying these principles here, the record fails to establish that the parties had reached an enforceable agreement that ARR would pay MLEA for the entire price of the equipment.  On or about December 11, 2000, Timberlake sent to ARR's agent, RTG, a request for a "second long lead [purchase order]" in order "to get some of the major items in manufacture."  (See Exh. "P", 12/12/00 Fax Cover Sheet from Timberlake to Meckert).  The purchase order request, *i.e.*, the offer, indicated that the identified items "have been evaluated at the minimum down payment for which the suppliers are willing to begin work."  (See Exh.  "P", 12/11/00 Timberlake Letter to Meckert).  The offer requested a "Total Down Payment Request" of $298,000.  Nowhere in the offer was any mention made of the total price of the equipment or any obligation.  At his deposition, Timberlake conceded that the offer he was proposing to ARR in his December 11th letter was nothing more than "that someone pay a down payment."  (See Exh. "D", Timberlake Trans. at 163 & 165).  Indeed, Timberlake admitted that the December 11th purchase order request was a "stop-gap measure to allow for the lease agreement later" – a lease agreement that never materialized.  (Id. at 169).  The individuals on ARR's side of the table confirm that Timberlake never proposed nor did ARR ever agree to pay Plaintiff any amounts other than the $298,000 amount requested by Timberlake and accepted by ARR as evidenced in ARR's purchase orders. (See Exh. "H", Meckert Decl, ¶ 9, 15; Exh. "I", Riordan Decl., ¶ 10, 15).

The only offer extended by Timberlake, the only offer ARR accepted and the only subject on which there was ever any meeting of the minds was for the payment of $298,000, which Timberlake had characterized as the minimum down payment.  (See Exh. "D", Timberlake Trans. at 168-69; Exh. "I", Riordan Decl. ¶ 10; Exh. "H", Meckert Decl, ¶ 9).  In response to Timberlake's offer, ARR issued the purchase orders for the requested down payment

and nothing more.  (See Exh. "Q", Second Purchase Order).  There was never any discussion of

the full purchase price of the various pieces of equipment identified in Timberlake's December

11th letter.  (See Exh. "D", Timberlake Trans. at 167-69; Exh. "I", Riordan Decl., ¶¶ 10, 15; Exh.

"H", Meckert Decl, ¶¶ 10, 17).

In fact, a few months after ARR issued the purchase orders, Timberlake acknowledged

Messer's intent in issuing the purchase orders for $298,000:

> Our first problem here is that we do not have an order for the plant
> in Nova Scotia.  **We do have two limited orders which together
> constitute approximately 10% of the value of the plant.  All
> along is has been our plan to apply for an operating lease for
> the system and incorporate the two orders in this lease.
> Therefore, we have intentionally kept the value of the orders
> small as it was our thinking that this was a temporary
> measure.  The problem is of course, that in our zest to hold
> scheduling we have way over-committed our company well
> beyond the value of the orders.**

(See Exh. "V", 2/27/01 Timberlake Letter to Kelly)(emphasis supplied).

The only "meeting of the minds" related to the $298,000 down payment.  Thus, to the

extent that a valid contract existed by virtue of the ARR purchase orders, it was a contract for

$298,000 and nothing more.

**D.    MLEA Is Not Entitled To Damages Flowing From Its Preparation Of
Engineering Plans/Drawings.**

MLEA claims that Defendants breached a contract for MLEA to "create plans, including

foundation plans, and equipment specifications for the Truro Facility."  (Complaint, ¶ 18).

MLEA further claims that Defendants owe $ 234,050.00 and $81,864.00, respectively, for these

so-called "design/specifications/drawings" and "process design/specifications," that were

completed by MLEA.  However, neither ARR nor RTG, ever authorized or agreed to MLEA's

design of these plans.  MLEA also claims that it can somehow recover from Defendants for these

engineering plans based on the equitable theories of promissory estoppel and unjust enrichment. Plaintiff cannot recover on either theory, as will be shown below.

        **1.**        **The Parties Never Entered Into Any Agreement Regarding The Engineering Plans.**

MLEA cannot recover for the engineering plans under a breach of contract theory because no contract or agreement ever existed between the parties regarding these plans.  Indeed, Manuel Menendez, one of MLEA's owners and its Vice-President of Engineering, has testified that no one from ARR or RTG "ever agree[d] to pay for the services that went into" the engineering plans.  (See Exh. "C", Menendez at 93-94).

