IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MLEA, INC., as successor in interest to Engineered Gas Systems, LLP and Main Line Engineering Associates : : : : Plaintiff, : : v. : : Atlantic Recycled Rubber, Inc., et al. : : Defendants. : | CIVIL ACTION<br><br>NO. 02 CV 4393 |

**DEFENDANTS, ATLANTIC RECYCLED RUBBER, INC.'S AND
RECOVERY TECHNOLOGIES GROUP, INC.'S PRETRIAL MEMORANDUM**

Defendants, Atlantic Recycled Rubber, Inc. ("ARR") and Recovery Technologies Group, Inc. ("RTG"), submit this Pretrial Memorandum pursuant to Local Rule of Civil Procedure 16.1(c).

**I.   NATURE OF THE ACTION AND BASIS OF JURISDICTION**

Plaintiff MLEA, Inc., as successor in interest to Engineered Gas Systems, LLP and Main Line Engineering Associates, (collectively "Plaintiff" or "MLEA") filed a Complaint against ARR, Recovery Technologies Group, Inc. ("RTG"), and Casella Waste Systems, Inc. ("Casella") alleging the failure to pay for engineering plans and certain equipment with an alleged value of approximately $1.6 million. MLEA seeks to recover against ARR directly on claims of alleged breach of contract, promissory estoppel and unjust enrichment, and also seeks to impose liability upon defendants RTG and Casella through some sort of alter ego/veil piercing theory.

Defendant RTG has filed a Counterclaim on two $75,000 Promissory Notes executed by Plaintiff for a total of $150,000, plus interest, costs and attorneys' fees.

Jurisdiction is proper under 28 U.S.C. § 1332(a)(1) and (2), because the parties are corporate citizens of either different states or of a state and a foreign state, and the matter in controversy exceeds $75,000, exclusive of interest and costs. Venue is proper under 28 U.S.C. § 1391(a)(2).

## II.  STATEMENT OF FACTS

In the summer of 2000, ARR began to transform its traditional tire-recycling operation in Truro, Nova Scotia, Canada (the "Truro facility") into a cryogenic facility.[1] However, to utilize the cryogenic procedure, ARR was required to purchase and ship liquid nitrogen for the Truro facility from a vendor in Maine. The shipment of liquid nitrogen to Truro was cost-prohibitive, and ARR began to investigate more cost-efficient methods to supply liquid nitrogen for the Truro facility. One option was to have a plant built on-site that would produce liquid nitrogen for use in the Truro facility.

In response to informal discussions between Messer (predecessor to plaintiff MLEA) and ARR, Messer, through its then-consultant and salesman, George Timberlake, submitted a written offer to construct such a plant in August 2000. Realizing how important RTI-Canada considered third-party financing through a leasing agreement, Messer sent RTI-Canada a September 13, 2000 revised offer letter in which Timberlake stated that it had already "arranged a lease through National Fleet Leasing, . . .." Notwithstanding Timberlake's representation, lease financing was never put in place.

RTI-Canada responded to Messer's September 13, 2000 letter indicating that it was the intent of RTI-Canada to accept Messer's proposal for the Plant <u>if and only</u> if an operating

---

[1] ARR (formerly known as Atlantic Trucking and Lime Spreading Limited) was purchased by KTI Recycling of Canada, Inc. in June 2000. KTI Recycling of Canada, Inc. changed its name to Recovery Technologies (Canada), Inc. ("RTI-Canada").

2

lease agreement could be worked out and the Canadian and local authorities agreed to the construction of the Plant.

Beginning in October 2000, Messer began attempting to make arrangements for the operating lease with National Fleet Leasing which Timberlake had represented was already approved. By his letter of November 20, 2000, Timberlake represented that Messer was having difficulty getting information for the envisioned lease and that the "lease approval cycle" would take up more time. Timberlake, therefore, requested that a purchase order be issued for the purchase of "long lead and critical use items" in the amount of $155,000, which was the total purchase price for those items. The items Timberlake requested that a purchase order be issued for included: (1) a feed breaker; (2) a transformer and (3) a cryogenic storage tank. In his November 20th letter, Timberlake agreed that Messer would buy back the items described in his letter at the same price as soon as the lease was approved and that the items would then be included in the lease.

