**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MLEA, INC.,** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 02-CV-4393** |
| | : | |
| **ATLANTIC RECYCLED RUBBER** | : | |
| **INC., RECOVERY TECHNOLOGIES** | : | |
| **GROUP INC., AND CASELLA** | : | |
| **WASTE SYSTEMS, INC.** | : | |
| | : | |
| **Defendants.** | : | |

**PRETRIAL MEMORANDUM OF
DEFENDANT CASELLA WASTE SYSTEMS, INC.**

Defendant Casella Waste Systems, Inc. ("Casella"), by and through its undersigned

counsel, and pursuant to the Court's Orders of January 22, 2004 and October 26, 2002,

respectfully submits this Pretrial Memorandum.

**I.     Nature of the Action and Basis for Jurisdiction**

Plaintiff MLEA, Inc., as successor in interest to Engineered Gas Systems, LLP and Main

Line Engineering Associates, instituted this action against Atlantic Recycled Rubber, Inc.

("ARR"), Recovery Technologies Group, Inc. ("RTG"), and Casella alleging that the defendants

failed to pay for certain equipment and "design/specifications/drawings" and "process

design/specifications" (collectively, "engineering plans") with an alleged value of approximately

$1.6 million.  MLEA seeks monetary damages, and intends to amend its Complaint to seek a

declaratory judgment pursuant to 28 U.S.C. § 2201 that the defendants are obligated to pay for

items of equipment that MLEA recklessly ordered in January and February 2001.

MLEA's sole allegation against Casella for liability in this action is that "[o]n information and belief, at all times relevant hereto, Defendants Atlantic [ARR] and Recovery Technologies were acting on behalf of Casella."

Casella agrees with MLEA's statement regarding jurisdiction of this Court.

## II.    Counter–Statement of Facts

### A.    RTG's And ARR's Business

Defendant RTG provides tire-recycling services throughout North America, through a network of collection, transfer and manufacturing subsidiaries and facilities.  Defendant ARR is one of these subsidiaries.[1]  RTG collects used/scrap rubber tires, transfers them to one of its recycling sites and manufactures crumb rubber and other rubber-derived products from the tires.

RTG and its subsidiaries utilize a patented and unique commercial process to recycle the used tires.  First, the scrapped tires are transported to RTG processing facilities.  At these locations, the scrap tires are shredded into much smaller pieces, and then frozen in liquid nitrogen cryogenic chambers, and finally, the frozen rubber pieces are "hammered" into "crumbs" of various sizes.  The crumb rubber is then sold to manufacturers for use in the fabrication of a number of different items, *i.e.*, playground and running track surfaces, shoe soles, carpet underlay and tires.

### B.    RTG-Casella Relationship

Casella is a regional solid waste services company that provides collection, transfer, disposal and recycling services to residential, industrial and commercial customers, primarily in the eastern United States.

---

[1] ARR is a corporate entity formed under the laws of Nova Scotia, Canada.  ARR is a wholly–owned subsidiary of Recovery Technologies Canada, Inc. ("RTI – Canada").  RTI – Canada is not a party to this lawsuit.

In December 1999, Casella acquired KTI, Inc., as well as certain of KTI's subsidiaries, including various tire recycling assets and commercial recycling facilities (including ARR). RTG was formed by Casella in July 2000 to consolidate these newly acquired tire-recycling assets (formerly of KTI). RTG and its subsidiaries (including ARR) focused on the collection, processing, and recycling of scrap tires into rubber-derived products, and operated as separate and independent companies during the brief time they were Casella subsidiaries.[2]

C.    **Factual Background**

In the summer of 2000, ARR began to transform its traditional tire-recycling operation in Truro, Nova Scotia, Canada into a cryogenic facility using RTG's technology (the "Truro facility"). However, to utilize the cryogenic procedure, ARR was required to purchase and ship liquid nitrogen for the Truro facility from a gas company in Maine. The shipment of liquid nitrogen to Truro was cost-prohibitive, and ARR began to investigate more cost-efficient methods to supply liquid nitrogen for the Truro facility. One option was to have a plant built on-site that would produce liquid nitrogen for use in the Truro facility.

Messer Advanced Gas Systems, Inc. ("Messer") (predecessor to plaintiff MLEA, Inc.),[3] through its consultant and salesman, George Timberlake, submitted a written offer to construct such a plant in August 2000. Messer submitted a revised offer on September 13, 2000. Realizing the extreme importance of third-party financing to this project, the offer letter from Mr. Timberlake stated, <u>falsely</u>, that a lease had already been "arranged . . . through National Fleet Leasing, . . .." Messer, EGS or MLEA never obtained that lease financing.

---

[2] In August 2001, Casella sold 80.1% of its interest in RTG and its affiliates, including ARR, to Crumb Rubber Investors Co., LLC as part of Casella's divestiture of its tire recycling business.
[3] As will be described more fully below, in January 2001, Messer AGS (now Generon IGS, Inc.) assigned the Truro project to Engineered Gas Systems ("EGS"), a subsidiary of MLEA, Inc.

RTI – Canada responded to the September 2000 offer, and stated that "this purchase is contingent on the completion of a leasing agreement and acceptance by Canadian and Local authorities." (emphasis added). All three of the MLEA employees who have been deposed in this matter have testified that the turnkey contract was contingent on obtaining a lease agreement.

RTG stated on several occasions during these early negotiations that it did not wish to own or manage any plant built for its Truro facility. Rather, ARR would consent to having a plant built on-site, but operated by an outside vendor. Nor did ARR wish to finance the construction of the plant with its own money. As such, Messer, primarily through Mr. Timberlake, allegedly began to arrange for a lease with a Pittsburgh company, National Fleet Leasing ("National Fleet"). Although Mr. Timberlake stated to ARR in correspondence that he had arranged for a lease through National Fleet, Mr. Timberlake testified during his deposition that he had never placed a lease or arranged for a lease with National Fleet.

Although the parties exchanged draft contracts in September and October 2000, no agreement was ever executed by any defendant. In October 2000, due to the unsuccessful negotiations with Messer, RTI – Canada circulated a Request for Proposal ("RFP") to a number of gas and energy companies requesting bids for the supply of liquid nitrogen to the Truro facility.

RTI – Canada received at least three responses to the RFP, but ARR continued to negotiate with Messer. However, several major stumbling blocks prevented the parties from reaching agreement, including the size of the plant, Messer's insistence that ARR purchase the plant after construction, and Messer's inability to obtain suitable lease financing. Indeed, on November 20, 2000, George Timberlake admitted, for the first time, that Messer was having a

"great deal of trouble" with the lease. Messer then requested that RTG purchase certain "long lead and critical use items" so that the suggested timetable for construction would be protected.

On December 1, 2000, upon Messer's request, ARR issued Purchase Order No. 715258 to Messer for three items: a cryogenic storage vessel, a feed breaker, and a transformer. The letter from ARR accompanying the purchase order contained three conditions: (1) that the equipment would be returned to Messer if the lease was not obtained; (2) that the payment of the purchase order would be from the proceeds of the lease; and (3) the items identified in the purchase order would be repurchased by Messer when the lease was approved. At this time, Mr. Timberlake fully understood that ARR was the customer, and the entity with which he was transacting business.

Similarly, on December 12, 2000, based on certain representations made by Mr. Timberlake in a December 11, 2000 letter, ARR issued two more purchase orders (nos. 715260 and 715261) (the "second purchase orders") in the amount of $298,00 to fund down payments on certain other equipment necessary for construction of the plant. Again, the letter accompanying these purchase orders made clear that the equipment would be returned to Messer for full credit if the lease did not proceed and that the items identified in the purchase orders would be repurchased by Messer when the lease was approved. Mr. Timberlake never proposed, and ARR never agreed to pay, any amounts over and above the $298,000 that Mr. Timberlake proposed to ARR.

Similarly, as described more fully in Casella's Motion for Summary Judgment, MLEA never requested or proposed at any time that ARR pay for engineering drawings and design specifications allegedly required for the ordering of the equipment in any of the above-referenced purchase orders.

In January 2001, Messer assigned control and responsibility for the Truro project to EGS.[4]   As part of the transfer of the Truro project, EGS hired a number of former Messer employees who had been working on the project for Messer, including Mr. Menendez.  Mr. Timberlake, who served as a consultant for Messer, also joined EGS.

In or around late February 2001, RTG requested that Rick Kelley, a Casella employee, assist ARR with the negotiations relating to the Truro project because he had experience with gas and energy companies.  Until this time, representatives of ARR alone had negotiated with EGS and had acted without Casella's supervision or direction.  By the time Mr. Kelley became involved, EGS had already issued purchase orders to vendors for the equipment for which it is now seeking damages.

