## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MLEA, INC.,** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No.  02-CV-4393** |
| | : | |
| **ATLANTIC RECYCLED RUBBER,** | : | |
| **INC., RECOVERY TECHNOLOGIES** | : | |
| **GROUP, INC., AND CASELLA** | : | |
| **WASTE SYSTEMS, INC.** | : | |
| | : | |
| **Defendants.** | : | |

### REPLY BRIEF OF DEFENDANT CASELLA WASTE SYSTEMS, INC. IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Casella Waste Systems, Inc. ("Casella") hereby files this Reply to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion Summary Judgment.

## I.    INTRODUCTION[1]

The risk that a contract will be breached is inherent in any contract.  A variety of means are available to limit that risk and to protect against it.  However, it is the contracting party's obligation, not the Court's, to incorporate limitations and protections.  It is not the business of the Court to rectify imprudent or bad business judgments by rewriting contracts, or creating contracts where they do not exist, with hindsight.

---

[1]    Casella filed its Motion for Summary Judgment on February 10, 2004.  Defendants Recovery Technologies Group, Inc. ("RTG") and Atlantic Recycled Rubber, Inc. ("ARR") also filed motions for summary judgment and partial summary judgment, respectively, that same day.  Plaintiff's Responses to all three Motions were due on March 15, 2004.  However, on March 12, 2004, Plaintiff filed for bankruptcy, and requested a stay in the district court of this litigation.  The stay was granted by Order of the Court on March 17, 2004.

Plaintiff subsequently received relief from the stay, and filed an omnibus Response to the three separate Motions on October 15, 2004.

Assuming that a contract even exists here, which it does not, MLEA admits that it "way over-committed" itself, through no fault of Casella's.  *See* Exhibit "R." [2]  The truth of the matter is that MLEA chose to order the equipment at issue and perform certain engineering services without an executed contract for a turnkey liquid nitrogen plan.  MLEA is now seeking to blame and impute liability to three other parties, including Casella, for its own bad business judgment. There is no basis in fact or under law for such a result.

## II.    <u>STATEMENT OF UNDISPUTED FACTS</u>

The following critical facts are undisputed as set forth, for the most part, in Plaintiff's own admissions and documents.  Plaintiff has not rebutted these facts, and they serve as the basis for Casella's underlying motion:

- The parties never reached a meeting of the minds, so therefore never executed a final contract for a turnkey liquid nitrogen plant.  *See* Exhibit "I," Menendez Transcript at 73; Exhibit "J," DelGaizo Transcript at 33-34, 92; Exhibit "F," Timberlake Transcript at 50; Exhibit "L," at 149, 152-53, 174, 186 (trial transcript from *Generon IGS, Inc. v. Engineered Gas Systems, LLP, et al.*, No. 02-00973, Court of Common Pleas of Chester County); Exhibit "U" (plaintiff admitted that "[t]here never was a written contract or signed purchase order for the entire facility between Messer or Generon and ARR" in an April 2001 letter to one of its vendors);

- The parties never reached an agreement regarding, or even discussed, the drafting of the engineering plans and foundation drawings.  *See* Exhibit "I," Menendez Transcript at 93-96; Exhibit "J," DelGaizo Transcript at 93-94;

---

[2] All references to Exhibits identified <u>by letters</u> in this Reply brief refer to exhibits attached to Casella's February 10, 2004, Motion for Summary Judgment.  All Exhibits identified <u>by numerals</u> refer to those exhibits attached to this Reply brief.

- None of the defendants agreed to pay MLEA for drafting or creating the engineering plans and foundation drawings. *See* Exhibit "I," Menendez Transcript at 93-96; Exhibit "J," DelGaizo Transcript at 93-94;

- ARR is a wholly owned subsidiary of Recovery Technologies (Canada), Inc. ("RTI-Canada"),[3] which is a wholly owned subsidiary of defendant RTG, which was owned for a short time by Casella. *See* Exhibit "1," Benison Transcript at 128-29; Exhibit "2," Bohlig Transcript at 16-18; Exhibit "W" (Casella corporate organizational chart);

- MLEA has never delivered to any defendant the entire set of engineering plans and drawings necessary to construct the plant, and the plant cannot be built without a full set of plans. *See* Exhibit "I," Menendez Transcript at 94-96; Exhibit "J," DelGaizo Transcript at 109;

- MLEA never believed that RTG and/or Casella were going to guarantee ARR's performance of the purchase orders, and no such guarantee was ever given. *See* Exhibit "3," Timberlake Transcript at 151, 178-79;

- Some of the engineering plans and drawings at issue were provided to ARR or RTG on or around September 10, 2001. *See* Plaintiff's Pretrial Memorandum, at 8;

- The foundation drawings at issue were provided to ARR or RTG on or around September 14, 2001. *See* Plaintiff's Pretrial Memorandum, at 8; Exhibit "4," at 4 (Plaintiff's Objections and Answers to Casella's Interrogatories);

- ARR, and ARR alone, executed the three purchase orders issued to MLEA in December 2000. *See* Plaintiff's Pretrial Memorandum, at 3, 4 ("[O]n December 12, 2000, <u>Benison, of Atlantic Recycled, issued Purchase Orders</u> 715260 and 715261 . . ..") (emphasis added); Exhibits "O" and "P" (copies of ARR purchase orders);

- Casella was not a signatory to the "Four-Way  Letter." *See* Exhibit "E" (copy of January 19, 2001 "four-way letter");

- None of the three defendants executed or were signatories to the "Three-Way Letter." *See* Exhibit "F" (copy of January 15, 2001 "three-way letter");

---

[3] Plaintiff chose not to sue RTI-Canada, even though ARR was a wholly owned subsidiary of RTI-Canada.  RTI-Canada was formerly known as KTI Recycling of Canada, Inc.

