# EXHIBIT 3

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                    - - -
 4   MLEA, INC.,                    : NO. 02-CV-4393
             Plaintiff             :
 5                                  :
         vs.                        :
 6                                  :
     ATLANTIC RECYCLED RUBBER, INC.,  :
 7   RECOVERY TECHNOLOGIES GROUP,    :
     INC., and CASELLA WASTE SYSTEMS, :
 8   INC.,                          :
             Defendants             :
 9                    - - -
10      Oral deposition of GEORGE TIMBERLAKE, taken
11   pursuant to notice, held at the offices of
12   BUCHANAN INGERSOLL, P.C., 11 Penn Center,
13   14th Floor, 1835 Market Street, Philadelphia,
14   Pennsylvania, on Tuesday, November 18, 2003,
15   beginning at 10:15 a.m., before Kelly A. Draham,
16   Shorthand Reporter-Notary Public, there being
17   present.
18                    - - -
19
20
21          ZANARAS REPORTING AND VIDEO
            REGISTERED PROFESSIONAL REPORTERS
22           1616 Walnut Street, Suite 300
            Philadelphia, Pennsylvania 19103
23               2112 Bay Avenue
            Ocean City, New Jersey 08226
24          (215) 790-7857  1-877-GO-DEPOS
```

```
 1   APPEARANCES:
 2

         PEPPER HAMILTON, LLP
 3       BY:  PHILIP J. KATAUSKAS, ESQUIRE
         3000 Two Logan Square
 4        18th and Arch Streets
         Philadelphia, Pennsylvania 19103
 5       Phone:  (215) 981-4000
         Representing MLEA, Inc.
 6

 7
         ECKERT, SEAMANS, CHERIN & MELLOTT, LLC
 8       BY:  JOHN F. O'RIORDAN, ESQUIRE
         1515 Market Street, 9th Floor
 9       Philadelphia, Pennsylvania 19102
         Phone:  (215) 851-8485
10       Representing Atlantic Recycled Rubber, Inc.
          and Recovery Technologies Group, Inc.
11

12
         BUCHANAN INGERSOLL, P.C.
13       BY:  BRIAN J. McCORMICK, ESQUIRE
         11 Penn Center, 14th Floor
14        1835 Market Street
         Philadelphia, Pennsylvania 19103
15       Phone:  (215) 665-8700
         Representing Casella Waste Systems, Inc.
16

17

18

19

20

21

22

23

24
```

GEORGE TIMBERLAKE

1    A.    He had the technical responsibility for

2    this.  And also, he was my boss as much as a

3    consultant has a boss.  And he was involved from

4    the initial inception from the technical point of

5    view.

6    Q.    At that time who did you understand the

7    customer to be?

8    A.    Well, I thought it was Mr. Anderson.

9    Q.    And who did Mr. Anderson work for?

10    A.    Well, that's where I have a lapse.  I'm

11    kind of thinking it might have been something like

12    Atlantic Recycling or something.

13    Q.    Well, how about Atlantic Recycled

14    Rubber?

15    A.    Yes, ARR.

16    Q.    Okay.

17    A.    His title was president.  So, yes, sir,

18    Mr. President, what can we do for you, sir.

19    Q.    When did Messer first make a proposal

20    to Mr. Anderson regarding the construction of this

21    plant?

22    A.    I think the first proposal might have

23    been August, the first written proposal.  I don't

24    believe I knew enough about the requirement at

1          Q.      You wrote this letter when you told

2     Mr. Anderson that the lease was preliminarily

3     approved.  Did you ever talk to Mr. Cohen again?

4          A.      Oh, I talked to him many times after

5     that on different other possibilities, not on this

6     one I don't believe but on other possibilities.

7          Q.      Other possibilities being other

8     projects or other --

9          A.      Yeah, other projects.

10         Q.      Okay.  But not about the Truro project?

11         A.      Not having anything to do with this.

12         Q.      We have to watch speaking over each

13    other, speaking at the same time.  That's more my

14    fault than yours.

15              You also say that National Fleet

16    Leasing is the company that normally provides this

17    service to our customers.  How many times in the

18    past did you use National Fleet Leasing?

19         A.      This is the first time that I tried to

20    actually set a completed -- to arrange a completed

21    lease.  Before that I had some other possibilities

22    that I went to them for, primarily having to do

23    with Electrolyzer.  They didn't get very far.  So

24    this was the only one that I brought into the

1    condition that I could actually say I arranged

2    this to happen.

3        Q.    Had you ever used National Fleet

4    Leasing when you were consulting for Messer AGS

5    before?

6        A.    No.  They have their own financial

7    systems.

8        Q.    Why did you go outside their normal

9    financial systems in this incident?

10                MR. KATAUSKAS:  Objection;

11            form.  He didn't say it was

12            normal.  He said they had their

13            own.  But you can answer.

14                MR. McCORMICK:  I think he

15            said had their own normal.

16                THE WITNESS:  Messer would

17            not be leasing this equipment.

18            This company would be leasing the

19            equipment.

20                MR. KATAUSKAS:  When you

21            say this company you're pointing

22            to --

23                THE WITNESS:  Right.

24            Recovery Technologies would be

1          leasing this equipment.  So

2          Messer's financial apparatus did

3          not allow for that.  So I went to

4          people that I knew.

5    BY MR. McCORMICK:

6        Q.    Would it surprise you to know that

7    Mr. Cohen said this lease was never preliminarily

8    approved?

9        A.    Yes, it would.  It's not what he told

10   me.

11       Q.    Did you ever receive anything in

12   writing from National Fleet Leasing saying this

13   lease was in place?

14       A.    No.  As far as I know it was never in

15   place.  You know, it would require input from

16   Recovery Technologies to put the lease in place,

17   and that never occurred.

18       Q.    Did you ever submit any information to

19   National Fleet Leasing regarding this project?

20       A.    Yes.

21       Q.    What did you submit?

22       A.    The sent the proposal, the same

23   proposal that was sent here and --

24                  MR. KATAUSKAS:  You're