It is black letter law that in order to form an enforceable contract, there must be an offer, acceptance, consideration and a mutual meeting of the minds.  See Jenkins, 658 A.2d at 384.  A breach of contract claim requires proof that the defendant breached a duty imposed under the contract, and further proof of actual loss resulting from the defendant's alleged breach.  See, e.g., Corestates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. 1999) (claim for breach of contract must be established by pleading (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages).

Under Pennsylvania law, contracts are enforceable when the parties reach a mutual agreement, exchange consideration, and set forth the terms of their bargain with sufficient clarity.  See SDK investments, Inc. v. Ott, No. Civ. A. 94-111, 1996 WL 69402, at *6 (E.D. Pa. Feb. 15, 1996).  Similarly, "the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced."  Channel Home Ctrs. v. Grossman, 795 F.2d 291, 298-99 (3d Cir. 1986) (relying on and citing to Pennsylvania cases).  This is clearly not the case here.

20

Indeed, all three of MLEA's witnesses concur that the parties never agreed to the terms of any turnkey contract.  (See Exh. "C", Menendez at 73; Exh. "D", Timberlake Trans. at 189 ("I didn't believe that we had an order for a turnkey plant."); Exh. "B", DelGaizo at 33-34).

Plaintiffs have also repeatedly admitted that parties reached no agreement regarding the engineering plans:

> Q.  Your counsel has produced with you today what we've marked as DelGaizo-1, 2 and 3 which are construction drawings and some specifications. . . . **Did anyone from ARR or RTG ever agree to pay for the services that went into those drawings --**
>
> A.  **No.**
>
> Q.  **-- or specifications?**
>
> A.  **No, but the point is without doing this work, you can't really order the equipment**.  I mean,  in other words, until you know a lot of this information, including the specifications which you go out with on the purchase order, you know, you just can't order that in a vacuum, so there's a certain amount of this work that has to go on just to buy the equipment.
>
> Q.  When you talk about buying the equipment, are you referring to the equipment that was the subject of the purchase orders that were sent out in December and January?
>
> A.  Yes.  Right.
>
> * * * * *
>
> Q.  **At the time that you did the foundation drawings, was there an agreement by RTG or ARR to pay for your services in making those drawings**?
>
> A.  **No.**

(See Exh. "C", Menendez Trans. at 93-96) (emphasis added).  Mr. DelGaizo also admitted that no one from ARR or RTG ever agreed to pay for the services that went into the engineering plans.  (See Exh. "B", DelGaizo Trans. at 93-94).

Accordingly, there is no basis for a breach of contract claim regarding MLEA's claim for damages as to the "engineering plans," and MLEA's claim should be dismissed.

E.    **Plaintiff's Claims For Promissory Estoppel and Unjust Enrichment Fail Because Plaintiff's Claims Arise From An Express Contract Between The Parties.**

In Counts II and III of Plaintiff's Complaint, MLEA sues for promissory estoppel and unjust enrichment.   The parties here dispute the terms of the contract; they do not contest that one was formed.[7]   Indeed, Plaintiff has sued for breach of an express contract.  (See Complaint, Count I) Claims of promissory estoppel and restitution are not cognizable where the parties have a contract. See Carlson v. Arnot-Ogden Mem. Hosp., 918 F.2d 411, 416 (3d Cir. 1990) (promissory estoppel only invoked "where the formal requirements of contract formation have not been satisfied and where justice would be served by enforcing a promise"); Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 999 (3d Cir. 1987) (holding unjust enrichment "inapplicable when the relationship between the parties is founded on a written agreement").

Plaintiff urges that these counts be sustained presumably because its contract with ARR does not provide for the payment of any amounts over and above the $298,000 amount stated in Timberlake's December 11, 2000 offer letter requesting the issuance of those purchase orders and confirmed by the purchase orders issued by ARR in response to Timberlake's solicitation. (See December 11, 2000 letter, Exh. "P" and Exh. "Q", purchase orders).  However, "promissory estoppel. . . is not designed to protect parties who do not adequately memorialize their contracts in writing." Iversen Baking Co., Inc. v. Weston Foods, Ltd., 874 F. Supp. 96, (E.D. Pa. 1995). Restitution is similarly unavailable where a contract fixes the amount of compensation due.  See Hershey Food Corp., 828 F.2d at 999.  Plaintiff had a sufficient opportunity to protect its expectations through express contract terms and cannot now rely on consideration substitutes and quasi-contract theory. Counts II and III should, therefore, be dismissed.