On December 1, 2000, in reliance on Mr. Timberlake's representations about having difficulty getting information for the lease and the resulting delay, ARR issued purchase order #715258 with the stipulations that: (1) the items identified in that purchase order would be re-purchased by Messer when the system lease was approved; (2) that payment of the purchase order would be from the proceeds of the lease; and (3) ARR could return the equipment to Messer for full credit in the event that ARR and Messer did not proceed with the lease. At that point, Timberlake fully understood that ARR was the customer and the entity with which he was transacting business.

By his letter of December 11, 2000, Timberlake again represented that Messer was having difficulty getting information for the envisioned lease and that the "normal lease cycle"

3

would "jeopardize [ARR's] April target date." Timberlake, therefore, requested that a "second temporary equipment order" be issued for a down payment of $298,000 on various items identified in his letter. Timberlake never suggested in his letter and never mentioned in any discussion with any ARR representative the idea that he was proposing that either ARR or RTG pay any amount other than the $298,000. This purchase order was intended to be a "stop-gap measure to allow for the Lease Agreement later on." Indeed, in sending his December 11th solicitation, it was Timberlake's intention to secure nothing other than a purchase order for $298,000.

In his December 11th letter, Timberlake agreed that if the proposed $298,000 purchase order issued, Messer would buy back the items described in his letter at the same price as soon as the lease was approved and that the items would then be included in the lease. In reliance on Timberlake's December 11th representations about having difficulty getting information for the lease, and that the "normal lease cycle" would "jeopardize our April target date" and that the amount of the purchase order was limited to $298,000, ARR issued purchase orders 715260 and 715261 with the stipulations that: (1) the items identified in that purchase order would be re-purchased by Messer when the system lease was approved; (2) that payment of the purchase order would be from the proceeds of the lease; and (3) ARR could return the equipment to Messer for full credit in the event that ARR and Messer did not proceed with the lease.

Timberlake thereafter represented that the leasing company had objected to the stipulation that Messer purchase back the equipment identified in his December 11th letter. ARR representatives, John Riordan and Bill Meckert, discussed this issue and relying solely upon the truthfulness of Timberlake's representations about the objections of the leasing company to the

4

Messer purchase stipulation to purchase orders 715260 and 715261, requested that Steve Benison, ARR's General Manager, remove the stipulations that Messer purchase back the equipment identified in his December 11th letter. ARR acted upon that request and did, in fact, remove those stipulations.

However, irrespective of ARR's removal of the stipulations in purchase orders 715260 and 715261, Timberlake never proposed and ARR never agreed to pay any amounts over and above the $298,000 that Timberlake proposed in his December 11th letter. Nor did Timberlake ever discuss with any ARR representative any amount other than the $298,000 in connection with his request that ARR issue the "second temporary equipment order."

Similarly, MLEA never requested or proposed at any time that ARR pay for engineering drawings and specifications allegedly required for the ordering of the equipment in any of the above-referenced purchase orders. It is undisputed that ARR never agreed to pay for such engineering drawings.

In approximately December, 2000, Messer decided to disband its engineering division. At that point, Timberlake, who was then neither a Messer or an EGS employee, decided that he and Messer employee, Manny Menendez, would attempt to persuade Messer to transfer the Truro project to EGS, which would operate as an affiliate of Plaintiff MLEA. At the same time, on January 18, 2001, EGS became a distributor for MG Generon, Inc., a wholly-owned subsidiary of Messer MG Industries, Inc. Under the distributorship agreement, EGS was to purchase all of its requirements for membrane equipment systems from MG Generon.

By letter agreement dated January 19, 2001 ("Four Way agreement"), Messer, MG Generon, MLEA and ARR agreed that Messer was undergoing ownership and organizational changes, that Messer was being disbanded and that the Truro project was being transferred to

5

EGS. The Four Way agreement confirmed that the purchase orders previously issued by ARR were to be "funded by the lease, when the lease is executed" but that the financial and commercial terms would now be between ARR and EGS. Signatories to this letter were ARR, MLEA, Messer and MG Generon. RTG was not a signatory to the letter.

Upon receiving the executed Four Way agreement, EGS proceeded to develop more formal and detailed purchase orders and engineering plans and specifications for the equipment identified in the ARR purchase orders. EGS then placed orders with various third party vendors for the purchase of that equipment. To the extent that Plaintiff relied upon any representations in performing those engineering services, developing plans and specifications, and ordering the equipment identified in the ARR purchase orders, all of those representations were made prior to and included Plaintiff's receipt of the Four Way agreement on January 19, 2001. Thereafter, EGS took over responsibility for the Truro project, including the procuring of the operating lease for the Truro project. However, because EGS, unlike Messer, was a small, new company, EGS was unable to obtain the operating lease.