In his first correspondence to Mr. Kelley regarding the Truro project, Mr. Timberlake admitted that EGS's "first problem . . . is that we do not have an order for the plant in Nova Scotia." (emphasis added).  Mr. Timberlake also admitted that EGS had not even applied for the necessary lease yet, and that EGS was "way over-committed." (emphasis added).

Over the next several months, EGS repeatedly requested that ARR issue a purchase order for the entire plant, and continued to attempt to negotiate a contract with ARR.  However, the parties did not reach an agreement on many of the essential terms, such as the size of the plant and the warranties.   For example, EGS continued to propose a 30-ton capacity plant, even though representatives of ARR had repeatedly stated that it only needed a plant with a 15-ton capacity.  A 30-ton plant would have required ARR to purchase liquid nitrogen at a higher per pound price than a 15-ton plant and would have required ARR to sell the excess liquid nitrogen.

---

[4] EGS was formed in January 2001 as a subsidiary of Main Line Engineering Associates of Exton, Pennsylvania ("Main Line Engineering") to assume responsibility for the Truro project.  Messer was disbanding the division of its company handling the Truro project, and EGS was formed by a number of former Messer employees.  MLEA, Inc. was incorporated as the parent company of both EGS and Main Line Engineering in January 2002.  EGS and Main Line Engineering are now divisions of MLEA.

ARR consistently told EGS that it was not in the "gas-selling business," and wanted no part of a plant that would force it to sell liquid nitrogen. Although the parties never reached agreement, EGS continued to order equipment and perform engineering and design work without ARR's, RTG's or Casella's knowledge.

RTI – Canada paid EGS $100,750.00 on March 9, 2001 as payment for EGS's January 25, 2001 invoice for $100,750.00. This invoice, which was directed to ARR, corresponded to the down payments for the feed breaker and transformer, and the purchase price and installation of the storage tank from the first purchase order (PO No. 715258). Although ARR received the storage tank, it never received the transformer or feed breaker.

In April 2001, MLEA admitted that "[t]here never was a written contract or signed purchase order for the entire facility between Messer or Generon and ARR" in a letter to MG Generon, one of its vendors. EGS further admitted that "[s]ince January [2001], we have finished the facility design and have ordered essentially all the equipment in spite of the fact that we have yet to obtain a written contract or signed PO for the facility, and have been paid on only the smaller of the two initial POs." (emphasis added). Mr. DelGaizo also admitted that the "[Truro] project . . . has collapsed."

During the spring and summer of 2001, EGS continued to send ARR drafts contracts. On at least one occasion, in April 2001, EGS forwarded an executed copy of a proposed contract to RTG. None of these proposals was ever agreed to or signed by RTG or ARR. Nor was any proposal ever directed to Casella.

In August 2001, Casella sold 80.1 % of its interest in RTG in August 2001. It retains a 19.1% interest in a holding company that is an indirect subsidiary of Casella. Although negotiations between ARR, RTG and MLEA continued until April 2002, Casella had no role in

the Truro project until this lawsuit was filed.  For example, MLEA delivered an incomplete set of

the engineering plans and design specifications to ARR in September and October 2001.

Although these plans have never even been used by ARR, MLEA seeks to recover the alleged

value of the plans and drawings from Casella.

## III.    Damages

According to its Pretrial Memorandum, MLEA is seeking to recover several categories of

damages in this case.  Casella denies liability for any alleged damages.  Moreover, at least five of

these categories of damages are not recoverable.

First, MLEA seeks to recover more than $650,000 for the equipment it imprudently

ordered in 2001.  However, MLEA admits that it has not had to pay, or make restitution, for

many of the amounts that make up this sum.  By way of example, MLEA has been sued by three

of its vendors.  It has settled with two of these vendors, and lost a trial on the third vendor's

claim.  In addition, according to discovery in this case, MLEA has arranged written "agreements"

with two other vendors wherein MLEA pays a set amount per month to the respective vendor.

Several other vendors have not yet pursued MLEA for the money allegedly owed them.  In fact,

during their depositions, both Mr. DelGaizo and Mr. Menendez testified that several vendors

have not contacted them in several months regarding the equipment at issue.  If the factfinder

were to award MLEA the amount of damages it seeks, MLEA would be enriched beyond the

status quo.  MLEA is not entitled, and should not be permitted, to recover a windfall.[5]

Second, MLEA's calculation of damages includes $389,274.00 for "MG Generon

development."  See Exhibit "B" to Plaintiff's Pretrial Memorandum.  Plaintiff's counsel, at the

---

[5] Additionally, MLEA is claiming that defendants are liable for certain equipment worth approximately $15,000 that
MLEA purchased from AMSCO Sales Corp., but was never included on the purchase orders.  MLEA ordered this
equipment from AMSCO without ARR's knowledge, and this item was not included on the ARR purchase orders.
Evidence of this amount should be barred at trial.

January 21, 2004, status conference before the Court, stated that this unrelated fee was <u>not</u> an amount that MLEA could or would seek.  Nor was this fee ever disclosed in discovery as part of MLEA's damages claim.  This fee is unrelated to this case.  MLEA cannot recover damages that have no causal connection to the defendants' alleged actions.

Third, MLEA is claiming it is due certain "mitigation" damages.  *See* Exhibit "C" to Plaintiff's Pretrial Memorandum.  MLEA is belatedly seeking damages for this category of damages.   In May 2003, Casella served discovery requests seeking information regarding MLEA's efforts to mitigate its damages.  MLEA's response was sparse, to say the least, and primarily addressed MLEA's efforts to resolve the potential lawsuit with ARR.  MLEA's response neither included, nor even referenced, the facts it now, for the first time, provides in its Pretrial Memorandum. Further, during depositions, MLEA's witnesses could not provide the explicit information regarding mitigation that is being claimed now.  In fact, Mr. Timberlake testified that he had had no contact with the vendors, yet MLEA is claiming that he spent <u>more than 920 hours</u> over the past three years attempting to "mitigate" MLEA's damages.  Further, MLEA's mitigation calculation is entirely based on an hourly rate basis.  Defendants have had no chance to challenge, or even take discovery on, any of these figures.  As such, the Court should not permit MLEA's eleventh–hour attempt to insert this "surprise" category of damages into the case.  Discovery is closed.

Additionally, MLEA does not cite any statute or case that permits a party to recover its own "mitigation costs" as consequential damages.  Instead, plaintiff cites two Pennsylvania statues that generally discuss damages under the Uniform Commercial Code.  Neither stands for the proposition that MLEA may recover the inflated sums it allegedly spent trying to mitigate its damages.

Similarly, MLEA now seeks certain damages for "in-house legal expenses." However, it provides no back up or supporting documentation for this figure. Like its newly raised claim for mitigation damages and the MLEA-Generon project development fee, MLEA never raised in-house legal fees as a potential damages figure before last week. In addition, MLEA never produced documents or supplemented its interrogatory answers to identify this category of damages. As such, this claim must also be stricken and any evidence of these "legal expenses" barred a trial.

Finally, MLEA claims that it is entitled to prejudgment interest. However, in Pennsylvania, a plaintiff is not entitled as of right to prejudgment interest for unliquidated damages. Traditionally, Pennsylvania federal and state courts find that prejudgment interest as of right exists only when the defendant breaches a contract to pay a definite or liquidated sum of money, or an amount ascertainable by mathematical calculation. *Montgomery County v. Microvote Corp.*, No. CIV. A. 97-6331, 2001 WL 722485, at *5 (E.D. Pa. June 25, 2001) (R. Kelly, J.). Recovery of prejudgment interest relating to an unliquidated debt is only available at the Court's discretion. *Id.* Thus, in order for MLEA to recover prejudgment interest, it must demonstrate that the damages were liquidated; that is, either stated in the contract, or ascertainable by application of a formula stated in the contract. However, MLEA cannot do this. For example, MLEA claims it is due interest for the settlements or informal "agreements" it has reached with several of its vendors. These figures, while definite now, are based on negotiation and compromise between MLEA and the respective vendor. Defendants had no role in selecting or establishing these amounts. Nor are these amounts in any way reflected in the only alleged contracts at issue here – the purchase orders between ARR and MLEA.