- Any final agreement on any contract for a turnkey liquid nitrogen plant at Truro was contingent on obtaining third-party financing through a lease for construction of the project. *See* Exhibit "H" (RTI-Canada stated that this "purchase is contingent on the completion of a leasing agreement and acceptance by the Canadian and Local authorities"); Exhibit "G"; Exhibit "3," Timberlake Transcript at 43, 89, 118-19, 188;

- None of the parties obtained the necessary financing. *See* Exhibit "3," Timberlake Transcript at 169; and

- During negotiations, Mr. Timberlake falsely claimed that a lease had already been arranged for the project. *Compare* Exhibit "G" (copy of Sept. 13, 2000, letter from G. Timberlake) to Exhibit "5," at ¶¶ 4-5 (Declaration of Alan Cohen) and Exhibit "3," Timberlake Transcript at 27-29, 111-14.

In addition, Plaintiff chose not to sue the company that owned ARR – RTI-Canada – at the time of the negotiations and the unconsummated transaction. For most of the relevant time period, the corporate chain at issue here was as follows:

Casella Waste Systems, Inc.

↓

Recovery Technologies Group, Inc.

↓

Recovery Technologies (Canada), Inc.

↓

Atlantic Recycled Rubber, Inc.

In its opposition, Plaintiff tries to "muddy the waters" in an effort to persuade the Court that material facts remain in dispute. Close scrutiny of the facts that are not in dispute will show that Casella is entitled to summary judgment.

III.    **LEGAL ARGUMENT**

    A.    **Plaintiff MLEA Cannot "Pierce the Corporate Veil" To Reach Defendant Casella.**

MLEA contends that it willingly entered into an agreement <u>with ARR</u> under the terms contained in three purchase orders.  MLEA never requested, at any time, any type of executed agreement from Casella.  Nor did it ever require a guarantee or signed purchase order from RTG or Casella (instead of ARR) before it began ordering equipment.  Now, after ARR allegedly breached a contract, MLEA alleges that RTG and/or Casella were the "alter egos" of ARR and seeks to hold those parties liable for ARR's alleged breach.

However, there is simply insufficient evidence to permit MLEA to pierce the corporate veil to reach Casella.  The Third Circuit applies a rigorous test to the determination of whether to pierce the corporate veil.  *See Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1521-23 (3d Cir. 1994) (applying Pennsylvania law), *aff'd*, 514 U.S. 938 (1995).  In *Kaplan*, the Court indicated that "the corporate veil is pierced only when 'the corporation was an artifice and a sham to execute illegitimate purposes and [an] abuse of the corporate fiction and immunity that it carries.'" *Id.* at 1520-21 (citations omitted).  The Court noted that "[n]ot every disregard of corporate formalities or failure to maintain corporate records justifies piercing the corporate veil," adding that the piercing remedy "is available only if it is also shown that a corporation's affairs and personnel were manipulated to such an extent that it became nothing more than a sham used to disguise the alter ego's use of its assets for his own benefit in fraud of its creditors." *Id.* at 1521.  The Court also indicated that "[b]ecause alter ego [piercing] is akin to and has elements of fraud, we think it too must be shown by clear and convincing evidence." *Id.* at 1522 (citations omitted).  As will be demonstrated below, such "clear and convincing"

evidence is not present in the case at hand.

The Third Circuit has further stated:

> The corporate form was created to allow shareholders to invest without incurring personal liability for the acts of the corporation. These principles are equally applicable when the shareholder is, in fact, another corporation, and hence, mere ownership of a subsidiary does not justify the imposition of liability on the parent.

*Pearson v. Component Technology Corp.*, 247 F.3d 471, 484 (3d Cir. 2001) (in federal WARN Act case, appellate court affirmed district court's grant of summary judgment for defendant and would not permit plaintiff to pierce the corporate veil) (citing *United States v. Bestfoods*, 524 U.S. 51, 69 (1998)) (emphasis added).  In *Pearson*, the Third Circuit observed that "[t]he test . . . is demonstrably an inquiry into whether the debtor corporation is little more than a legal fiction. Such a burden is notoriously difficult for plaintiffs to meet."  *Id.* at 485.  Only "specific, unusual circumstances" can compel an exception to this rule.  *See Zubik v. Zubik*, 384 F.2d 267, 273 (3d Cir. 1967), *cert. denied*, 390 U.S. 988 (1968) (citations omitted) (applying Pennsylvania law).

Thus, under the "alter ego" theory, a party seeking to disregard a corporate entity must prove that an owner so dominates or controls the corporate entity that the corporate actions are those of the owner.  *See Parkinson v. Guidant Corp.*, 315 F.Supp.2d 741, 745 (W.D. Pa. 2004) (applying Pennsylvania law).   There must also be clear proof that "the corporate fiction is being used by the corporation itself to defeat public convenience, justify wrong either to third parties dealing with the corporation . . ., perpetrate fraud or other similar reprehensible conduct."  *Sams v. Redevelopment Auth,* 244 A.2d 779, 781 (Pa. 1968).  The burden of proof is clearly on the party attempting to negate the existence of the corporate form.  *Zubik*, 384 F.2d at 272.

MLEA has not proffered any evidence to the Court that Casella, RTG or RTI-Canada "dominated" ARR to such an extreme extent, or that the corporate entities here were misused in any way.  Moreover, courts are reluctant to disregard the corporate form in contract cases such as

this one, where the Plaintiff, a voluntary creditor, knew the party with which it was contracting and failed to negotiate guarantees or other security arrangements with the parent corporation. *See* Casella's February 10, 2004 Motion for Summary Judgment, or, Alternatively, for Partial Summary Judgment ("Casella's Motion"), at 13.  There is simply insufficient evidence to warrant piercing the corporate veil to reach Casella.   For these reasons, discussed more fully below, the Court should grant Casella's Motion for Summary Judgment, and dismiss Casella from this lawsuit.