```
 1            record.

 2                 MR. KATAUSKAS:  I'm sorry?

 3                 MR. McCORMICK:  It's

 4            previously been marked as

 5            Menendez-1, which I already put

 6            on the record.

 7                 MR. KATAUSKAS:  I

 8            understand.  It's just easier if

 9            the date is also on the record.

10   BY MR. McCORMICK:

11       Q.    Mr. Timberlake, did you understand that

12   at this time in 2000, September of 2000, the

13   purchase of this plant was contingent on the

14   completion of the leasing agreement?

15       A.    I did.

16       Q.    But that leasing agreement was never

17   put in place; is that correct?

18       A.    That's correct.

19       Q.    It was also contingent on the

20   acceptance by Canadian and local authorities; is

21   that correct?

22       A.    That's what it says.

23       Q.    Was that your understanding at the

24   time?
```

1    reasonable to assume that the project is going to

2    go forward.

3         Q.    But after that letter of intent weren't

4    you still trying to get them to sign the proposal?

5         A.    Definitely.  That's what I do.

6         Q.    In that letter of intent -- I think we

7    already looked at it.  That's the letter of intent

8    that makes the purchase of the turnkey plant

9    contingent upon completion of a leasing agreement;

10   is that correct?

11        A.    Yes.

12             MR. KATAUSKAS:  You've

13        handed him which exhibit?

14             MR. McCORMICK:  It was

15        marked as Menendez-1.  It was not

16        marked during this deposition.

17        It's a September 13th letter.

18        Off the record.

19                   - - -

20             (Whereupon a discussion was held off

21   the record.)

22                   - - -

23   BY MR. McCORMICK:

24        Q.    Other than Mr. Anderson's urging you to

GEORGE TIMBERLAKE

Page 111

1    kinds of leases.

2        Q.    I didn't ask you that.  What was your

3    understanding of the type of lease that you

4    arranged?

5        A.    I didn't know there were other kinds of

6    leases, so I didn't know what the type was.

7        Q.    Did you have any understanding at all

8    regarding any terms or conditions of the lease --

9        A.    No.

10       Q.    -- that you say you had arranged?

11              MR. KATAUSKAS:  Wait until

12        he's done his question.

13   BY MR. O'RIORDAN:

14       Q.    None at all?

15       A.    No.

16       Q.    And, Mr. Timberlake, in the final part

17   of that sentence you say National Fleet Leasing,

18   the company that normally provides this service to

19   our customers.  Do you see that?

20       A.    Uh-huh.

21       Q.    That was not a true statement when you

22   made that, was it?

23       A.    Well, actually it is.  I've asked them

24   for several different kinds of leases -- or not

GEORGE TIMBERLAKE

Page 112

 1    kinds of leases, but leases for different kinds of

 2    equipment.  They were mostly hydrogen equipment

 3    having to do with Electrolyzer.  And Electrolyzer

 4    is a company that I've worked for also.  And, yes,

 5    they've offered to provide leases for them more

 6    than once.

 7        Q.    You had never arranged a lease with

 8    National Fleet Leasing; correct?

 9            MR. KATAUSKAS:  Objection;

10            asked and answered at least three

11            or four times.

12            MR. O'RIORDAN:  Well, now

13            he's opened the door to a

14            contradictory statement.

15            MR. KATAUSKAS:  He hasn't

16            opened the door to anything.

17            It's asked and answered.  Move

18            on.

19            MR. O'RIORDAN:  No, I'm not

20            going to move on.

21            MR. KATAUSKAS:  Well, we'll

22            get to the point where I'll

23            instruct him not to answer and

24            you can call the judge.

1           MR. O'RIORDAN:  We can do