---

[7] Defendants do, however, contend that the purchase orders are void ab initio because those purchase orders were procured by Plaintiff's fraud and deceit.

Simply stated, this is not a case about promissory estoppel because a written contract sets forth the promises and undertakings of the parties. Timberlake's December 11, 2000 offer letter soliciting a $298,000 "temporary equipment order" and the two ARR purchase orders that accepted Timberlake's offer were the product of a never-ending series of solicitations by Plaintiff's salesman, Timberlake. By their own terms, those documents constituted the entire relationship between the parties as to the obligations to pay for the equipment identified in those purchase orders. The law of contract interpretation precludes Plaintiff from now adding price terms to those purchase orders through litigation which were never part of the contract. Indeed, the valid existence of a contract and a claim for promissory estoppel are mutually exclusive. <u>See</u>, <u>e.g.</u>, <u>Carlson v. Arnot-Ogden Memorial Hosp.</u>, 918 F.2d 411, 416 (3d Cir. 1990); <u>Atlantic Paper Box Co. v. Whitman's Chocolates</u>, 844 F. Supp. 1038, 1042 (E.D. Pa. 1994); <u>Iversen Baking Co., Inc. v. Weston Foods, Ltd.</u>, 874 F. Supp. 96, 102 (E.D. Pa. 1995). Without such a written contract for an additional price term, Plaintiff's promissory estoppel claim must fail.

      **F.    Alternatively, ARR Is Entitled To Summary Judgment On Plaintiff's Promissory Estoppel Claim Because Plaintiff Cannot Establish The Existence Of An Enforceable Promise Upon Which To Base Its Claim For Promissory Estoppel.**

In Count II (Promissory Estoppel) of its Complaint, Plaintiff alleges that "Defendants' express and implied representations constituted promises to pay Plaintiff for (a) the equipment ordered by Plaintiff for the Defendants' Truro Facility, and (b) the engineering services rendered by Plaintiff to Defendants that resulted in Plaintiff's creation of the plans and specifications that Plaintiff delivered to Defendants." (Complaint, ¶25). As a result of those alleged promises regarding the equipment that was the subject of the two ARR purchase orders, Plaintiff claims

that ARR is liable to it for an amount in excess of $1.4 million even though the amount of those two purchase orders was expressly limited to $298,000.

Defendants have now gone behind the easily-made assertions in Plaintiff's pleadings and uncovered the facts by taking the depositions of Plaintiff's witnesses. Those depositions demonstrate that Plaintiff's claim for promissory estoppel fails because neither ARR nor any other defendant ever made any promise to Plaintiff other than the promises made by ARR in issuing the $298,000 purchase orders that form the basis for Plaintiff's breach of contract claim.

The doctrine of promissory estoppel allows a party, under limited circumstances, to enforce a promise even though that promise is not supported by consideration. See Shoemaker v. Commonwealth Bank, 700 A.2d 1003, 1006 (Pa. Super. 1997) (citing Thatcher's Drug Store v. Consolidated Supermarkets, Inc., 535 Pa. 469, 476, 636 A.2d 156, 160 (1994) and Restatement (Second) of Contracts § 90)). To establish a claim for promissory estoppel, the plaintiff must plead and prove:

> (1)     That the promisor made a promise that he should have reasonably expected would induce action or forbearance on the part of the promisee;
> (2)     That the promisee actually took action or refrained from taking action in reliance on the promise; and
> (3)     That injustice can be avoided only by enforcing the promise.

Id. "The doctrine of promissory estoppel … may be invoked only in those cases where all the elements of a true estoppel are present, for if it is loosely applied any promise, regardless of the complete absence of consideration, would be enforceable." Stelmack v. Glen Alden Coal Co., 339 Pa. 410, 416, 14 A.2d 127, 130 (1940); see also Fried v. Fisher, 328 Pa. 497, 196 A. 39 (1938). "A party asserting a claim of estoppel has the burden of establishing all of the essential elements." Thatcher's Drug Store, 535 Pa. at 477, 636 A.2d at 160. See also Cardamone v.

University of Pittsburgh, 253 Pa. Super. 65, 384 A. 2d 1228, (1978) (holding that an alleged "promise" is an essential element to a claim of promissory estoppel).