By letter dated February 27, 2001, EGS requested that a purchase order be issued for the entire Plant. EGS also requested that payment be made on the previously issued purchase orders – orders which were supposed to be funded through a lease. Moreover, in response to concerns raised by ARR, RTG and Casella regarding the Plant's warranty, for the first time, EGS indicated that the proposed Plant might not be able to meet the production capacity of 30 tons per day.

In response, RTI-Canada paid EGS $100,750.00 on March 9, 2001 as payment for EGS's January 25, 2001 invoice for $100,750.00. This invoice corresponded to the down payments for the feed breaker and transformer, and purchase and installation of the storage tank

6

that were the subject of ARR Purchase Order #715258, the first purchase order.  ARR received delivery of the storage tank, but it did not receive the transformer or feed breaker.  Thus, ARR had a credit of approximately $12,400.00.

In April 2001, in a letter to MG Generon, one of its vendors, Plaintiff admitted that "[t]here never was a written contract or signed purchase order for the entire facility between Messer or Generon and ARR".  EGS further admitted that "[s]ince January [2001], we have finished the facility design and have ordered essentially all the equipment *in spite of the fact that we have yet to obtain a written contract or signed PO for the facility*, and have been paid on only the smaller of the two initial POs."  Mr. DelGaizo also admitted that the "[Truro] project . . . has collapsed."

On April 24, 2001 and on June 12, 2001, EGS forwarded executed copies of proposed contracts to RTG and ARR, respectively.  Neither was signed by ARR or RTG.

In late August 2001, in an attempt to provide plaintiff with some financial assistance while the parties continued to see if a deal could be reached, RTG agreed to loan EGS $150,000. RTG's Counterclaim asserts that Plaintiff owes RTG more than $150,000.00 in connection with the loan that RTG made to Plaintiff – a loan memorialized by two promissory notes and a security agreement that Plaintiff duly executed. The promissory notes were secured by the engineering plans, modifications thereto and the foundation drawings for the Plant (collectively the "Plans").  Plaintiff's President and CEO, Mr. DelGaizo, has admitted that Plaintiff signed the two promissory notes (the "Notes") and the security agreement, and that Plaintiff received two checks for $75,000 each.  Pursuant to those Notes, Plaintiff agreed to pay RTG a total of $150,000 plus interest at the rate of 8%, together with all costs of collection, including attorneys' fees.  According to the terms of the Notes, the Notes were deemed to be immediately due and

7

payable upon any "Event of Default." The Notes defined an "Event of Default" as including "[i]f Theodore DelGaizo shall fail to deliver a personal guarantee" of the Notes to RTG by September 5, 2001. DelGaizo admitted at his deposition that, despite the requirement that he personally guarantee the Notes, DelGaizo never executed any personal guarantee of the Notes. It is therefore undisputed that Plaintiff has not paid all or any part of the amount due under the Notes and that Plaintiff is in default on those Notes as a result of DelGaizo's failure to personally guarantee payment of those Notes.

EGS continued to submit proposals to RTG through early 2002, at which time it became clear to RTG and ARR that EGS was not able to offer a Plant with acceptable terms that would meet ARR's needs. Accordingly, the discussions with EGS ceased and this litigation was commenced.

### III.    ITEMIZED DAMAGES

Defendant RTG seeks damages on its Counterclaim in the amount of $150,000, plus interest, cost and attorneys' fees. Plaintiff agreed under the Promissory Notes and related Security Agreement to pay $150,000 plus eight percent interest per annum. The interest due, from September 5, 2001 through February 10, 2004 at the stated interest rate of eight percent per annum, is $28,999.95. Plaintiff also agreed in the Promissory Notes and Security Agreement that, in the event of default, RTG was entitled to recover the cost of collection, including attorneys' fees and costs.

### IV.    LEGAL ISSUES & AUTHORITY

Defendants RTG and ARR filed Motions for Summary Judgment, Or Alternatively for Partial Summary Judgment on February 10, 2004 ("Motions"). The Motions raise various legal issues that will need to be addressed prior to trial. Plaintiff's responses to the Motions are due on

March 15, 2004.  Depending on the resolution of the Motions, Defendants will likely file motions in limine to address various evidentiary issues.