IV.    **Casella's Witness List**

Casella intends to call the following witnesses at trial:

1.  James Bohlig
    Casella Waste Systems, Inc.
    Rutland, VT

2.  Rick Kelley
    Recovery Technologies Group Inc.
    7000 Boulevard East
    Guttenberg, NJ 07093

3.  Robert Wetzel, Esq.
    Recovery Technologies Group Inc.
    7000 Boulevard East
    Guttenberg, NJ 07093

4.  Martin Sergi
    Recovery Technologies Group Inc.
    7000 Boulevard East
    Guttenberg, NJ 07093

5.  Alan Cohen
    804 Cypress Blvd.
    Pompano Beach, FL  33069

6.  Roderick Alewijnse (as on cross-examination)
    MLEA, Inc.
    211 Welsh Pool Road
    Exton, PA

7.  Barry Smith (as on cross-examination)
    Kennett Square, PA

8.  John M. Riordan
    65 Fox Hill Lane
    Saco, Maine 04072

9.  G.W. Meckert
    40 E. 20th Street, Apt. 7E
    NY, NY 10009-8208

10.  James R. Anderson
    Recovery Technologies (Canada), Inc.
    1225 Franklin Blvd.
    Cambridge, Ontario, Canada

Casella reserves the right to call witnesses designated or offered by MLEA, ARR or

RTG, and also reserves the right to call witnesses not named above to rebut evidence offered by

MLEA, ARR or RTG.

Casella will offer testimony by way of deposition testimony for the following individuals.

Pursuant to the Court's Pretrial and Trial Procedures, Casella will provide written designations to

all counsel and the court at the appropriate time.

1.    George Timberlake

2.    Theodore DelGaizo

3.    Manuel Menendez

## V.    <u>List of Exhibits</u>

A schedule of exhibits is attached as Exhibit "A."

Casella reserves the right to offer in evidence the exhibits listed in Plaintiff's Pretrial Memorandum, or offered or marked by MLEA.  Casella also reserves the same rights as to those exhibits identified by co-defendants ARR and RTG.  Casella also reserves the right to offer in evidence documents not listed above that are used for impeachment purposes or on rebuttal.

## VI.    <u>Legal Issues</u>

Casella's Motion for Summary Judgment or, in the alternative, for Partial Summary Judgment is pending.  Casella moved for summary judgment based on MLEA's inability to "pierce the corporate veil" of three separate corporate entities to reach Casella.  Alternatively, Casella moved for partial summary judgment on plaintiff's claim for damages as to the value of certain engineering plans and limit plaintiff's remaining claims for damages to the amounts listed in the three purchase orders at issue for the equipment allegedly ordered.

Casella has also joined in the Motion of Defendant Atlantic Recycled Rubber, Inc. ("ARR") for Summary Judgment.  Casella agrees with the arguments of ARR that the second two ARR purchase orders that form the basis for MLEA's claims in this case were procured by fraud and therefore should be declared void *ab initio*, and that MLEA's claims for promissory estoppel and unjust enrichment must fail because MLEA's claims arise from an express contract between the parties.

Casella intends to file motions *in limine* to bar any evidence and testimony MLEA intends to present as to damages for losses it has not yet suffered, any evidence and testimony relating to MLEA's alleged mitigation damages, and any evidence or testimony relating to MLEA's efforts to recover for the project development fee.

The final issue is a choice of law issue. Depending on the outcome of defendants' various summary judgment motions, a conflict of laws issue may arise.

## VII.    **Points for Charge**

Defendant Casella's proposed points for charge are attached as Exhibit "B." Casella reserves the right to supplement and/or modify these proposed points for charge dependent upon the outcome of the pending motions for summary judgment, as well as any motions *in limine*.

## VIII.    **Estimated Trial Time**

Casella estimates it will take 1 1/2 to 2 days to present its defense.

Respectfully submitted,

_____
Antoinette R. Stone, I.D. No. 23464
Brian J. McCormick, Jr., I.D. No. 81437
BUCHANAN INGERSOLL PC
1835 Market Street, 14th Floor
Philadelphia, PA 19103
(215) 665-8700
(215) 665-8760 (fax)

Dated: February 18, 2004

Attorneys for Defendant Casella Waste Systems Inc.

# EXHIBIT "A"

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MLEA, INC.,** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No.  02-CV-4393** |
| | : | |
| **ATLANTIC RECYCLED RUBBER** | : | |
| **INC., RECOVERY TECHNOLOGIES** | : | |
| **GROUP INC., AND CASELLA** | : | |
| **WASTE SYSTEMS, INC.** | : | |
| | : | |
| **Defendants.** | : | |

**DEFENDANT CASELLA WASTE SYSTEMS, INC.'S LIST OF EXHIBITS
FOR PRETRIAL MEMORADNUM**

| TRIAL EXHIBIT NUMBER | EXHIBIT NAME | |
|---|---|---|
| 1. | LINC-15U Construction Package (DelGaizo 1) | |
| 2. | LINC-15U Engineering Flowsheet, and attachments (DelGaizo 2) | |
| 3. | LINC-30 CBO511 Cold Box (DelGaizo 3) | |
| 4. | Letter to James Anderson from George Timberlake, dated 9/13/2000 (Timberlake 1, Kelley 2, Benison 2) | MLEA2 |
| 5. | Letter to Messer AGS from James Anderson, dated 9/13/2000 (Menendez 1, Sergi 1, Kelley 1, Benison 1) | MLEA1 |
| 6. | Letter to G.W. Meckert from George Timberlake, dated 12/11/2000 (Timberlake 2, Benison 3) | MLEA38-MLEA39 |
| 7. | Letter to Rick Kelley from George Timberlake, dated 2/27/2001 (Timberlake 3, Kelley 7, Benison 13) | MLEA66-MLEA67 |
| 8. | Letter to George Timberlake from James Anderson, dated 10/2/2000 (Timberlake 10) | MLEA30 |
| 9. | Letter to G.W. Meckert from George Timberlake, dated 10/26/2000 (Timberlake 12, Sergi 8) | RTG51-RTG52 |

| 10. | Letter to G.W. Meckert from George Timberlake, dated 11/20/2000 (Timberlake 14, Kelley 4) | MLEA31 |
|---|---|---|
| 11. | Letter to Messer AGS from Bill Meckert, dated 12/6/2000 (Sergi 4) | MLEA35 |
| 12. | Letter to Bill Meckert from George Timberlake, dated 11/21/2000 | RTG728 |
| 13. | Letter to George Timberlake from Steven Benison, dated 12/1/2000 (Timberlake 16, Kelley 6, Benison 4) | MLEA32 |
| 14. | Atlantic Recycled Rubber Purchase Order 715258, dated 12/1/2000 (Timberlake 15, Menendez 3) | MLEA64 |
| 15. | Letter to George Timberlake from Steven Benison, dated 12/12/2000 (Benison 6) | MLEA40 |
| 16. | Atlantic Recycled Rubber Purchase Order 715620 | MLEA62 |
| 17. | Atlantic Recycled Rubber Purchase Order 715261 | MLEA63 |
| 18. | Letter to Barry Smith from T.J. DelGaizo, et al., dated 1/15/2001 (DelGaizo 4, Benison 7) | MLEA58 |
| 19. | Letter to G.W. Meckert from T.J. DelGaizo, et al., dated 1/19/2001 (DelGaizo 5, Sergi 10, Benison 10) | MLEA65 |
| 20. | E-mail to Rick Kelley from George Timberlake with attachments, dated 3/12/2001 (Menendez 8, Kelley 8) | MLEA68-MLEA71 |
| 21. | E-mail to mtopola_prc@qlo.com, et al., from George Timberlake with attached contract, dated 3/21/2001 (Menendez 9) | RTG531-RTG560 |
| 22. | Letter to Rick Kelley from George Timberlake, dated 4/6/2001 (Timberlake 5) | MLEA76-MLEA79 |
| 23. | Letter to Rick Kelley from George Timberlake, dated 4/10/2001 | CD-ROM130-CD-ROM131 |
| 24. | Letter to Rick Kelley from George Timberlake, dated 4/10/2001 | MLEA84-MLEA87 |
| 25. | Letter to Rick Kelley from George Timberlake, dated 4/13/2001 (Menendez 11) | MLEA88-MLEA90 |