      1.       **MLEA Has Not Produced The Evidence Necessary To Survive A Motion For Summary Judgment.**

In its Opposition brief, MLEA relies on the following proposition for its argument that MLEA should be permitted to pierce the corporate veil:

> While consideration of each of the individual factors . . . is important, the real question to consider is 'if the corporate form is a sham, constituting a facade for the operations of the dominant shareholder.'

Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (hereinafter, "Plaintiff's Opposition"), at 27 (citing *River Road Development Corp. v. The Carlson Corp. – Northeast*, Civ. A. Nos. 89-7037 and 90-2386, 1992 WL 212351, at *16 (E.D. Pa. Aug. 27, 1992)).  Casella agrees with this proposition, and notes that MLEA offered no record evidence showing that Casella "created" either ARR or RTG (or RTI-Canada) for any of the purposes that *River Road* and *Sams* forbid, or that ARR or RTG were created or used by Casella as a shame or as a façade for Casella's operations, so there is no basis for piercing the corporate veil.

MLEA makes much of the fact that Casella and RTG had common employees and directors.  However, it is "entirely appropriate" for a parent and subsidiary corporation to have

common management and it is "normal" for a parent and subsidiary to have identical directors

and officers.  *See United States v. Bestfoods*, 524 U.S. 51, 69 (1998).  In *Bestfoods*, the Supreme

Court stated:

> In imposing direct liability on these grounds, the District Court failed to
> recognize that "it is entirely appropriate for directors of a parent
> corporation to serve as directors of its subsidiary, and that fact alone may
> not serve to expose the parent corporation to liability for its subsidiary's
> acts."

*Id.* at 69 (citations omitted).

    Similarly, common officers often "change hats" to represent the two

corporations separately:

> This recognition that the corporate personalities remain distinct has its
> corollary in the "well established principle [of corporate law] that directors
> and officers holding positions with a parent and its subsidiary can and do
> 'change hats' to represent the two corporations separately, despite their
> common ownership." Since courts generally presume "that the directors
> are wearing their 'subsidiary hats' and not their 'parent hats' when acting
> for the subsidiary," it cannot be enough to establish liability here that dual
> officers and directors made policy decisions and supervised activities at
> the facility.

*Id.* (citations omitted).  Thus, for example, MLEA's allegations regarding Martin Sergi, who

served as RTG's President and CEO and as a member of Casella's Board of Directors during the

relevant time period, are misplaced.  This evidence is not indicative of the "specific, unusual"

circumstances or "reprehensible conduct" necessary to pierce the veil.

    The Third Circuit has also held that the fact that a subsidiary is required "to secure

approval from their parent corporations for large investments and acquisitions or disposals of

major assets," does not necessarily lead to alter ego liability.  *See Phoenix Canada Oil Co. Ltd. v.

Texaco, Inc.*, 842 F.2d 1466, 1476 (3d Cir. 1988), *cert. denied*, 488 U.S. 908 (1988).  *See also

Local Union No. 98 v. Morris*, No. Civ. A. 03-5272, 2004 WL 1151722, *2, 4 (E.D. Pa. May 24,

2004) (Bartle, J.) (fact that allegedly "sham" corporation had been an operating and active entity for 25 years was a factor in precluding efforts to pierce the corporate veil).

There is abundant and undisputed evidence in the record, including the following, that ARR and RTG were entities separate from each other and from Casella, functioned as separate entities and were not "shell" corporations established by Casella for the purpose of defrauding MLEA:

- ARR had been operating since 1994, and continues to operate today. *See* Exhibit "1," Benison Transcript, at 7-8. *Compare Local Union No. 98*, 2004 WL 1151722, *2, 4;

- RTG previously existed as KTI, which was a multi-million dollar recycling and municipal waste company that has existed since at least 1985, and it continues to operate today. *See* Exhibit "A," Bohlig Transcript, at 12-14; Exhibit "6," Sergi Transcript, at 93-95. *Compare Local Union No. 98*, 2004 WL 1151722, *2, 4;

- Casella is able to provide extensive business reasons not related to ARR for its purchase of RTG's predecessor, KTI, in 1999. *See* Exhibit "A," Bohlig Transcript, at 12-14. *Compare Local Union No. 98*, 2004 WL 1151722, *2, 4;

- "Gross undercapitalization" did not exist here; in fact, ARR was solvent and paying its own bills. *See* Exhibit "6," Sergi Transcript, at 9-10 ("Atlantic was solvent in the sense, if the question means that they had had enough liquid assets to pay their current bills, they were solvent."). *Compare Phoenix Capital*, 842 F.2d at 1476;

- MLEA has not provided any evidence that RTG and ARR did not follow corporate formalities and/or conduct their financial operations so that each had its own separate corporate existence. *See Garden State Tanning, Inc. v. Mitchell Mfg. Group, Inc.*, 55 F.Supp.2d 337, 345 (E.D. Pa. 1999) (Katz, S.J.) (where plaintiff could not offer, *inter alia*, any evidence that defendants did not observe corporate formalities, and defendants demonstrated that corporate formalities were followed by both parent and subsidiary, summary judgment was proper for parent corporation); and

- Plaintiff chose not to join ARR's parent corporation, RTI-Canada, in this lawsuit, or amend the complaint during discovery to join RTI-Canada.

Additionally, during discovery, the defendants produced hundreds of pages of corporate records and financial documents, including certificates of incorporation, resolutions of

shareholders, resolutions of directors, and financial statements, *see, e.g.*, Casella's Pretrial

Memorandum, at Exhibit "A" (List of Trial Exhibits), demonstrating that each defendant is a

separate and distinct entity.  Plaintiff has not addressed or challenged any of these documents.