2       that any time you want to, Phil.

3   BY MR. O'RIORDAN:

4       Q.    You had not arranged any leases with

5   National Fleet Leasing; correct?

6       A.    Except for this one.

7       Q.    And National Fleet Leasing was not a

8   company that provided services to Messer

9   customers; is that correct?

10      A.    I don't know that.

11      Q.    It was not a company, to your

12   knowledge, that provided services to Messer

13   customers?

14      A.    That's correct.

15      Q.    Okay.  And when you use, in this

16   sentence that you authored, our customers you're

17   referring to Messer customers; correct?

18      A.    I'm referring to my customers.

19      Q.    Your customers?  When you use the term

20   our, ours plural?

21      A.    Well, mine and Messer's.  And in this

22   case this was one from Messer and I have done it

23   before.  So our is certainly appropriate.

24      Q.    You had done --

GEORGE TIMBERLAKE

Page 114

```
 1          A.    I have asked them for leases before for
 2    hydrogen electrolytic systems, yes.
 3          Q.    All right.  But they had never provided
 4    a lease to any of your customers?
 5          A.    Never had the opportunity.  Never got
 6    far enough.
 7          Q.    Okay.  Mr. Timberlake, I apologize if
 8    this was asked.  What's your educational
 9    background?
10          A.    I'm a mechanical engineer with
11    additional courses in mechanical engineering.
12          Q.    What college did you graduate from?
13          A.    University of Maryland.
14          Q.    And what was your degree in?
15          A.    BSME.
16          Q.    Any degrees past that?
17          A.    No, sir.
18          Q.    And other than Mr. Cohen, you never
19    spoke with anyone else from National Fleet
20    Leasing?
21          A.    Not true.  Rick.
22          Q.    Rick who?
23          A.    His last name escapes me.  He's the
24    current president of National Fleet.  He took it
```

GEORGE TIMBERLAKE

Page 118

1    big and we offered that as an alternate and he

2    didn't want that.

3         Q.    And if you look at Menendez-1 --

4         A.    Yes, sir.

5         Q.    Okay.  Now, when you received this --

6    in the second sentence Mr. Anderson says also note

7    that this purchase is contingent on the completion

8    of a leasing agreement and acceptance by Canadian

9    local authority.

10              Had you had any discussion with

11   anyone regarding whether or not the plant was

12   going to be contingent on the completion of a

13   leasing agreement prior to receiving this letter?

14        A.    Yes.

15        Q.    Okay.  And who had you discussed that

16   particular --

17        A.    Mr. Anderson.

18        Q.    And did he tell you that this purchase

19   was contingent on the completion of a leasing

20   agreement?

21        A.    Yeah.  Nothing here is new to me.  We

22   had discussed all of this before.

23        Q.    And did Mr. Anderson ever tell you why?

24        A.    No.

1    Q.    Did you ever learn why at any point?

2    A.    No, sir.

3    Q.    And is that something that Mr. Anderson

4  continued to be interested in throughout the

5  entire course of this, your involvement in the

6  Truro project, that is a leasing agreement?

7    A.    I'm still involved in Truro.  But as

8  long as he was involved he was.

9    Q.    And when did Mr. Anderson cease his

10  involvement in the project?

11    A.    I would say when Bill Meckert and

12  Marty Sergi became involved.

13    Q.    When was that?

14    A.    Maybe March or April.

15    Q.    Of 2001?

16    A.    Yeah.

17    Q.    Okay.  And when you received this

18  letter from Mr. Anderson you were under the

19  understanding that you had a contract to build a

20  plant; right?  And when I say you I mean you

21  working on behalf of Messer?

22    A.    Well, this is not a contract.  It's a

23  letter of intent.  What this implies to me is if

24  we can get a lease and the Canadian authorities