In the present case, Plaintiff has failed to produce evidence of facts essential to the cause of action of promissory estoppel. First, and fundamentally, Plaintiff has failed to produce evidence that ARR made any enforceable promise to Plaintiff to pay any amounts over and above the $298,000 amount set forth in Plaintiff's December 11, 2000 offer letter and confirmed in the purchase orders issued by ARR in the amount of $298,000. (See Exh. "D", Timberlake Trans. at 161-163, "I'm proposing that someone pay a down payment"; at 167-169, "This was a stop-gap measure to allow for the lease agreement later on."). Similarly, Plaintiff has confirmed that neither ARR nor RTG ever promised to pay Plaintiff for the plans and specifications for which Plaintiff seeks to recover. (See Exh. "B", DelGaizo at 96-100). Clearly, if Plaintiff cannot identify a promise that ARR made to it, then as a matter of law Plaintiff cannot maintain a cause of action sounding in promissory estoppel. Even if this Court could find that ARR made some sort of "promise" or "assurance" to Plaintiff, Plaintiff cannot produce any evidence that it relied on it.

Finally, Plaintiff has not and cannot establish that enforcement of a promise against ARR is necessary to avoid injustice. Comment b to Section 90 of the Restatement (Second) of Contracts discusses satisfaction of the requirement of avoiding injustice. It states, in relevant part:

> Satisfaction of [this] requirement may depend on the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant.

Restatement (Second) Contracts § 90, comment b (quoted in Thatcher's Drug Store at 535 Pa. at 477, 636 A.2d at 160).  In the present case, Plaintiff has utterly failed to produce any evidence that enforcement of the "promise" is necessary to avoid injustice given the circumstances under which the "promise" was made, the relationship between the parties, the informality of the promise, and the unreasonableness of Plaintiff's reliance.

Moreover, as explained in detail above, fraudulent intent permeates the entire scheme by Plaintiff's representative, Timberlake, to procure from ARR purchase orders for equipment based upon alleged problems and objections from National Fleet Leasing, Inc.  How Plaintiff hopes to show that injustice can be avoided by helping it enforce an alleged promise rooted in a fraudulent scheme is a mystery.

Contrary to what Timberlake represented in his zeal to squeeze purchase orders out of ARR, National Fleet Leasing never did business with either Timberlake or Messer and had not provided leases to any Messer customers. (See Exh. "D", Timberlake Trans. at 111-114).  While he was representing that National Fleet's "normal approval cycle" would delay the project, Timberlake had had no discussions of any kind with anyone from National Fleet Leasing regarding their approval cycle; in fact, Timberlake admitted under oath that he had no information of any kind as to National Fleet's approval process.  (Id. at 153-155).  Even more egregious was Timberlake's representation that National Fleet **had objected** to the stipulations that, in the event that the lease was not consummated, ARR could return the equipment to Messer and that if the lease was consummated, Messer would purchase the equipment from ARR and then include the price of that equipment in the lease.  (See  Exh. "I", Riordan Decl., ¶ 13-16; Exh. "H", Meckert Decl., ¶ 12). Timberlake's representations regarding National Fleet Leasing's alleged objections to the stipulations in the two ARR purchase orders was made solely to

induce ARR to remove those stipulations so that the purchase orders would be acceptable to MLEA which knew that it lacked the money to pay for that equipment in the event that it was unable to obtain a lease for the Truro Project.  (See Exh. "B", DelGaizo at 90)   In fact, Timberlake's representations were false – National Fleet Leasing never raised any objection to the ARR purchase orders (See Cohen Decl.) nor did Timberlake ever even discuss the ARR purchase orders or the stipulations in the ARR purchase orders with anyone from National Fleet Leasing.  (See Exh. "D", Timberlake Trans. at 167-168).

To the extent that there was any promise by ARR to order any equipment without the stipulation that ARR would be able to return the equipment in the event that a lease was not consummated, that promise was fraudulently procured by the lies and deceit of Timberlake. Therefore, there can be no injustice by non-enforcement of any promise by ARR.  If there is any injustice to be seen, it would be in helping Plaintiff and its shareholder Timberlake further perpetuate their fraudulent scheme by enforcing ARR's purchase orders.   As a matter of law, therefore, ARR is entitled to summary judgment on Plaintiff's claim for promissory estoppel.

## G.    Neither ARR Nor RTG Were unjustly enriched by MLEA's services.

MLEA also claims that it should be rewarded for its engineering services under a theory of unjust enrichment.