## V.     DEFENDANTS' WITNESS LIST

Defendants identify the following witnesses who they may call at trial either live or through deposition testimony.  Defendants reserve the right to call any witnesses identified in Plaintiff's witness list and Defendant Casella Waste Systems, Inc.'s witness list.  In addition, Defendants reserve the right to call additional witnesses who may be necessary for impeachment or rebuttal.  The following witnesses may be called to testify regarding liability and damages issues.

1. Roderick Alewijnse
   27 S. Wyoming Avenue
   Ardmore, PA 19003-1226

2. James R. Anderson
   Atlantic Recycled Rubber, Inc.
   1225 Franklin Boulevard
   Cambridge, Ontario, Canada  N1R 7E5

3. Steven Benison
   c/o Brian W. Stilwell
   Burchell MacDougall
   710 Prince Street
   Truro, Nova Scotia Canada  B2N 5H1

4. James Bohlig
   Casella Waste Systems, Inc.
   25 Greens Hill Lane
   Rutland, VT  05701

5. Alan Cohen
   804 Cypress Blvd.
   Pompano Beach, Florida 33069

6. Theodore J. DelGaizo, P.E., Esquire
   MLEA, Inc.
   211 Welsh Pool Road, No. 120
   Exton, PA  19341

7. Richard Kelley, Jr.
   Recovery Technologies Group, Inc.
   499 West Branch
   Manchester, VT  05255

8. George William Meckert
   440 E. 20th Street, Apt. 7E
   New York, NY  10009-8208

9. Manuel Menendez
   MLEA, Inc.
   211 Welsh Pool Road, No. 120
   Exton, PA  19341

10. James Petrie
    Recovery Technologies Group, Inc.
    1125 Franklin Blvd.
    Cambridge, ON, Canada  N1R 7ES

11. Ross Pirasteh
    130 E. 65th Street
    New York, NY  10021

12. Martin J. Sergi
    Recover Technologies Group, Inc.
    7000 Boulevard East
    Guttenberg, NJ  07093

13. Barry Smith
    108 West Clay Creek Lane
    Kennett Square, PA  19348

14. 
    George Timberlake
    MLEA, Inc.
    211 Welsh Pool Road, No. 120
    Exton, PA  19341

    15.   Robert E. Wetzel, Esquire
           Recovery Technologies Group, Inc.
           20 Braeburn Lane
           Barrington Hills, IL  60010

## VI.    SCHEDULE OF TRIAL EXHIBITS

Defendants identify the exhibits, attached hereto as Exhibit "A", which they may introduce into evidence at trial.  Defendants reserve the right to offer demonstrative exhibits at trial, as well as introduce or use any exhibits identified in Plaintiff's exhibit list and Defendant Casella Waste Systems, Inc.'s exhibit list and any documents produced in this litigation. Defendants also reserve the right to introduce all pleadings, discovery responses, Plaintiffs' admissions from the Complaint and portions of the depositions of Mr. DelGaizo, Mr. Menendez, Mr. Benison, as well as portions of the trial testimony of Mr. DelGaizo and Mr. Menendez in the case of Generon IGS, Inc. v. MLEA, Chester County CCP, No.02-00973.  Defendants reserve the right to introduce into evidence exhibits which may be necessary for impeachment or rebuttal.

**VII.    ESTIMATED TRIAL TIME**

    Trial is estimated at 4-5 days.

Dated:  February 18, 2004

Respectfully submitted,

ECKERT SEAMANS CHERIN
 & MELLOTT, LLC

By: _____
John F. O'Riordan, Esquire
Heather E. Rennie, Esquire
Attorney I.D. Nos. 59311 & 69715
1515 Market Street, Ninth Floor
Philadelphia, PA  19102
(215) 851-8400

Attorneys for Defendants Atlantic
Recycled Rubber, Inc. and
Recovery Technologies Group, Inc.

**CERTIFICATE OF SERVICE**

I, Heather E. Rennie, Esquire, hereby certify that on February 18, 2004, I served a true and correct copy of the foregoing Defendants, Atlantic Recycled Rubber, Inc.'s and Recovery Technologies Group, Inc.'s Pretrial Memorandum via first-class mail upon the following:

Philip J. Katauskas, Esquire
Pepper Hamilton LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA  19103-2799

Brian J. McCormick, Jr., Esquire
Buchanan Ingersoll
Professional Corporation
Eleven Penn Center, 14th Floor
1835 Market Street
Philadelphia, PA  19103

_____
Heather E. Rennie, Esquire

*M0446203.DOC*

This document was created with Win2PDF available at http://www.daneprairie.com.
The unregistered version of Win2PDF is for evaluation or non-commercial use only.