| 26. | Email to Marty Sergi from Rick Kelley, dated 4/13/01 | RTG564 |
|---|---|---|
| 27. | Letter to Rick Kelley from Manny Menendez, dated 4/16/2001 | MLEA91-MLEA93 |
| 28. | Minutes of Meeting with Mary Sergi, dated 5/18/2001 (Menendez 12) | MLEA101 |
| 29. | Letter to Barry Smith from T.J. DelGaizo, dated 4/9/2001 (DelGaizo 6) | MLEA80-MLEA81 |
| 30. | Memo to Barry Smith from Manny Menendez, dated 4/27/2001 (Menendez 13) | MLEA230-MLEA231 |
| 31. | Minutes of Meeting with Ross Pirasteh, dated 10/9/2001 (DelGaizo 8) | CD-ROM561 |
| 32. | E-mail to T.J. DelGaizo from George Timberlake, dated 10/11/2001 (DelGaizo 9) | MLEA164 |
| 33. | Casella Waste System, Inc. Organizational Chart as of 4/30/1999, 2000, 2001, 2002 (Bohlig 1) | C653-C656 |
| 34. | Memo to Marty Sergi, et al., from John Riordan, dated 3/23/2001 (Sergi 6, Kelley 10, Benison 15) | C66-C70 |
| 35. | E-mail to Robert Wetzel from George Timberlake, dated 9/17/2001 (Wetzel 4) | MLEA152-MLEA154 |
| 36. | Messer Invoice # 000236, dated 1/4/2001 | C390 |
| 37. | Engineered Gas Systems LLP Invoice, dated 1/25/2001 (Benison 11) | C90 |
| 38. | Engineered Gas Systems LLP Invoice dated 1/30/2001 (Benison 12) | C92 |
| 39. | RTI-Canada Check #20450, for $110,750, dated 3/9/2001 | C89 |
| 40. | E-mail to Marti Sergi, et al. from George Timberlake with attachment, dated 3/21/2001 (Timberlake 4) | MLEA72-MLEA75 |
| 41. | Letter to Greg Hepler from George Timberlake, dated 9/26/2001 (Timberlake 7) | CD-ROM804-CD-ROM805 |
| 42. | Status of EGS POs for RTG Project (1/24/02) (Timberlake 9) | RTG357 |

| 43. | Gas Cost with an Operating Lease and a Capital Lease, dated 10/7/2000 (Timberlake 11, Sergi 9) | RTG1-RTG2 |
|---|---|---|
| 44. | Letter to G.W. Meckert from George Timberlake, dated 11/17/2000 (Timberlake 13) | RTG747-RTG749 |
| 45. | Letter to Robert Wetzel from George Timberlake, dated 12/20/2001 (Timberlake 18) | RTG644 |
| 46. | Letter to Marty from unknown author, dated 8/2/2001 (Timberlake 21) | CD-ROM508 |
| 47. | E-mail to George Timberlake from Manny Menendez, dated 4/9/2001 (Menendez 10) | CD-ROM441-CD-ROM442 |
| 48. | Promissory Note, dated 8/31/2001 (Wetzel 2) | MLEA137-MLEA138 |
| 49. | Security Agreement, dated 8/31/2001 (Wetzel 3) | MLEA139-MLEA148 |
| 50. | E-mail to Barry Smith from T.J. DelGaizo, dated 11/8/2001 (DelGaizo 10) | CD-ROM466 |
| 51. | List of Purchase Orders (Menendez 7) | |
| 52. | Fax to Bill Meckert from George Timberlake, dated 9/4/2001 | RTG623-RTG624 |
| 53. | E-mail to Marty Sergi from Manny Menendez, dated 10/1/2001 | CD-ROM452 |
| 54. | Engineering Transmittal to Bill Meckert form Manny Menendez, dated 10/25/2001 | RTG593 |
| 55. | RTG/ARR Nitrogen Plant Time Line | CD-ROM513-CD-ROM515 |
| 56. | EGS Down Payments on RTG Nitrogen Generator Equipment | CD-ROM503 |
| 57. | E-mail to "Chuck" (undated) | CD-ROM526 |
| 58. | Truro Project Cancellation Fees – Major Equipment | CD-ROM531 |
| 59. | Background Information - MLEA/EGS Truro NS Project | CD-ROM517 |
| 60. | Addendum 1 to Contract EGS-CONT-01-10A | CD-ROM563-CD-ROM565 |

5

| 61. | Addendum 1 to Contract EGS-CONT-01-10A | CD-ROM567 |
| 62. | Addendum 1 to Contract EGS-CONT-01-10B | CD-ROM568-CD-ROM570 |
| 63. | Significant ARR Changes to 15-TPD Contact | CD-ROM516 |
| 64. | EGS Comments on ARR's Contract Changes of 5/30/2001 | CD-ROM68-CD-ROM69 |
| 65. | LiNC-15 Payment Schedule | CD-ROM683-CD-ROM684 |
| 66. | Engineered Gas Systems Proposed Payment Schedule, dated 3/12/2001 | CD-ROM127-CD-ROM128 |
| 67. | Engineered Gas Systems Option 2 with a 10 year Lease, dated 3/30/2001 | CD-ROM155-CD-ROM160 |
| 68. | Draft letter to "Vendor" from Manny Menendez, dated 7/6/2001 | CD-ROM711 |
| 69. | E-mail to George Timberlake from T.J. DelGaizo, dated 9/17/2001 | CD-ROM756 |
| 70. | Letter to Accounts Payable, EGS from American Bureau of Collections, Inc., dated 11/6/2001 | CD-ROM786 |
| 71. | E-mail to George Timberlake from Dom Dionisio, PSB Industries, dated 11/27/2001 | CD-ROM474 |
| 72. | E-mail to Robert Wetzel from T.J. DelGaizo, dated 1/3/2002 | CD-ROM419 |
| 73. | E-mail to George Timberlake from Paul Heston, dated 1/3/2002 | CD-ROM421 |
| 74. | E-mail to Manny Menendez, et al., from T.J. DelGaizo, dated 1/15/2002 | CD-ROM426 |
| 75. | Notes from 1/25/2002 Meeting | CD-ROM557-CD-ROM558 |
| 76. | Minutes of Meeting with Marty Sergi on 1/31/2002 | |
| 77. | E-mail to George Timberlake from Dan Pleis, dated 3/18/2002 | CD-ROM2 |
| 78. | E-mail to Fred Vosburg, et al., from T.J. DelGaizo, dated 4/4/2002 | CD-ROM7-CD-ROM8 |

| 79. | E-mail to George Timberlake from Jeff Johnson, dated 9/6/2001 | |
| 80. | E-mail to George Timberlake from Patti Galstad, dated 9/20/2001 | |
| 81. | E-mail to George Timberlake from Sandy Higgins, dated 9/20/2001 | CD-ROM766-CD-ROM767 |
| 82. | Email to George Timberlake from James Carroll, dated 10/19/01 | CD-ROM453-CD-ROM454 |
| 83. | Truro, Nova Scotia, Canada – 30 Ton Per Day Budget | CD-ROM125-CD-ROM126 |
| 84. | Alternatives for RTG, dated 3/30/2001 | CD-ROM16-CD-ROM26 |
| 85. | MG Generon Distributor Agreement, dated 1/18/2001 | MLEA47-MLEA57 |
| 86. | Letter to T.J. DelGaizo from Barry Smith, dated 12/10/2001 | MLEA226-MLEA227 |
| 87. | Letter to Manny Menendez from Paul Henson, dated 1/7/2002 | MLEA216 |
| 88. | E-mail to Keith Michael, et al. from T. J. DelGaizo, dated 6/29/2002 | CD-ROM12 |
| 89. | E-mail to Keith Michael from Paul Swofford, dated 2/2/2001 | MLEA259-MLEA261 |
| 90. | Letter to Manny Menendez from Shawna Rudersmith, dated 2/15/2001 | RTG312-RTG319 |
| 91. | E-mail to T.J. DelGaizo from Denny Thompson, dated 9/19/2001 | CD-ROM759-CD-ROM 760 |
| 92. | Email to George Timberlake from Denny Thompson, dated 9/20/01 | CD-ROM762-CD-ROM763 |
| 93. | E-mail to George Timberlake from T.J. DelGaizo, dated 12/28/2001 | CD-ROM479-CD-ROM480 |
| 94. | E-mail to Fred Vosbury, et al. from T.J. DelGaizo, dated 1/31/2002 | CD-ROM429 |
| 95. | E-mail to binderjt@erols. com from George Timberlake, dated 5/23/2002 | CD-ROM11 |

| | 5/23/2002 | |
|---|---|---|
| 96. | E-mail to John Jensvold from Keith Michael, dated 7/17/2002 | CD-ROM484 |
| 97. | MLEA Invoices List (undated) | CD-ROM732-CD-ROM735 |
| 98. | E-mail to Evan Mongelard from George Timberlake, dated 7/27/2000 | |
| 99. | E-mail to Evan Mongelard from George Timberlake, dated 10/13/2000 | |
| 100. | E-mail to George Timberlake from E.J. Fleming, dated 6/15/2001 | |
| 101. | E-mail to George Timberlake from E.J. Fleming, dated 1/25/2002 | |
| 102. | Letter to T.J. DelGaizo from Barry Smith, dated 4/20/2001 | MLEA232-MLEA233 |
| 103. | Letter to Marty Sergi from T.J. DelGaizo, dated 6/12/2001, and attachment | RTG57-RTG75 |
| 104. | Vilter Materials | RTG148-RTG172 |
| 105. | Cutler Hamer Materials | RTG174-RTG203 |
| 106. | AMSCO Materials | RTG207-RTG217 |
| 107. | Chart Materials | RTG218-RTG230 |
| 108. | PSB Materials | RTG237-RTG250 |
| 109. | ABB Materials | RTG254-RTG260 |
| 110. | ACD Materials | RTG263-RTG279 |
| 111. | Ingersoll-Rand Materials | RTG280-RTG299, |