Nor has Plaintiff introduced even one fact into the record that ARR or RTG (or RTI-Canada) did

not observe the necessary corporate formalities.

These facts establish that ARR, RTG and Casella functioned in the real world as separate

and distinct entities.  Moreover, Plaintiff has not produced any evidence relating to the

relationship between ARR and its direct parent, RTI-Canada, or between RTG and RTI-Canada.

Thus, Plaintiff is skipping a crucial step in the chain of corporations here.  Further, ARR and

RTG are both operating, ongoing entities in Nova Scotia, Canada, and New Jersey, respectively.

Plaintiff has produced no evidence that Casella set them up as "sham" or "shell" corporations.

Finally, MLEA has failed to point out any evidence regarding the elements of control,

undercapitalization and common management that will defeat the rigorous test that Pennsylvania

and the Third Circuit have adopted in order to justify piercing the corporate veil.

Accordingly, MLEA's attempt to pierce the corporate veil of ARR, RTI-Canada and

RTG to pin liability on Casella is not sufficient under Pennsylvania law.  Plaintiff has conducted

extensive discovery and depositions of ARR, RTG and Casella, and has failed to produce any

evidence of the extraordinary circumstances or fraud necessary to pierce the corporate veil.

### 2. MLEA's "Bait-And-Switch" Fraud Theory Is Factually Inaccurate, And Legally Impossible.

MLEA's eleventh-hour "bait and switch" fraud argument arises from desperation.

Plaintiff's Opposition, at 28-30.  In fact, Plaintiff introduces this theory for the first time in its

Opposition to Defendants' Motions.

First, Plaintiff did not include a fraud claim in its Complaint and has not amended its Complaint to add such a claim.  Nor did Plaintiff make any reference to a fraud claim in its Pretrial Memorandum, which was filed on February 10, 2004.

Additionally, the statute of limitations for a fraud claim has run against MLEA.  In Pennsylvania, the statute of limitations for a fraud claim is two years.  42 Pa.C.S.A. § 5524(7).  Accordingly, Plaintiff is barred from relying on any alleged fraud by the defendants in prosecuting its case.  Moreover, the Federal Rules of Civil Procedure require that a cause of action for fraud be pleaded with particularity.  Fed.R.Civ.P. 9(b).  Plaintiff has not pleaded fraud anywhere, let alone with particularity.

Further, MLEA's argument is disingenuous considering its own fraudulent conduct in procuring the purchase orders.[4]  For example, Mr. Timberlake misrepresented, among other things, that a leasing agreement was already in place in September 2000 and that National Fleet Leasing had objected to the stipulations obligating Messer to repurchase or accept return of the equipment.  *Compare* Exhibit "G" (copy of Sept. 13, 2000 letter from G. Timberlake), Exhibit "3," Timberlake Transcript at 27-29, 111-14, 153-55, 167-68, and Exhibit "5," at ¶¶ 4, 9-10 (Declaration of Alan Cohen).  *See also* Exhibits "I," at ¶¶ 12-14 (Declaration of J. Riordan) and "H," ¶¶ 13-15 (Declaration of W. Meckert) (Messrs. Riordan and Meckert provided sworn statements that Timberlake represented to them that National Fleet Leasing had objected to "buy-back" stipulations), attached to the Appendix of Exhibits in Support of Defendants ARR's and RTG's Motions for Summary Judgment.  During his deposition, Mr. Timberlake testified that he did not have any discussions with anyone from the leasing company regarding Messer's proposal to buy back the equipment, and that he did not recall discussing the "buy back" restriction with anyone from ARR or RTG.  *See* Exhibit "3," Timberlake Transcript at 167-68.   Mr.

---

[4] Defendants pleaded fraud as an affirmative defense.

Timberlake's misrepresentations provide "clear and convincing" evidence to support Casella's affirmative defense of fraud.

Additionally, MLEA's "bait-and-switch" defense is simply incorrect factually, based on its own witnesses' testimony.  At all relevant times, MLEA knew which defendant was the contracting party.   All three purchase orders, which were accepted by MLEA without question on two separate occasions, were issued on ARR letterhead.  *See* Exhibits "O" and "P." Moreover, Mr. Menendez and Mr. Timberlake visited the site – on ARR's property.  *See* Exhibit "F," Timberlake Transcript at 19; Exhibit "7," Menendez Transcript at 80-82.   Everyone knew that the plant was being built at ARR's location, that ARR was the customer and that the purchase orders were being issued by ARR, not RTG or Casella.  *See* Exhibit "3," Timberlake Transcript at 18, 157-59; Exhibit "J," DelGaizo Transcript at 28-29, 101.   In fact, the "four-way letter" specifically contemplates an agreement only between ARR and EGS, Plaintiff's predecessor.  Exhibit "E."

Indeed, Mr. Timberlake testified as follows:

Q.   What was the entity who was going to be purchasing that?
A.   Oh, I thought that ARR would purchase it.
                              * * * * *
Q.   And was this a purchase order between Messer Advanced Gas Systems and Atlantic Recycled Rubber, Inc.?
A.   Yes.
Q.   And you understood when you received this purchase order that the entity you were dealing with was Atlantic Recycled Rubber, Inc.?
 A.   Yes.
                              * * * * *
Q.   Okay.  But you understood when you reached that agreement you were reaching an agreement with Atlantic Recycled Rubber?
 A.   Certainly.  I didn't know how the various entities fit together.

Exhibit "3," Timberlake Transcript, at 157, 158, 160.  There was no "bait and switch" here.

MLEA knew exactly which company it was dealing with.