```
 1        A.      No, nothing at all.

 2        Q.      Did you know whether or not it was a

 3    start-up company?

 4        A.      No.

 5        Q.      You didn't know one way or the other?

 6        A.      No.  I have no way of knowing something

 7    like that unless somebody would tell me.

 8        Q.      Do you believe that that made a

 9    difference one way or the other whether or not

10    Atlantic was a start-up company or not?

11        A.      No.  It was owned by Casella.

12        Q.      Did you have any information at that

13    point in time, November 20th of 2000, regarding

14    whether or not Casella was going to guarantee or

15    provide any funding for any lease?

16        A.      No.

17        Q.      In the second sentence you say you

18    believe the needed information is in the act of

19    being sent today.  To what are you referring to

20    there?

21        A.      I called Jim Anderson frequently and I

22    probably had called him just before I sent this

23    letter out.

24        Q.      And did Mr. Anderson provide you with
```

Page 153

```
 1    BY MR. O'RIORDAN:

 2        Q.     In your next sentence you say however,

 3    we are still going to have to go through the

 4    approval cycle, which will take up even more time.

 5    What is the approval cycle?

 6        A.     After the information would be sent to

 7    Mr. Cohen he would have to go through it, and

 8    verify it, and then sign off on it.

 9        Q.     How did you know that?

10        A.     Because he's told me that before.

11        Q.     Well, hadn't you already received

12    preliminary approval of this lease?

13        A.     Preliminary.

14        Q.     Did you have any idea how long the

15    approval cycle would take?

16        A.     No.

17        Q.     Did you know whether the approval cycle

18    could be done in a day?

19        A.     No, I didn't know that.

20        Q.     You didn't know?

21        A.     I didn't know it then.

22        Q.     You didn't know one way or the other?

23        A.     No.

24        Q.     What was it that caused you to believe
```

1    that the purchase order ought to be issued?

2        A.    Well, my job was to get orders.   And

3    since I didn't know that the approval cycle would

4    be long or short, I would have to assume that it

5    would be long and cause us to miss.

6        Q.    And in here you proposed that RTG

7    should issue a purchase order for the referenced

8    items, and as soon as the lease is approved Messer

9    will buy them back at the same price.

10               Did you discuss that concept with

11   anyone at Messer?

12       A.    Yes.

13       Q.    And who did you discuss that with?

14       A.    Manny and Roderik Alewijnse.

15       Q.    And were you authorized to make that

16   representation?

17       A.    Yes.

18       Q.    And you identify three items in here; a

19   feed breaker, a transformer, and a cryogenic

20   storage vessel.

21               The $155,000 that you refer to here,

22   is that the total price for all those items?

23       A.    Yes.

24       Q.    And you were proposing here that RTG

GEORGE TIMBERLAKE

Page 155

```
 1    should issue a purchase order for that total

 2    price?

 3         A.    Yes.

 4         Q.    Thanks.  Did you ever, at any point in

 5    time, have any discussion with Alan Cohen or

 6    anyone from Fleet Leasing regarding the process by

 7    which this approval process would work?

 8         A.    No.

 9         Q.    And do you ever recall whether or not

10    the information that you were talking about

11    obtaining or that you were talking about

12    Mr. Anderson sending on to Fleet Leasing, do you

13    ever recall one way or the other whether or not

14    that information was actually sent to Fleet

15    Leasing?

16              MR. KATAUSKAS:  Could you

17         read that back, please?

18                   - - -

19              (Whereupon the reporter read back

20    the last question.)

21                   - - -

22              MR. KATAUSKAS:  Objection

23         to the form.