Pennsylvania law provides that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to another."  D.A. Hall Co. v. Clevertrust Realty Investors, 573 A.2d 1005 (Pa. 1990) (citing RESTATEMENT OF RESTITUTION § 1).  To assert an unjust enrichment claim, a plaintiff must allege that (1) it conferred a benefit on the defendant,

(2) the defendant appreciated the benefit, and (3) it would be inequitable for the defendant to accept and retain the benefit without paying the plaintiff for the value of the benefit conferred. See Styer v. Hugo, 619 A.2d 347, 350 (Pa. Super. 1993), aff'd, 637 A.2d 276 (Pa. 1994).

The unjust enrichment doctrine does not apply where the defendant *may have benefited* as a result of the actions of the plaintiff.  See Meehan v. Cheltenham Township, 189 A.2d 593 (Pa. 1963); Ameripro Search, Inc. v. Fleming Steel Co., 787 A.2d 988, 990 (Pa. Super. 2001). Thus, MLEA cannot merely allege its own loss as the measure of recovery.  Instead, it must demonstrate that ARR or RTG or Casella in fact benefited from these services.  See D.A. Hill, 573 A.2d at 1009; Meehan, 189 A.2d at 595.  MLEA cannot do this.

MLEA certainly cannot argue that ARR was enriched by EGS's alleged engineering plans, or, for that matter, the equipment at issue.  Indeed, neither has RTG.  First, the plant was never constructed using these plans.  Nor did any defendant ever use the Plans.  (See Exh. "H", Meckert Decl. and Exh. "F", Anderson Decl.)

Further, no benefit can be gained here because MLEA never delivered the complete plans to defendants.  Indeed, Mr. Menendez testified that MLEA never delivered all of the engineering plans to ARR, and that the plant cannot be built, even now, without a full set of those plans:

> Q.  As of September 14, 2001, with the plans that were provided in January or February and these foundation drawings, could RTG or ARR have built or manufactured the plant?
>
> A.    No, not with those drawings.
>
> Q.   **What else was needed?**
>
> A.   **They needed the remainder of the detailed piping drawings.**

(See Exh. "C", Menendez at 94-96 (emphasis added)).  (See also Exh. "B", DelGaizo at 109 ("Again, there might have been drawings being passed back and forth for comment, but some of them have still never been delivered.  The electrical drawings are still at my place.  And the

reason that they really never were delivered is they never were totally finished either.")
(emphasis added). Mr. Menendez testified that ARR could not construct the plant with the
equipment provided. Id.

Thus, by MLEA's own admissions, (1) there never was an agreement by RTG or ARR to
pay for MLEA's services in assembling the engineering plans, and (2) the liquid nitrogen plant
could not be constructed with the plans as drawn. Accordingly, MLEA cannot recover for the
cost of the engineering plans on an unjust enrichment theory since no benefit has been conferred
on ARR[8], and summary judgment should be entered against Plaintiff as to Count III of its
Complaint.

## CONCLUSION

For the foregoing reasons, Defendant Atlantic Recycled Rubber, Inc. respectfully
requests that summary judgment be entered in its favor on all counts of Plaintiff's Complaint.

Dated: February 10, 2003                    Respectfully submitted,

                                            ECKERT SEAMANS CHERIN
                                              & MELLOTT, LLC

                            By:     _____
                                            John F. O'Riordan, Esquire
                                            Heather E. Rennie, Esquire
                                            Attorney I.D. Nos. 59311 & 69715
                                            1515 Market Street, Ninth Floor
                                            Philadelphia, PA  19102
                                            (215) 851-8400

                                            Attorneys for Defendant Atlantic Recycled
                                            Rubber, Inc.

---

[8] Moreover, a claim for unjust enrichment does not lie because MLEA delivered the engineering drawings and plans
to RTG as collateral for two Promissory Notes entered into between RTG and MLEA. Having voluntarily supplied
the drawings and plans to RTG in order to obtain a benefit from RTG (*i.e.,* $150,000), MLEA cannot seriously
contend that RTG obtained any benefit "unjustly".

## <u>CERTIFICATE OF SERVICE</u>

I, John F. O'Riordan, Esquire, hereby certify that on February 10, 2004, I served a true

and correct copy of the foregoing Defendants, Atlantic Recycled Rubber, Inc.'s Motion for

Summary Judgment, or, Alternatively for Partial Summary Judgment and accompanying

Memorandum of Law via first-class mail upon the following:


Philip J. Katauskas, Esquire
Pepper Hamilton LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103-2799

Brian J. McCormick, Jr., Esquire
Buchanan Ingersoll
Professional Corporation
Eleven Penn Center, 14th Floor
1835 Market Street
Philadelphia, PA 19103



_____
John F. O'Riordan, Esquire


*M0445801.DOC*