| | | RTG339-RTG356 |
|---|---|---|
| 112. | Hydro-Thrift Materials | RTG300-RTG321 |
| 113. | API Materials | RTG322-RTG327 |
| 114. | Generon Materials | RTG328-RTG338 |
| 115. | E-mail to Janet Benison from Marty Sergi, dated 5/30/2001 | RTG514-RTG515 |
| 116. | E-mail to Marty Sergi from Rick Kelley, dated 4/13/2001 | RTG564 |
| 117. | Fax to Rick Kelley from Steve Benison, dated 3/26/2001 | C78-C87 |
| 118. | Fax to Rick Kelley from Jim Petrie, dated 3/26/2001 | C88-C94 |
| 119. | Letter to Rick Kelley from T.J. DelGaizo, dated 4/18/2001 | C109 |
| 120. | Fax to Rick Kelley, et al. from John Riordan, dated 4/6/2001 | C175-C177 |
| 121. | Main Line Engineering Associates Invoice # 10568, dated 10/1/2001 | C409 |
| 122. | Main Line Engineering Associates Invoice # 10580, dated 11/2/2001 | C408 |
| 123. | Memo to Manny Menendez from T.J. DelGaizo, dated 1/25/2001 | C411-C412 |
| 124. | Engineered Gas Systems Terms and Conditions | GEN8 |
| 125. | Current Bids for Generon/AGS Chart, dated 12/7/2000 | GEN15-GEN16 |
| 126. | Letter to Barry Smith from Manny Menendez, dated 1/2/2001 | GEN31-GEN32 |
| 127. | Letter to Barry Smith from Manny Menendez, dated 7/9/2001 | GEN70 |
| 128. | E-mail to Manny Menendez, et al., from George Timberlake, dated 12/1/2000 | GEN101 |

| 129. | E-mail to George Timberlake from Manny Menendez, dated 11/20/2000 | GEN104 |
|---|---|---|
| 130. | E-mail to Jim Anderson from George Timberlake with attachment, dated 11/8/2000 | GEN145-GEN165 |
| 131. | E-mail to Jim Anderson from George Timberlake with attachment, dated 11/8/2000 | GEN166-GEN186 |
| 132. | E-mail to Roderik Alewijnse from George Timberlake, dated 10/25/2000 | GEN238-GEN239 |
| 133. | E-mail to Roderik Alewijnse from George Timberlake, dated 8/29/2000 | GEN243 |
| 134. | E-mail to Roderik Alewijnse from George Timberlake, dated 8/15/2000 | GEN283-GEN286 |
| 135. | E-mail to Evan Mongelard from George Timberlake, dated 8/2/2000 | GEN325-GEN328 |
| 136. | Certificate of Incorporation of Casella Waste Systems, Inc., dated 3/1/1993 | C514-C517 |
| 137. | Amended and Restated Certificate of Incorporation of Casella Waste Systems, Inc., dated 12/22/1995 | C518-C533 |
| 138. | Second Amended and Restated Certificate of Incorporation of Casella Waste Systems, Inc., dated 11/3/1997 | C554-C574 |
| 139. | Certificate of Amendment to Second Amended and Restated Certificate of Incorporation of Casella Waste Systems, Inc., dated 10/27/1998 | C575-C576 |
| 140. | Consolidated Financial Statements – Recovery Technologies Group, Inc. (9/7/01 – 3/31/02) | RTG806 – RTG826 |
| 141. | Certificate of Incorporation – Recovery Technologies (Canada) Inc. | RTG827 – RTG837 |
| 142. | Organizational Resolutions of the Shareholder of Recovery Technologies (Canada) Inc. | RTG855 – RTG860 |
| 143. | By-Law No. 1 for Recovery Technologies (Canada), Inc. | RTG 838 – RTG 854 |
|  | Organizational Resolutions of the Shareholder of Recovery Technologies (Canada), Inc. | RTG 00855 – RTG 00867 |

| | | RTG 00867 |
|---|---|---|
| | Recovery Technologies (Canada), Inc. Shareholders' Ledger | RTG 00868 – RTG 00871 |
| 144. | RTG Stock Certificates | RTG872 – RTG874 |
| 145. | Certificate of Incorporation and Certificate of Amendment – Recovery Technologies Group,  Inc. | RTG875 – RTG888 |
| 146. | Unanimous Consent of the Directors of RTG dated January 28, 2002 | RTG904 |
| 147. | Unanimous Consent of the Directors of RTG dated April 30, 2002 (bates label 00906) | RGG906 |
| 148. | Certificate of Resolution to Borrow | RTG908 – RTG909, RTG911 – RTG912 |
| 149. | Unanimous Consent of the Directors of RTG dated July 17, 2002 | RTG910 |
| 150. | RTI–Canada Unanimous Written Consent of Board of Directors in Lieu of Meeting, 7/1/01 | |
| 151. | RTI–Canada Unanimous Written Consent of Sole Shareholder to Actions Taken in Lieu of Meeting, 7/1/01 | |
| 152. | Resolutions of the Board of Directors of RTI–Canada, 4/30/01 | |
| 153. | RTI–Canada Unanimous Written Consent of Directors to Action Taken in Lieu of a Special Meeting Thereof, 4/30/01 | |
| 154. | RTI–Canada Unanimous Written Consent to Directors to Action Taken in Lieu of a Special Meeting Thereof, 4/30/01 | |
| 155. | RTI–Canada Written Consent of Board of Directors to Actions Taken in Lieu of Annual Meeting Thereof, 3/30/01 | |
| 156. | RTI–Canada Unanimous Written Consent of Sole Shareholder to Actions Taken in Lieu of Annual Meeting Thereof, 3/30/01 | |
| 157. | KTI Recycling of Canda, Inc. ("KTI–Canada") Unanimous Written Consent of Directors to Actions Taken in Lieu of Annual Meeting Thereof, 3/30/00 | |
| 158. | KTI–Canada Written Consent of Sole Shareholder to Actions Taken in Lieu of Annual Meeting Thereof, 3/30/00 | |

| | | |
|---|---|---|
| | Taken in Lieu of Annual Meeting Thereof, 3/30/00 | |
| 159. | KTI–Canada Unanimous Written Consent of Directors to Actions Taken in Lieu of Annual Meeting Thereof, 8/30/99 | |
| 160. | KTI–Canada Written Consent of Sole Shareholder to Actions Taken in Lieu of Annual Meeting Thereof, 8/30/99 | |
| 161. | KTI–Canada Resolution of the Sole Shareholder, 9/29/98 | |
| 162. | KTI–Canada Share Subscription, 9/29/98 | |
| 163. | KTI–Canada Resolution of the Sole Director, 9/29/98 | |
| 164. | Receipt, 9/29/98 | |
| 165. | Resignation of Paolo Guida, 9/29/98 | |
| 166. | KTI–Canada Resolutions of the Sole Shareholder, 9/29/98 | |
| 167. | KTI–Canada Consent to Act as a Director and Declaration of Citizenship | |
| 168. | KTI–Canada Consent to Act as a Director, 9/29/98 | |
| 169. | Resolution of the Board of Directors of KTI–Canada, 9/29/98 | |
| 170. | Resolution of the Sole Shareholder of KTI–Canada, 9/29/98 | |
| 171. | KTI–Canada Resolution of the Board of Directors, 9/29/98 | |
| 172. | Unanimous Shareholder Agreement between KTI–Canada, KTI Recycling, Inc., Ross Pirasteh and Rupert H. Chartrand, 9/29/98 | |
| 173. | Resolution of the Board of Directors of KTI–Canada, 11/19/98 | |
| 174. | Resolution of the Board of Directors of KTI–Canada, 11/19/98 | |
| 175. | Resignation of Rupert H. Chartrand, 11/20/98 | |
| 176. | KTI–Canada Resolution of the Sole Shareholder, 11/20/98 | |
| 177. | KTI–Canada Consent to Act as a Director and Declaration of Citizenship, 11/20/98 | |
| 178. | Resolutions of the Board of Directors of KTI–Canada, 12/31/98 | |