Finally, after broadly claiming that Casella participated in this "bait and switch" scheme with ARR and RTG, MLEA does not point to one iota of evidence tying Casella to such an elaborate scheme.  *See* MLEA's Opposition, at 28-30 ("Recovery Technologies continued its fraud . . .", "Recovery Technologies cemented the fraud . . .", and "Recovery Technologies' fraud . . ." ).  As such, Plaintiff's attempts to create a corporate shell game will not work here.

There simply is no evidence of fraud or other such conduct here.  And even if such evidence existed, MLEA has not shown that Casella was aware of or participated in any fraud.

### 3. MLEA's "Directly Liable" Argument Is A Diversion To Gain A Non-Existent Claim Against Casella.

As an alternative theory to piercing the corporate veil, MLEA argues that it can avoid the strict standards of piercing the corporate veil in Pennsylvania and the Third Circuit by belatedly pleading that Casella is somehow *directly* liable to MLEA.  This theory is inappropriate here, as MLEA has not demonstrated the complete domination and intrusiveness of a parent corporation over daily business decisions necessary to bring this theory into play.

"Direct liability" against a parent corporation requires evidence of the same nature needed to establish an agency or alter ego theory – such as direct control and influence by a parent over the subsidiary's operations:

> In such situations, the parent has not acted on its own (in which case there would be no need even to consider the subsidiary's actions), nor has it acted in its capacity as owner of the subsidiary;  rather, it has forced the subsidiary to take the complained-of action, in disregard of the subsidiary's distinct legal personality.

*Pearson*, 247 F.3d at 486-87 (citations omitted).  This theory is "not often employed to hold parent corporations liable for the acts of subsidiaries in the absence of other hallmarks of overall integration of the two operations, . . .." *Id.* at 486-87 (citing *Bestfoods*, 524 U.S. at 64).

13

For example, in *Bestfoods*, the Supreme Court stated that when examining direct *or* derivative liability, "the acts of direct operation that give rise to parental liability must necessarily be distinguished from the interference that stems from the normal relationship between parent and subsidiary." *Bestfoods*, 524 U.S. at 71.  The Supreme Court reasoned that certain conduct by a parent "should not give rise to direct liability," including "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures." *Id.* at 72.  Here, the record cannot support an inference of direct liability.

The undisputed facts are that Casella is the "great-grandparent" of ARR. No Casella employee ever signed or approved of the purchases orders between ARR and MLEA, and only ARR's General Manager signed the purchase orders.  Moreover, none of the actions complained of by MLEA constitute evidence of liability under *Bestfoods*.  For example, the involvement of Casella's Rick Kelley in ARR's business is nothing more than the "monitoring of the subsidiary's performance" described in *Bestfoods*.  Similarly, William Meckert's participation in the issuance of the purchase orders is simply "supervision" of ARR's finance and budget decisions.  *See Bestfoods*, 524 U.S. at 17.

Further, MLEA treated ARR and RTG, let alone Casella, as separate entities.  MLEA accepted three separate purchase orders that specifically identified the customer as ARR.  *See* Exhibits "O and "P."  Moreover, MLEA has submitted no testimony of any MLEA witness claiming to have been confused or misled as to the identity of the entities.  For many of the reasons set forth above in section § II.A.1., simply sharing officers and employees does not mean that the parent can be held liable for the breach of a contract entered into by one of its subsidiaries.  Further, holding a parent corporation liable for a breach of contract by a subsidiary

simply because an employee of the parent may have known of the contract, or participated in its execution, completely eviscerates the reasons for a parent-subsidiary relationship.

Finally, MLEA spends most of the two pages in its brief discussing this theory solely attempting to tie RTG, ARR's "grandparent" corporation, to the ARR–MLEA transaction.   At the very end of its argument, Plaintiff broadly proclaims that Casella is also responsible, yet provides no specific facts relating to Casella.  Further, the evidence on which MLEA relies to tie Casella into the claim occurred <u>after</u> the purchase orders were issued.   For example, Mr. Kelley did not begin advising on this project until late February 2001, more than two months after the purchase orders were issued, and Mr. Wetzel's alleged agreement to pay the equipment vendors occurred <u>after</u> Casella had spun off the majority of RTG.  Any damages that MLEA claims it incurred were suffered well before Kelley's and Wetzel's involvement.

To accept MLEA's argument here would dramatically alter traditional concepts of corporation law.  MLEA's "direct liability" claim is specious, and Casella's Motion for Summary Judgment should be granted.

**4.    Under Pennsylvania Law, A Request To Disregard A Distinct Corporate Entity Is A Claim For An Equitable Remedy Which <u>Should Be Resolved By The Court Sitting In Equity.</u>**

Plaintiff also argues that summary judgment should be denied here because only a jury may determine whether to pierce the corporate veil.  This argument is simply wrong.  MLEA cannot nullify Rule 56 simply by seeking to pierce the corporate veil.

MLEA is also incorrect in stating that it is "hornbook law" that the piercing of the corporate veil is an issue to be decided solely by the jury.   Plaintiff's Opposition, at 25.  To the contrary, Pennsylvania courts have consistently held that piercing the veil of a corporate entity is a form of equitable relief that should be decided by the Court.  *See Advanced Telephone Systems,*

*Inc. v. Com-Net Professional Mobile Radio, LLC*, 846 A.2d 1264, 1275-78 (Pa. Super. 2004)

(holding that there is no right to a jury trial in a veil piercing case under the Pennsylvania

Constitution) (citing cases).[5]  *See also Int'l Union of Operating Eng'rs v. Linesville Constr. Co*.,

322 A.2d 353, 356 (Pa. 1974) (holding that "[a] court of equity is peculiarly adapted to resolve

this [veil piercing] problem") (citations omitted).[6]  Indeed, even a case cited by Plaintiff, *River*

*Road*, 1992 WL 212351, at *16, holds that "[p]iercing the corporate veil is an equitable remedy."