24              THE WITNESS:  I get the
```

```
 1        A.     I don't know.  It would have been a
 2   prudent thing to do.
 3        Q.     Was it a matter of importance to you?
 4        A.     Yes.
 5        Q.     At this point in time do you recall
 6   having any further discussions at all with
 7   Mr. Cohen or anyone else from Fleet Leasing?
 8        A.     No.
 9        Q.     And just so the question is clear, at
10   this point in time you're talking about
11   November 20, 2000, from that point forward did --
12        A.     That doesn't mean I didn't have
13   conversations.  I just don't recall.
14        Q.     And as of November 20, 2000 who was it
15   that you believed was going to be purchasing the
16   equipment that you had referenced in
17   Timberlake-14?
18        A.     Who was going to --
19        Q.     What was the entity who was going to be
20   purchasing that?
21        A.     Oh, I thought that ARR would purchase
22   it.
23        Q.     Okay.  And what was that understanding
24   based on?
```

Page 158

```
1       A.    That's the way we had been talking.
2             MR. O'RIORDAN:  Mark this,
3         please.
4                    - - -
5             (Whereupon the court reporter marked
6    Timberlake-15 for purposes of identification.)
7                    - - -
8    BY MR. O'RIORDAN:
9       Q.    Mr. Timberlake, I've shown you what the
10   court reporter has marked as Timberlake
11   Exhibit-15.
12      A.    Yes.
13      Q.    And it's a purchase order, 715258,
14   signed by Steve Benison?
15      A.    Yes, sir.
16      Q.    Have you seen this before?
17      A.    Yes, I have.
18      Q.    And was this the purchase order for the
19   equipment that we just referred to in the earlier
20   letter?
21      A.    It was.
22      Q.    And was this a purchase order between
23   Messer Advanced Gas Systems and Atlantic Recycled
24   Rubber, Inc.?
```

Page 159

```
 1      A.    Yes.

 2      Q.    And you understood when you received

 3  this purchase order that the entity you were

 4  dealing with was Atlantic Recycled Rubber, Inc.?

 5      A.    Yes.  Are we done with this one, sir?

 6      Q.    Yes, we are.

 7            MR. O'RIORDAN:  Mark this,

 8        please.

 9                   - - -

10            (Whereupon the court reporter marked

11  Timberlake-16 for purposes of identification.)

12                   - - -

13  BY MR. O'RIORDAN:

14      Q.    Mr. Timberlake, I've shown you what the

15  court reporter has marked as Timberlake

16  Exhibit-16, which is a December 1st, 2000 letter

17  from Steve Benison, General Manager of Atlantic

18  Recycled Rubber, Inc. addressed to yourself at

19  Messer Advanced Gas Systems.  Do you recall

20  receiving this letter?

21      A.    Yes, I do.

22      Q.    And this letter refers to Purchase

23  Order 715258.  Is that the purchase order we just

24  looked at?
```

```
 1          A.      It was indeed.

 2          Q.      And Mr. Benison's letter states that

 3     the items mentioned on P.O.715258 are to be

 4     re-purchased by Messer Advanced Gas Systems when

 5     the system lease is approved and payment of this

 6     P.O. will be from the proceeds of this lease.

 7                      Is that an agreement you reached

 8     with Mr. Benison?

 9          A.      Yes, sir.

10          Q.      And you were authorized to reach that

11     agreement?

12          A.      Yes.  However, it was not reached with

13     Mr. Benison.

14          Q.      Okay.  Who was it reached --

15          A.      That would be with Mr. Meckert.

16          Q.      Okay.  But you understood when you

17     reached that agreement you were reaching an

18     agreement with Atlantic Recycled Rubber?

19          A.      Certainly.  I didn't know how the

20     various entities fit together.