| | | |
|---|---|---|
| 179. | Special Resolutions of KTI–Canada, 12/1/99 | |
| 180. | Minutes of the Meetings of the Board of Directors of KTI–Canada, 1/13/00 | |
| 181. | Special Resolution of KTI–Canada, 10/18/00 | |
| 182. | Resolutions of the Sole Shareholder of KTI–Canada, 12/13/00 | |
| 183. | KTI–Canada Incorporation Forms | |
| 184. | KTI–Canada Shareholders' Ledger | |
| 185. | Various Registers of KTI–Canada | |
| 186. | KTI–Canada Shareholder Registration List (9/29/98 – 11/9/98) | |
| 187. | KTI–Canada Share Certificate | |
| 188. | KTI–Canada Articles of Incorporation | |
| 189. | By-Law No. 1 for KTI–Canada | |
| 190. | By-Laws of RTI Collections Services, Inc. | RTG889 – RTG901 |
| 191. | ARR Financial Statements, 3/31/02 | ARR1-6 |
| 192. | ARR Balance Sheet (6/9/01) | ARR7-10 |
| 193. | ARR Balance Sheet (4/30/01) | ARR11-14 |
| 194. | Atlantic Trucking & Limespreading Limited Financial Statements, 6/7/00 | ARR15-21 |
| 195. | Atlantic Trucking & Limespreading Ltd Financial Statements, 12/31/99 | ARR22-25 |
| 196. | Certificate of Name Change, 6/29/00 | ARR 26 |
| 197. | Certificate of Registration, 1/17/96 | ARR 27 |
| 198. | Certificate of Incorporation, 11/26/93 | ARR 28 |
| 199. | Memorandum of Association for Atlantic Trucking & Limespreading Limited | ARR30-31 |

| 200. | Articles of Association for Atlantic Trucking & Limespreading Limited | ARR32-66 |
|---|---|---|
| 201. | Appointment of Agent, 6/29/00 | RTG78 |
| 202. | Notice to the Registrar of Joint Stock Companies | ARR79 |
| 203. | Various Registers for ARR | ARR80-83 |
| 204. | Shareholders' Ledger | ARR84-86 |
| 205. | Resolutions of Directors of Atlantic Trucking & Limespreading Limited (11/26/93) | ARR87-88 |
| 206. | Resolutions of the Shareholder of Atlantic Trucking & Limespreading Limited (11/29/93) | ARR90-93 |
| 207. | Resolution of the Director of Atlantic Trucking & Limespreading Limited (11/29/93) | ARR94-95 |
| 208. | Resolutions of the Director of Atlantic Trucking & Limespreading Limited (11/30/93) | ARR97-98 |
| 209. | Resignation | ARR99 |
| 210. | Special Resolution of the Sole Shareholder of Atlantic Trucking & Limespreading Limited (12/8/94) | ARR100 |
| 211. | Resolution of the Sole Director of Atlantic Trucking & Limespreading Limited (12/8/94) | ARR101 |
| 212. | Resolution of the Directors of Atlantic Trucking & Limespreading Limited (9/4/00) | ARR106 |
| 213. | Special Resolution of the Sole Shareholder of Atlantic Trucking & Limespreading Limited (6/8/00) | ARR 107 |
| 214. | Special Resolution of the Sole Shareholder of Atlantic Trucking & Limespreading Limited (6/8/00) | ARR108 |
| 215. | Resolution of the Director of Atlantic Trucking & Limespreading Limited (6/8/00) | ARR109 |
| 216. | Resignation of Steven Benison | ARR110 |
| 217. | Atlantic Trucking & Limespreading Limited Director's Resolution, 6/8/00 | ARR111 |

| 218. | Atlantic Trucking & Limespreading Limited Shareholder's Resolution, 6/8/00 | ARR 113 |
|------|------|------|
| 219. | Atlantic Trucking & Limespreading Limited Shareholder's Resolution, 6/8/00 | ARR 114 |
| 220. | Certificate of Common Stock | ARR121 |
| 221. | Resolutions of the Board of Directors of ARR (4/30/01) | |
| 222. | ARR Unanimous Written Consent of Directors to Action Taken in Lieu of a Special Meeting (4/30/01) | |
| 223. | ARR Unanimous Written Consent of Directors to Actions Taken in Lieu of a Special Meeting (3/30//01) | |
| 224. | ARR Unanimous Written Consent of Directors to Actions Taken in Lieu of a Special Meeting (8/30/00) | |
| 225. | ARR Unanimous Written Consent of Directors to Actions Taken in Lieu of a Special Meeting (6/30/00) | |
| 226. | ARR Written Consent of Sole Shareholder to Actions Taken in Lieu of Annual Meeting Thereof (6/3/00) | |
| 227. | EGS Purchase Order EGS0100001 | C509 |
| 228. | EGS Purchase Order EGS0100002 | C508 |
| 229. | EGS Purchase Order EGS0100003 | C507 |
| 230. | EGS Purchase Order EGS0100004 | C506 |
| 231. | EGS Purchase Order EGS0100005 | C505 |
| 232. | EGS Purchase Order EGS0100005 Addendum 1 | C504 |
| 233. | EGS Purchase Order EGS0100006 | C503 |
| 234. | EGS Purchase Order EGS0100007 | C500 |
| 235. | EGS Purchase Order EGS0100008 | C499 |
| 236. | EGS Purchase Order EGS0100009 | C495 |
| 237. | EGS Purchase Order EGS0100010 | C498 |

| 238. | EGS Purchase Order EGS0100010 Addendum 1 | C496 |
|---|---|---|
| 239. | EGS Purchase Order EGS0100013 | C493 |
| 240. | EGS Purchase Order EGS0100014 | C492 |
| 241. | EGS Purchase Order EGS0100015 | |
| 242. | EGS Purchase Order EGS0100016 | |
| 243. | EGS Purchase Order EGS0100017 | C491 |
| 244. | EGS Purchase Order EGS0100021 | |
| 245. | EGS Purchase Order EGS0100031 | |
| 246. | Undated Chart Comparing LINC-15 with LINC-30 | CD-ROM63 |
| 247. | Plaintiff 's Objections and Answers to Defendant Casella Waste System Inc.'s  First Set of Interrogatories | |
| 248. | Plaintiff's Response to Defendant Casella Waste System Inc.'s First Set of Requests for Production of Documents and Things | |
| 249. | Defendants' Objections and Responses to Plaintiff's Interrogatories, dated 8/12/2002, in *Generon IGS* Lawsuit | |
| 250. | Defendants Atlantic Recycled Rubber, Inc.'s and Recovery Technologies Group, Inc.'s Initial Disclosures, 10/28/02 | |
| 251. | Plaintiff's Self-Executing Disclosure, 10/25/02 | |
| 252. | Drafts of 15 Ton Per Day Onsite Liquid Nitrogen System | |
| 253. | Draft of 28 Ton Per Day Onsite Liquid Nitrogen System | |
| 254. | Drafts of 30 Ton Per Day Onsite Liquid Nitrogen System | |
| 255. | Drafts of an Onsite Liquid Nitrogen (LIN) Facility Supply Agreement | |
| 256. | Deposition Transcript of Manuel Menendez, 8/15/2003 | |
| 257. | Deposition Transcript of Theodore J. DelGaizo, 8/27/2003 | |
| 258. | Deposition Transcript of Steven John David Benison, 10/14/2003 | |

| | | |
|---|---|---|
| 259. | Deposition Transcript of Robert E. Wetzel, 10/15/2003 | |
| 260. | Deposition Transcript of Richard Gray Kelley, Jr., 10/15/2003 | |
| 261. | Deposition Transcript of James Bohlig, 10/27/2003 | |
| 262. | Deposition Transcript of Martin J. Sergi, 11/14/2003 | |
| 263. | Deposition Transcript of George Timberlake, 11/18/2003 | |
| 264. | Deposition Transcript of Manny Menendez, 10/25/2002 (*Generon IGS Lawsuit*) | |
| 265. | Deposition Transcript of Barry Smith, 2/18/2003 (*Generon IGS Lawsuit*) | |
| 266. | Trial Transcript from *Generon IGS, Inc. v. EGS, CCP, et al.* (September 22 & 23, 2003) | |

# EXHIBIT "B"

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MLEA, INC.,** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 02-CV-4393** |
| | : | |
| **ATLANTIC RECYCLED RUBBER** | : | |
| **INC., RECOVERY TECHNOLOGIES** | : | |
| **GROUP INC., AND CASELLA** | : | |
| **WASTE SYSTEMS, INC.** | : | |
| | : | |
| **Defendants.** | : | |

**DEFENDANT CASELLA WASTE SYSTEMS, INC.'S
<u>PROPOSED POINTS FOR CHARGE</u>**


Defendant Casella Waste Systems, Inc, by and through its undersigned attorneys,

Buchanan Ingersoll PC, respectfully submits these proposed points for charge pursuant to the

Court's Orders of January 22, 2004 and October 22, 2002.