Thus, whether the corporate entity can be disregarded and a parent corporations held

liable for a subsidiary's alleged breach is a question which lies not in law but in equity.

### B.    Defendant Casella Did Not, And Will Not, Gain Any Benefit From Plaintiff's Plans, So Plaintiff's Unjust Enrichment Claim Must Be Dismissed.

Casella showed, in its Motion for Summary Judgment, that it did not, <u>and could not</u>,

receive a benefit from Plaintiff's engineering plans.  Casella's Motion, at 19-21.   Realizing that

it cannot argue in good faith that a benefit has been conferred on the defendants, Plaintiff now

argues "the plans will undoubtedly aid in the future building of any plant, a definite benefit."

MLEA's Opposition, at 19.

---

[5] Plaintiff relies on three cases for the proposition that veil piercing is an issue that should be decided by a jury. Plaintiff's Opposition, at 25-26.  Two of these cases (*Regent Nat'l Bank v. Dealers Choice Automotive Planning, Inc*., Civ. A. No. 96-7930, 1999 WL 357364, at *6 (E.D. Pa. June 2, 1999) and *Brownstein v. Hewlett Packard Co*., Civ. A. Nos. 95-2459 and 96-3600, 1997 WL 134898 (E.D. Pa. Mar. 18, 1997)) rely on *Cantiere DiPortovenere Piesse v Kerwin*, 739 F. Supp. 231 (E.D. Pa. 1990) for that proposition.
      However, in *Advanced Telephone*, the Pennsylvania Superior Court rejected the holding in *Cantiere* for support of this proposition.  *Compare* MLEA's Opposition, at 25-26 to *Advanced Telephone*, 846 A.2d at 1276-77.

[6] *Compare Bangor Punta Operations, Inc. v. Bangor & Aroostook RR Co.*, 417 U.S. 703, 713 (1974) (United States Supreme Court addressed the issue of disregarding a corporate form and held that "[i]n such cases, <u>courts of equity</u>, piercing all fictions and disguises, will deal with the substance of the action and not blindly adhere to the corporate form."  (emphasis added); *Eastern Minerals & Chem. Co. v. Mahan*, 225 F.3d 330, 333 n.6 (3d Cir. 2000) ("The <u>classical piercing of the corporate veil is an equitable remedy</u> whereby a court disregards the existence of the corporation to make the corporation's individual principals and their personal assets liable for the debts of the corporation.") (emphasis added) (citing *In re Blatstein*, 192 F.3d at 100 (applying Pennsylvania law)).

First, MLEA's theory is legally incorrect.  Casella laid out the elements of an unjust enrichment claim in its original Motion.[7]  Casella's Motion, at 19.   MLEA cannot satisfy these elements in this case at this time because no benefit has been conferred on any defendant. Indeed, "[i]t is incumbent upon a plaintiff in an unjust enrichment action to prove that a defendant has in fact been benefited or enriched."  *Scaramuzza*, 2004 WL 2063062, *5 (citing cases).   Moreover, "[i]t is well established that an unjust enrichment action will fail based on the allegations of future benefits."  *Id.* (holding that when alleged benefit has yet to occur, no relief could be granted under any set of facts because defendant had not been unjustly enriched yet).

Second, Casella no longer owns any part of RTG, RTI-Canada or ARR, making any "future benefit" of no value to Casella.  On or about April 22, 2004, Casella, through a wholly owned subsidiary, Casella RTG Investors Co., LLC, transferred all of its rights, title and interest in RTG Holding Corporation to Crumb Rubber Investors Co., LLC. *See* Exhibit "8," ¶ 3 (Declaration of Michael J. Brennan).  As of that date, neither Casella nor any of its subsidiaries or affiliates has any further stock or equity interest in or to RTG Holding Corporation or any subsidiary of RTG Holding Corporation.  *Id.* at ¶ 4.   Nor does Casella have any right to receive any payments, distributions or other financial or ownership benefits from RTG Holding Corporation or any subsidiary of RTG Holding Corporation.  *Id.* at ¶ 5.   Thus, Casella will not receive a benefit from MLEA's alleged efforts, if any ever accrues.

Third, the facts simply do not support the claim of past benefit.  Two of MLEA's principals have admitted that MLEA never delivered, and still have not delivered, all of the

---

[7] "Unjust enrichment is a retroactive equitable remedy, where one party has been unjustly enriched at the expense of another. . . .  For a plaintiff to sustain an unjust enrichment action, he must prove the following key elements: (1) benefits were conferred on the defendant; (2) the defendant appreciated the benefit; and (3) the acceptance or retention of such benefits would be inequitable or unconscionable."  *Scaramuzza v. Sciolla*, No. Civ. A. 04-CV-1270, 2004 WL 2063062 (E.D. Pa. Sept. 14, 2004) (Baylson, J.)  (citing *Mitchell v. Moore*, 729 A.2d 1200, 1202 n.2, 1204 (Pa. Super. 1999)).

engineering plans and drawings to RTG or ARR. *See* Exhibit "I," Menendez Transcript at 94-96; Exhibit "J," DelGaizo Transcript at 109. Mr. Menendez, MLEA's Vice-President of Engineering, has testified that without the complete plans, neither ARR, nor RTG, <u>nor any other company</u>, can build the plant:

> Q.    As of September 14, 2001, with the plans that were provided in January or February and these foundation drawings, could RTG or ARR have built or manufactured the plant?
> A.    No, not with those drawings.
> Q.    What else was needed?
> A.    They needed the remainder of the detailed piping drawings.
>                               * * * * *
> Q.    The material that is not provided to RTG and ARR, was that necessary to construct the plant?
> A.    Yes.