21          Q.      Okay.  If you could take a look at

22     Timberlake No. 2?

23          A.      Yes, sir.

24          Q.      Timberlake No. 2 is a December 11, 2000
```

Page 161

1    letter from yourself to Mr. Meckert.  Is that a

2    letter you prepared?

3         A.    Yes, sir.

4         Q.    And in this letter you talk about the

5    normal lease cycle.  Do you see that?

6         A.    Yes.

7         Q.    And you say the normal lease cycle will

8    jeopardize our April target date?

9         A.    Uh-huh.

10        Q.    Now, did you have any discussions with

11   anyone from National Fleet Leasing regarding what

12   a normal lease cycle would be?

13        A.    No.

14        Q.    And was this letter an effort on your

15   part to obtain a purchase order from ARR?

16        A.    Yes.

17        Q.    And you're proposing here that ARR

18   should sign on to purchase orders for a minimum

19   down payment?

20             MR. KATAUSKAS:  Objection.

21          That's not what this letter says.

22             MR. O'RIORDAN:  Let me ask

23          the question.  Maybe he can give

24          me the answer rather than have

GEORGE TIMBERLAKE

1          you answer for him.

2                    MR. KATAUSKAS:  No.  I get

3          to object.

4                    MR. O'RIORDAN:  Well, you

5          can object but don't speak.  If

6          you have an objection put the

7          objection --

8                    MR. KATAUSKAS:  It doesn't

9          say ARR.  You're

10         mischaracterizing the document.

11         Don't show him a document and ask

12         him a question that's not based

13         on the document.

14                   MR. O'RIORDAN:  Can we hear

15         the question back, please?

16                   MR. KATAUSKAS:  You said

17         ARR.

18                   MR. O'RIORDAN:  I can show

19         him a document and ask him a

20         question on anything under the

21         sun.

22                   MR. KATAUSKAS:  That's

23         right, then the document is off

24         the table.

GEORGE TIMBERLAKE

Page 163

```
 1              MR. O'RIORDAN:  No, it's

 2         not off the table.

 3              MR. KATAUSKAS:  It's done.

 4              MR. O'RIORDAN:  No, it's

 5         not done.

 6              Can you read the question

 7         back, please?

 8                   - - -

 9              (Whereupon the reporter read back

10    the last question.)

11                   - - -

12              MR. KATAUSKAS:  Objection;

13         mischaracterizes the document.

14              MR. O'RIORDAN:  It's a

15         question.

16              MR. KATAUSKAS:  You can

17         answer it.

18              THE WITNESS:  I'm proposing

19         that someone pay a down payment.

20    BY MR. O'RIORDAN:

21      Q.    An earlier purchase order we had talked

22    about was with ARR; correct?

23      A.    Correct.

24      Q.    And it was your understanding that you
```

1    were dealing with to issue a purchase order for

2    $298,000?

3         A.    Yes.

4         Q.    And is that what happened?

5         A.    Yes.  We got a purchase order in.

6         Q.    And was the purchase order for

7    $298,000?

8         A.    I really don't know exactly.  I'd have

9    to look at the purchase order.

10        Q.    Okay.  Let me see if I can help you

11   out.

12              MR. O'RIORDAN:  Mark this,

13         please.

14                    - - -

15              (Whereupon the court reporter marked

16   Timberlake-17 for purposes of identification.)

17                    - - -

18              MR. KATAUSKAS:  Wait until

19         he asks a question.  Read the

20         document and then he'll ask a

21         question then you answer.  Wait

22         until he's done with the

23         question.

24   BY MR. O'RIORDAN:

1    Mr. Benison that we discussed earlier marked as

2    Timberlake Exhibit-2?

3        A.    Yes, sir.

4        Q.    And the total amount of this purchase

5    order is for $298,000; correct?

6        A.    Correct.

7        Q.    At any point in time after these

8    purchase orders were issued up until the present

9    time did you have any discussion with anyone from

10   National Fleet Leasing regarding those purchase

11   orders?

12       A.    Not regarding the purchase orders.

13       Q.    From the time those purchase orders

14   were issued until the present did you have any

15   discussion with National Fleet Leasing about

16   Messer's proposal to buy back that equipment from

17   any lease that was eventually entered into?

18       A.    No.

19       Q.    Let me restate the last question

20   because I misstated it.

21            Did you have any discussion with

22   anyone from National Fleet Leasing regarding

23   Messer's willingness to buy back the equipment if

24   the lease was not entered into?

Page 168

1        A.    No.   See, that restriction was lifted a

2   few days after these orders were issued.

3        Q.    Why was the restriction lifted, if you

4   know?

5        A.    I don't know.

6        Q.    Did you have any discussion with anyone

7   from RTG or ARR regarding the lifting of that

8   restriction?

9        A.    I can't recall.

10        Q.    Did you ever have any discussion with

11   anyone from RTG or ARR including Mr. Meckert,

12   Mr. Benison, Mr. Sergi, anybody, regarding those

13   two purchase orders that we talked about being for

14   any amount above the $298,000 figure that you and

15   I just discussed?

16        A.    Yes.   This was the down payment on the

17   equipment and we were moving into the purchase of

18   the equipment.

19        Q.    And when you say we were moving in you

20   mean --

21        A.    Messer.

22        Q.    -- Messer?

23        A.    Uh-huh.

24        Q.    But you had no discussion with anyone

1    from RTG or ARR regarding any intention on their

2    part to issue purchase orders or enter into

3    agreements for amounts over and above the

4    $298,000?

5        A.    They were going to sign the lease

6    agreement for the turnkey project.

7        Q.    I'm talking strictly now about the

8    ordering of --

9        A.    Not on this.  This was a stop-gap

10   measure to allow for the lease agreement later.

11       Q.    And we can agree that that lease

12   agreement was not something that was ever signed;

13   correct?

14       A.    That's correct.

15       Q.    So other than the stop-gap measure

16   involving purchase orders for $298,000, you never

17   had any agreement or any discussion with anyone

18   from ARR or RTG about their willingness to pay any

19   amounts more than the $298,000 for the equipment

20   that was on those purchase orders?

21       A.    Yes, I did.

22       Q.    And who did you have that discussion

23   with?

24       A.    Bob Wetzel.

Page 178