**Instruction No. 1:**

## <u>THE PARTIES</u>

The Plaintiff in this case is MLEA, Inc.  I will refer to MLEA, Inc. as "MLEA."  The defendants are Atlantic Recycled Rubber, Inc., Recovery Technologies Group, Inc., and Casella Waste Systems Inc.  I will refer to them as "ARR," "RTG" and "Casella," respectively.  MLEA filed this lawsuit against ARR, RTG and Casella.  RTG has filed a counterclaim against MLEA.

**Instruction No. 2:**

**BURDEN OF PROOF ON PARTY - BREACH OF CONTRACT**

MLEA has brought a claim for breach of contract against the defendants.  The party bringing an action on a contract must prove its own performance and a breach by the other party. If an affirmative contract to perform a duty is proved, the person bound to perform the duty must prove that the terms and conditions of the contract have been met.  Likewise, where the acts of one party to a contract depend on the acts of the other party, the damaged party cannot support a breach of contract action without showing performance of each dependent act on its part. When suing on a contract to recover damages, it is enough to prove a breach, and it is not necessary to show that the contract was completely broken in every respect.

**Authority:**  Pennsylvania Suggested Civil jury Instructions ("PSCJI") § 15.17

3

**Instruction No. 3:**

## MULTIPLE PARTIES/DEFENDANTS

In this case there are several different parties representing separate and distinct claims. The law permits joining these claims for trial because they arise out of the same subject matter. Although these different claims will be tried together, each is separate from the other(s), and each party is entitled to have you consider each claim separately as it affects that party. Therefore, you should consider the evidence as it relates to each party or claim separately, as you would if each claim had been tried before you separately.

Although there is more than one defendant in this action, it does not follow from that fact alone that if one defendant is liable to the plaintiff, all defendants are liable. Each defendant is entitled to a fair consideration of the evidence. None of the defendants is to be prejudiced should you find against another defendant. [Unless otherwise stated,] all instructions I give you govern the case as to each defendant.

**Authority:** Adapted from Kevin F. O'Malley, Jay E. Grenig and the Honorable William C. Lee, FEDERAL JURY PRACTICE AND INSTRUCTIONS, CIVIL, § 103.14 (5th ed. 2000) (hereinafter "FEDERAL JURY PRACTICE & INSTRUCTIONS")

**Instruction No. 4:**

## ELEMENTS OF CONTRACT ACTION

In order for you to find for the plaintiff <u>on its breach of contract claim</u>, you must find that the plaintiff has proved a number of items by a preponderance of the evidence. Each of these items will be discussed separately.  But first, you need to know what constitutes a contract.

A contract is a legally enforceable agreement between two or more competent parties who have each promised to do, or refrain from doing, some lawful act. Whether oral or written, a contract is enforceable if its terms clearly express what each party intended and expected.  If the terms of the agreement are not definite and certain, any uncertainty may be clarified by examining the circumstances surrounding the bargain. The basic elements that must be present to form a contract, each of which must be proven by a preponderance of the evidence, are offer, acceptance, and consideration.

A.     *Offer*.  A valid offer expresses a willingness to enter into a contract.  The offer gives someone else the power to create the contract by making a valid acceptance of the offer and thereby "sealing the deal."  In determining whether something was intended to be an actual offer, it must be examined in context, and it must be examined in light of the surrounding circumstances. You may find that one party's actions did constitute an offer when you consider the custom established in a particular trade or business, the relation between the parties, and the prior dealings between the parties.

The offer must create the power to accept, and thereby create a binding contract. If the offeree rejects the offer, the offer is no longer open and cannot be accepted.  Other statements may be mistaken for an offer. Some of these include:

1.     An expression of intent to do something in the future (i.e., "I intend to sell my car for $5,000.00." The speaker is not bound to sell the car if the listener hands the speaker the money. The speaker did not offer the car for sale.);

5

2.    A request for bids, or invitations for others to make offers;

3.    An invitation to negotiate, such as "[w]ould you consider selling that?";

4.    A statement that a reasonable person would realize was not made in seriousness; and

5.    An "offer" made by an incompetent person is not a valid offer.

B.    *Acceptance*.  An acceptance is a clear indication that one agrees to be bound by the terms of the offer. The acceptance must be given within the time specified by the offer, or within a reasonable time if none is specified. The person to whom the offer was directed is the only person who may accept the offer.

If the parties have had previous dealings whereby certain methods of acceptance have become customary between them, then such will constitute valid acceptance.  An example of this would be a beginning of the requested performance upon receipt of the offer, rather than sending notice of acceptance of the offer first.

An acceptance must not change the terms of the offer, or impose any additional conditions.  If it does change the terms of the offer it will be considered a counteroffer, rather than an acceptance, and will therefore not create a contract.

C.    *Consideration*. There must be consideration given by each party to a valid contract. That is, each party must have bargained to exchange his or her promise for another. The exchanged promises are either promises to perform or promises not to perform some act. The value or adequacy of the consideration given will not usually be examined, but the circumstances which show that both parties were capable of bargaining will be examined.  In that sense competent people are free to contract, and even if one makes a bad deal, he or she is bound by the agreement.

One's promise to make a gift to another is not an enforceable promise since no consideration was given for that promise and thus no contract was created. There is, however,

consideration where one promises to use his or her best efforts. Yet no consideration will be found upon which to base a contract if one party has promised to do something that he or she is already obligated to do, such as repay a preexisting debt.

**Authority:**  PSCJI §15.00

**Instruction No. 5:**

## BREACH OF CONTRACT – GENERALLY

Failure of a party to a contract to perform in accordance with its terms gives the other party a cause of action for breach. A breach of contract occurs when a party to the contract fails to perform any contractual duty of immediate performance, or violates an obligation, engagement or duty.

Not every nonperformance, however, is to be considered a breach of the contract. If you find that the nonperformance was trivial, and thus that the contract was substantially performed, you must also find that a breach of the contract has not occurred.

**Authority:**  PSCJI §15.04

**Instruction No. 6:**

## CONDITION PRECEDENT - BREACH OF CONTRACT

To prove its breach of contract claim against the defendant, MLEA must establish by a preponderance of the evidence that it met all conditions precedent in its agreements with defendants.

If you determine that Casella was bound by such an agreement, and that the conditions included in the letters of September 13, 2000, December 1, 2000 and December 12, 2001 were terms of such an agreement, you will have to decide whether these terms were conditions precedent. A condition precedent is a condition that must occur before a duty to perform under a contract arises. An act or event designated in a contract will not be construed as constituting a condition precedent unless that clearly appears to be the parties' intent as expressed by clear language, and otherwise it will be construed as a covenant. The burden of proof to establish a condition precedent is on the party alleging a condition precedent.

**Authority:** *Acme Markets Inc. v. Federal Armored Express, Inc.*, 648 A.2d 1214 (Pa. Super. 1994)

**Instruction No. 7:**

## CORPORATE ENTITY - ALTER EGO

Plaintiff MLEA claims that defendant Casella is the alter ego of defendant ARR.  This amounts to a claim that those parties should be treated as being one and the same entity or person under the law so that the separate corporate existence of ARR should be disregarded and defendant Casella should be held liable for ARR's obligations.

One who asserts that a parent corporation is liable for the acts of its subsidiaries bears the burden of proving it.  In order to determine this, you must consider the law of "alter-ego" liability to determine whether ARR or RTG acted on behalf of Casella.

With respect to that issue, you are instructed that a corporation, generally, is a separate legal entity authorized under the law to do business in its own right and on its own credit as distinguished from the credit and assets of other persons or corporations.  Also, the mere fact that one or two individuals own and control the stock structure of a corporation, or that two corporation have common officers or directors, or both, does not mean that the corporation may be regarded as the alter ego of its stockholders.  Generally, the parent corporation must be shown to have a complete domination of not only finances, but of policy and business practice with respect to the transaction.

However, the existence of a corporate entity may be disregarded where it is proved that the corporation was created as a mere device or sham to accomplish some ulterior purpose, or is a mere instrumentality or agent of another corporation or individual owning all or most of its stock, or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose.  In Pennsylvania, the corporate form may be disregarded in limited situations, including

where there is:

1. gross undercapitalization of the subsidiary,

2. failure to adhere to corporate formalities,

3. substantial intermingling of various corporate affairs,

4. the use of the corporate form to perpetrate a fraud.