*See* Exhibit "I," Menendez Transcript at 94, 96.

Additionally, two RTG employees have submitted sworn statements that the liquid nitrogen plant was never constructed and that the plans provided by MLEA to ARR/RTG in September 2001 have never been used. *See* Declaration of George William Meckert, at ¶ 18 (attached as Exhibit "H" to the Appendix of Exhibits in Support of Defendants ARR's and RTG's Motions for Summary Judgment) and Declaration of James R. Anderson, at ¶¶ 15-16 (attached as Exhibit "F" to the Appendix of Exhibits in Support of Defendants ARR's and RTG's Motions for Summary Judgment). The only evidence that MLEA can muster to dispute these facts is Mr. DelGaizo's self-serving Affidavit stating that "It is my understanding that the defendants actually installed the foundations at the Truro Site, which could not have been accomplished without the foundation plans produced and delivered by MLEA." Affidavit of Theodore J. DelGaizo, at ¶ 8. Moreover, Mr. DelGaizo's statement is based solely on his "understanding." *Id.* He cites no facts to support that belief. As such, this Court should give no weight to his unsubstantiated, hearsay-based statement in considering this motion. *See*

Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits <u>shall be made on personal knowledge,</u> <u>shall set forth such facts as would be admissible in evidence,</u> and shall show affirmatively that the affiant is competent to testify to the matters stated therein.") (emphasis added).

Accordingly, Casella's motion for summary judgment as to MLEA's unjust enrichment claim must be granted.

### C.    Casella Is Entitled To Summary Judgment on Plaintiff's Promissory Estoppel Claim Because Plaintiff Cannot Establish The Existence of An Enforceable Promise Upon Which to Base Its Claim.

Assuming *arguendo* that MLEA is somehow permitted to pierce the corporate veil of three companies to reach Casella, its promissory estoppel claim must be dismissed because MLEA has failed to produce evidence that ARR or RTG, let alone Casella, made any express promise to purchase the $2 million in equipment, pay for certain engineering services or to construct the liquid nitrogen plant.

The elements of a promissory estoppel claim in Pennsylvania are set out in Casella's Motion, and will not be repeated here.  Casella's Motion, at 18-19.  "A party asserting a claim for estoppel has the burden of establishing all of the essential elements."  *Thatcher's Drug Store v. Consol. Supermarkets, Inc.*, 636 A.2d 156, 160 (Pa. 1994).   However, to recover under the theory of promissory estoppel, a <u>plaintiff must allege an express promise</u>.  An implied promise is insufficient to support a claim for promissory estoppel. *Constar, Inc. v. National Distribution Center, Inc.*, 101 F.Supp.2d 319, 324 (E.D. Pa. 2000) (R. Kelly, J.)  (applying Pennsylvania law).  MLEA has not identified and cannot identify any express promise by Casella to pay for either the equipment or the engineering plans.

Additionally, assuming that MLEA could somehow show evidence of such a promise, MLEA did not reasonably rely on that promise.  Where a defendant "cannot meet the first

element of this cause of action . . . ; namely, [Casella] simply made no promise," any alleged

reliance by Plaintiff upon such a promise could not have been reasonable.  *See Amoco Oil Co. v.*

*McMahon*, No. Civ. A. 96-1425, 1997 WL 50448, *7 (E.D. Pa. Feb. 6, 1997) (Padova, J.).

Similarly, when a plaintiff's reliance is not reasonable, or of a substantial character, its

promissory estoppel claim cannot stand.  *See  Buckwalter v. ICI Explosives USA, Inc.*, No. 96-

CV-4795, 1998 WL 54355, *16  (E.D. Pa. Jan. 8, 1998) (Van Antwerpen, J.) (holding that

plaintiff's reliance was not reasonable, or of a "substantial character," when he put his home on

the market and entered into an agreement of sale to buy a home in Texas when plaintiff and

prospective employer were still negotiating key terms of employment contract).  Here, Plaintiff

did not reasonably rely on any alleged promise by Casella.

 In its one-page response, MLEA fails to offer any evidence in response to Casella's

argument that there was never an express promise, by any defendant, to pay for the engineering

plans.  Plaintiff's Opposition, at 20 (citing Exhibit "I," Menendez Transcript, at 43, 90, 99;

Exhibit "F," Timberlake Transcript, at 49-50, 67-68).  This fact is now undisputed evidence.

 Similarly, MLEA's <u>only</u> evidence relating to the equipment is a citation to the deposition

testimony of Steven Benison, the General Manger of ARR.  Plaintiff's Opposition, at 20.

However, the cited testimony is clearly being taken out of context.  In fact, one of Mr. Benison's

statements actually supports Casella, since he acknowledged that ARR was not going to receive

any equipment until the larger contract for the plant itself was signed.  *See* Exhibit "1," Benison

Transcript at 139-40.

 Finally, since there was no promise by Casella, there can be no reliance.  Indeed, Plaintiff

has already stated, in its Pretrial Memorandum, that it relied solely on representations made by

ARR – "[i]n reliance on those three <u>Atlantic Recycled</u> <u>Purchase Orders</u> and upon the January 19,

2001, <u>agreement signed by Atlantic Recycled</u>, Plaintiff ordered" the equipment at issue.
Plaintiff's Pretrial Memorandum, at 5 (emphasis added). "In addition, based upon Atlantic
Recycled's statements . . ., Plaintiff undertook engineering design efforts and created plans, . . .."
*Id.* at 6. There is no evidence of any reliance by Plaintiff on any statement or promise of Casella.

 Accordingly, as a matter of law, Casella is entitled to summary judgment on MLEA's
claim for promissory estoppel.