```
 1          court.
 2     BY MR. O'RIORDAN:
 3          Q.    Let me go back.  You just said you
 4     believed the equipment was sold?
 5          A.    Uh-huh.
 6          Q.    What equipment are you referring to?
 7          A.    The list.
 8          Q.    The equipment that's on the $298,000
 9     purchase order?
10          A.    Yes.
11          Q.    And you believe that equipment was sold
12     to whom?
13          A.    To RTG.
14          Q.    And who sold it to RTG?
15          A.    That would be me.  The only thing I
16     didn't have was a signed turnkey agreement but I
17     did have a letter of intent.  I had down payments
18     on the equipment and I had RTG telling me that
19     they would send the information out imminently for
20     the lease.  And I knew that Casella was the parent
21     company and that these were wholly-owned
22     subsidiaries.  I had no concern with that.
23          Q.    Did you ever have any discussion with
24     anyone as to whether or not Casella was going to
```

GEORGE TIMBERLAKE

Page 179

1    guarantee any action by ARR or RTG?

2         A.    They were wholly-owned subsidiaries.

3         Q.    I understand.  I'm just asking about

4    any discussion you may have had?

5         A.    No.

6         Q.    With respect to this equipment that you

7    say was sold, did anyone from RTG or ARR ever

8    agree that they would purchase the equipment as

9    opposed to paying you a down payment as you had

10   requested in your letter?

11             MR. KATAUSKAS:  Again,

12        objection; asked and answered.

13             MR. O'RIORDAN:  He just

14        raised the issue.  So I want to

15        go back and clear it up.

16             MR. KATAUSKAS:  He raised

17        the issue in response to another

18        question that was asked and

19        answered.

20             MR. O'RIORDAN:  And he's

21        bringing in ambiguity.

22             MR. KATAUSKAS:  He's

23        answered the question.

24             MR. O'RIORDAN:  Okay.

GEORGE TIMBERLAKE

Page 188

1   agreeing to pay in this letter of intent?

2       A.    Not in the letter of intent, but the

3   letter of intent refers to documents that are

4   priced.

5       Q.    And this whole thing was contingent on

6   the lease?

7       A.    It's a package, yes.

8       Q.    And you knew at every point in time

9   throughout this that the lease hadn't been

10  executed; right?

11      A.    That's correct.

12      Q.    Is it fair to say, given what you knew

13  about the lease, is it fair to say at no point in

14  time did you ever believe that there had been a

15  plant ordered by either RTG or ARR?

16      A.    No, that's not fair to say at all.

17      Q.    At what point in time did you believe a

18  plant had been ordered?

19      A.    I believe the letter of intent

20  specified a plant governing those two conditions.

21      Q.    And do you believe that those two

22  conditions were ever met?

23      A.    I believe that the local authorities,

24  which turned out to be the harshest, which were