5. non-payment of dividends;

6. siphoning of funds from subsidiary by dominant shareholders;

7. non-functioning of other officers and directors; and

8. absence of corporate records.

**Authority:**  FEDERAL JURY PRACTICE & INSTRUCTIONS § 108.05

**Instruction No. 8:**

## UNJUST ENRICHMENT

Unjust enrichment or "quantum meruit" is essentially an equitable doctrine – a legal fiction – where the law implies the contract between the parties.  In its complaint, MLEA has alleged that Casella unjustly enriched itself, at MLEA's expense, by accepting and retaining certain engineering plans and design specifications, and that Casella used these plans to construct part of a plant at Truro.

In order to prevail on this claim, MLEA must prove:

1.    That MLEA conferred some benefit upon Casella – in this case, by proving certain equipment and services were received by Casella;

2.    That Casella appreciated the value of the benefit that MLEA conferred upon it; and

3.    That Casella accepted and retained the benefit that MLEA conferred upon it under such circumstances that it would be unjust for Casella to retain the benefit without paying MLEA the value of that benefit.

Whether the doctrine of unjust enrichment applies depends on the unique factual circumstances of each case.  In determining if the doctrine applies, the focus is not on the intention of the party, but rather on whether the defendant has been unjustly enriched.  The most significant element of the doctrine is whether the enrichment of the defendant is unjust.  The doctrine does not apply simply because the defendant may have benefited as a result of the action of the plaintiff.

If you are persuaded that Casella received a benefit from MLEA, then your verdict must be for MLEA on its claim for unjust enrichment.  If you are satisfied from the evidence that Casella did not receive a benefit from MLEA, and thus was not unjustly enriched, then you must return a verdict for Casella.

**Authority:**  *Ameripro Search, Inc. v. Fleming Steel Co.*, 787 A.2d 988, 990 (Pa. Super. 2001)

**Instruction No. 9:**

## PROMISSORY ESTOPPEL - ELEMENTS

In its complaint, MLEA has also brought a claim for promissory estoppel against defendants. Under the theory of promissory estoppel, a promise which the promisor should reasonably expect to induce action or forbearance and which does induce such action or forbearance is binding if injustice can be avoided only by the enforcement of the promise.

In order to prevail on this claim, MLEA must prove that:

> 1. Casella made a promise that it should have reasonably expected would induce action or forbearance on the part of MLEA;

> 2. MLEA actually took action or refrained from taking action in reliance on the promise; and

> 3. Injustice can be avoided only by enforcing the promise.

Reasonable reliance means that the party that changed its position must have lacked the means of knowing the truth about the facts in question.

If you are persuaded that Casella's conduct intentionally or unintentionally led MLEA to believe that a contract was formed, and that MLEA reasonably relied on Casella's conduct, then your verdict must be for MLEA on its claim for promissory estoppel. If you are satisfied from the evidence that Casella did not receive a benefit from MLEA, and thus was not unjustly enriched, then you must return a verdict for Casella.

**Authority:** *Constar, Inc. v. National Distribution Center, Inc.*, 101 F.Supp.2d 319, 324 (E.D. Pa. 2000) (R. Kelly, J.)

13

**Instruction No. 10:**

## GENERAL INSTRUCTION ON DAMAGES

I now turn to the issue of damages.  You must determine whether any of the parties to this lawsuit must compensate any other parties.  The fact that I am instructing you on damages does not mean that you should interpret that I have any belief that any party is liable to any other party in this case.

Instructions as to the measure of damages are given for your guidance only in the event you should find in favor of the plaintiff from a preponderance of the evidence in the case in accordance with the other instructions.

**Authority**:  FEDERAL JURY PRACTICE & INSTRUCTIONS § 106.02

14

**Instruction No. 11**:

## DAMAGES - BREACH OF CONTRACT

Where one party to a contract breaches that contract, the other party may recover for those injuries that have been produced to you with reasonable certainty. Any compensation for injury is termed "damages."

The primary aim or principle of the law of damages for breach of contract is to place the plaintiff in the same position in which the plaintiff would have been if the contract had been fulfilled. Or to place the plaintiff in the same position which he would have occupied had the breach of contract not occurred.

In this case, MLEA has the burden of proving that it suffered damages because of a defendant's breach of the MLEA-ARR contract.

**Authority**: PSCJI § 15.26

15

**Instruction No. 12:**

## CONSEQUENTIAL DAMAGES

If you find that a defendant breached an agreement with MLEA the measure of damages you award should place MLEA as nearly as possible in the same position as it would have been had the defendant not breached the agreement.  This includes consequential losses, if any, which MLEA suffered as a result of the defendant's breach.

Thus, if you find that a defendant breached a contract, MLEA is also entitled to consequential damages.  Consequential damages are all those damages that arise naturally from the defendant's breach or were reasonably foreseeable by MLEA at the time the parties entered into the contract with the defendant.

**Authority:**  *Reimer v. Tien*, 514 A.2d 566 (Pa. Super. 1986)

**Instruction No. 13:**

## DAMAGES MUST NOT BE SPECULATIVE

If you find that MLEA is entitled to damages, you may award it only such damages as will reasonably compensate it for its actual injury which you find from the preponderance of the evidence in this case.

Damages for breach of contract must be shown with certainty and not left to speculation. The law requires MLEA to produce evidence which establishes a basis for assessing damages with a firm degree of probability.

Therefore, you are not permitted to award speculative damages. This means that you cannot guess as to what damages may be, if any, and you cannot make an award of damages based on somebody else's guess or speculation, including that of any witness who has testified at trial. MLEA must have produced evidence to establish, with a fair degree of probability, a basis for assessing damages. I instruct you not to award damages to MLEA if they are too speculative, vague or contingent.

**Authority:** *JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.,* 1998 WL 17588 (E.D. Pa.. April 15, 1998) (McGirr Kelly, J.)

**Instruction No. 14**:

### DAMAGES – CAUSAL CONNECTION

In order to recover for damages pursuant to a breach of contract, a plaintiff must show a causal connection between the breach and the loss.

Thus, if the plaintiff is successful in proving that the defendants breached an agreement with the plaintiff, the plaintiff may only receive whatever damages it suffered if the damages were such as would naturally and ordinarily result from the breach, were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and can be proved with reasonable certainty.

**Authority:**  *Trans Penn Wax Corp. v. McCandless*, 50 F.3d 217 (3d Cir. 1995) (citing *Logan v. Mirror Print Co.*, 600 A.2d 225 (Pa. Super. 1991)

18

**Instruction No. 15:**

## **MITIGATION OF DAMAGES**

You are instructed that a party who has incurred damages because of a breach of contract has a duty under the law to "mitigate" those damages – that is, to make reasonable efforts under the circumstances to reduce or minimize the loss or damage. Mitigation of damages involves reasonable actions by the nonbreaching party to reduce or eliminate the damages caused or incurred by the breach of contract.

So, if you should find that Casella has proved that the plaintiff failed to seek out or take advantage of a business or employment opportunity that was reasonably available to it under all the circumstances shown by the evidence, then you should reduce the amount of plaintiff's damages by the amount it could have reasonably realized if it had taken advantage of such opportunity.

**Authority:** PSCJI § 15.31

19

**Instruction No. 16:**

## <u>VERDICT – ONE OF MULTIPLE DEFENDANTS</u>

At any time during your deliberations, you may return into court your verdict as to any party concerning whom you have unanimously agreed.

**Authority**: FEDERAL JURY PRACTICE & INSTRUCTIONS § 106.04

Respectfully submitted,

_____
Antoinette R. Stone, I.D. No. 23464
Brian J. McCormick, Jr., I.D. No. 81437
BUCHANAN INGERSOLL PC
1835 Market Street, 14th Floor
Philadelphia, PA 19103
(215) 665-8700
(215) 665-8760 (fax)

Attorneys for Defendant Casella Waste
Systems, Inc.

Dated: February 18, 2004

21

<u>**CERTIFICATE OF SERVICE**</u>

I, Brian J. McCormick, Jr., hereby certify that on February 18, 2004, I caused to be served a true and correct copy of Defendant Casella Waste Systems Inc.'s Pretrial Memorandum via first-class mail upon the following:

Philip J. Katauskas
Pepper Hamilton LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103-2799

Heather E. Rennie
Eckert Seamans Cherin & Mellott, LLC
1515 Market Street, Ninth Floor
Philadelphia, PA 19102

_____
Brian J. McCormick, Jr.

#630206-v1;PHL1_General;