  **D.** **There Is No Valid Agreement Between ARR And MLEA Because The Terms**
    <u>**of The Purchase Orders At Issue Are Indefinite.**</u>

 Plaintiff is restricted to arguing that the only written agreements now at issue in this case
are the purchase orders executed by ARR and accepted by MLEA.

 However, as explained in Casella's original brief, the terms necessary to enforce such a
contract are non-existent here. The first essential element of any contract is the existence of a
"definite and certain" promise or an offer to enter into a contract. *See GMH Assocs., Inc. v. The
Prudential Realty Group*, 2000 WL 228918, at *6 (Pa. Super. Mar. 1, 2000) (citation omitted).
*See also Ingrassia Constr. Co., Inc. v. Walsh*, 486 A.2d 478, 484 (Pa. Super. 1984) (stating that
"[a] court cannot enforce a contract unless it can determine what it is.") (quoting I A. CORBIN,
CORBIN ON CONTRACTS § 95 (1963)).

 It is abundantly clear that no fixed terms were reached in this transaction. For example,
the "down payments" in the purchase orders were for an unknown percentage of an unknown
purchase price. *See* Exhibit "X" ("These items have been evaluated to the minimum down
payment for which the suppliers are willing to begin work. For example <u>the compressors are at
20%, some items are more some are less</u>.") (emphasis added). Additionally, Mr. Timberlake
testified at his deposition that the offer contained in his December 11, 2000, letter (Exhibit "X")

was only a hope "that someone [would] pay a down payment."  Exhibit "3," Timberlake

Transcript at 161-63, 165.  *See also id.* at 169 (purchase orders were a "stop-gap measure" while

negotiations continued).  Mr. Timberlake never discussed with any ARR representative an

amount other than the $298,000 in connection with his request that ARR issue the second

purchases orders.  *Id.* at 167-69.  Moreover, no documentation was ever provided to ARR or

RTG in 2000 that they could have used to calculate the full price of the items.  *See, e.g.*, Exhibit

"G" and "H" (September 2000 letters between RTI-Canada and Messer contain no price terms

for equipment).

       Additionally, Plaintiff is <u>not</u> requesting that Defendants be held liable for the entire

amount of the equipment ordered.  Rather, Plaintiff appears to be pursuing certain "cancellation

charges" and prior payments to vendors.  Plaintiff's Pretrial Memorandum, at Exhibit "B";

Exhibit "4," at 12.   However, there is no evidence in the record that ARR or RTG ever agreed to

pay cancellation charges.  Nor is there any evidence in the record as to how these charges were

set by MLEA or the vendor.  Presumably, these charges and payments were part of MLEA's own

contracts with the vendors.  The Defendants were not parties to these vendor contracts and were

never apprised of their terms and conditions.  Nor are the terms and conditions included in the

three ARR purchase orders.

       It is clear that Pennsylvania courts will not enforce a contract that is indefinite in any of

its material and essential provisions.  Casella's Motion, at 22-24.   This is one of those instances.

Accordingly, Plaintiff's breach of contract claim should be dismissed, or, in the alternative, to

the extent that the purchase orders are held to be enforceable contracts, Plaintiff's damage should

be limited to $298,000.[8]

IV.    **CONCLUSION**

For all of the foregoing reasons, as well as the reasons discussed in Casella's principal brief, Casella respectfully requests that the Court enter summary judgment as a matter of law in Casella's favor and against Plaintiff, dismissing all of Plaintiff's claims against Casella with prejudice.

                                        Respectfully submitted,


                                         /s/ Brian J. McCormick, Jr.
                                        Antoinette R. Stone, I.D. No. 23464
                                        Brian J. McCormick, Jr., I.D. No. 81437
                                        BUCHANAN INGERSOLL PC
                                        1835 Market Street, 14th Floor
                                        Philadelphia, PA 19103
                                        (215) 665-8700
                                        (215) 665-8760 (fax)

Dated: December 1, 2004

                                        Attorneys for Defendant Casella Waste
                                        Systems, Inc.

---

[8] It should also be noted that Plaintiff makes several sweeping and inaccurate claims in its Opposition brief relating to this argument.  First, MLEA claims that Casella agreed in its original Motion that "defendants 'only agreed to pay the down payment amounts.'"  Plaintiff's Opposition, at 15.  This is an incorrect citation.  Casella specifically stated that "ARR only agreed to pay the down payment amounts . . .."  Casella's Motion, at 24.  There was no admission as to "defendants" as a whole.

Second, MLEA goes on to claim that "[o]n September 14, 2001, the parties reached an agreement that had the following key elements: . . .."  Plaintiff's Opposition, at 15.  Consistent with Plaintiff's imprecise and improper references throughout its Opposition Brief to "Defendants" and "parties", this statement is inaccurate.  Casella never reached any agreement on this issue.  Indeed, Casella had already divested itself of the majority share of RTG as of September 14, 2001.  Plaintiff's decision to constantly group all three defendants together within the omnibus description of "Defendants" throughout its Opposition Brief was imprecise, often erroneous and misleading to the Court.

## CERTIFICATE OF SERVICE

I, Brian J. McCormick, Jr., herby certify that this document has been filed electronically and is available for viewing and downloading on the Electronic Case Filing System of the United States District Court for the Eastern District of Pennsylvania.  I further certify that on December 1, 2004, I caused to be served a true and correct copy of Defendant Casella Waste Systems Inc.'s Reply Brief in Support of Motion for Summary Judgment via first-class mail upon the following:

Philip J. Katauskas
Pepper Hamilton LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103-2799

Heather E. Rennie
Eckert Seamans Cherin & Mellott, LLC
1515 Market Street, Ninth Floor
Philadelphia, PA 19102


/s/ Brian J. McCormick, Jr.
Brian J. McCormick, Jr.