**Exhibit F**

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2       FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                    - - -

4    MLEA, INC.,                    : NO. 02-CV-4393
          Plaintiff               :

5                                   :

     vs.                           :

6                                   :

     ATLANTIC RECYCLED RUBBER, INC.,  :

7    RECOVERY TECHNOLOGIES GROUP,    :

     INC., and CASELLA WASTE SYSTEMS, :

8    INC.,                           :
          Defendants               :

9                    - - -

10      Oral deposition of GEORGE TIMBERLAKE, taken

11   pursuant to notice, held at the offices of

12   BUCHANAN INGERSOLL, P.C., 11 Penn Center,

13   14th Floor, 1835 Market Street, Philadelphia,

14   Pennsylvania, on Tuesday, November 18, 2003,

15   beginning at 10:15 a.m., before Kelly A. Draham,

16   Shorthand Reporter-Notary Public, there being

17   present.

18                    - - -

19

20

21           ZANARAS REPORTING AND VIDEO
           REGISTERED PROFESSIONAL REPORTERS

22          1616 Walnut Street, Suite 300
          Philadelphia, Pennsylvania 19103

23              2112 Bay Avenue
          Ocean City, New Jersey 08226

24        (215) 790-7857  1-877-GO-DEPOS

Page 2

```
 1    APPEARANCES:
 2
        PEPPER HAMILTON, LLP
 3      BY:   PHILIP J. KATAUSKAS, ESQUIRE
        3000 Two Logan Square
 4       18th and Arch Streets
        Philadelphia, Pennsylvania 19103
 5      Phone:  (215) 981-4000
        Representing MLEA, Inc.
 6
 7
        ECKERT, SEAMANS, CHERIN & MELLOTT, LLC
 8      BY:   JOHN F. O'RIORDAN, ESQUIRE
        1515 Market Street, 9th Floor
 9      Philadelphia, Pennsylvania 19102
        Phone:  (215) 851-8485
10      Representing Atlantic Recycled Rubber, Inc.
         and Recovery Technologies Group, Inc.
11
12
        BUCHANAN INGERSOLL, P.C.
13      BY:   BRIAN J. McCORMICK, ESQUIRE
        11 Penn Center, 14th Floor
14       1835 Market Street
        Philadelphia, Pennsylvania 19103
15      Phone:  (215) 665-8700
        Representing Casella Waste Systems, Inc.
16
17
18
19
20
21
22
23
24
```

```
 1                       - - -

 2                  (It is hereby stipulated and agreed

 3      by and between counsel for the respective parties

 4      that sealing, certification and filing are waived

 5      and that all objections, except as to the form of

 6      the question, be reserved until the time of

 7      trial.)

 8                       - - -

 9                  GEORGE TIMBERLAKE, after having been

10      first duly sworn, was examined and testified as

11      follows:

12                       - - -

13                  EXAMINATION

14                       - - -

15      BY MR. McCORMICK:

16          Q.    Mr. Timberlake, please state your name

17      for the record?

18          A.    George Albert Timberlake, Jr.

19          Q.    And who are you employed by at the

20      present time?

21          A.    MLEA, Inc.

22          Q.    Are you an owner of MLEA, Inc.?

23          A.    I have a small amount of stock, yes.

24          Q.    What percentage do you own in MLEA,
```

1    Inc.?

2        A.    Let's see, it's -- if we consider the

3    amount that's held in the treasury as not being

4    part, then I've got 10 percent.

5        Q.    Mr. Timberlake, in the discovery

6    portion of this litigation were you ever asked to

7    search your files for documents relating to the

8    Truro project?

9        A.    Yes, quite a long time ago.

10        Q.    When I say Truro project, just so we're

11    all on the same page, do you know what I mean by

12    that?

13        A.    Yes, sir, I do.

14        Q.    Okay.  And what is that?

15        A.    That's the project in Truro, Nova

16    Scotia having to do with a LiNC plant that we've

17    been going to supply.

18        Q.    When you searched your files for

19    documents relating to this litigation were you

20    given any guidance by your attorney?

21                MR. KATAUSKAS:  Object to

22            the form of the question and to

23            the extent that it calls for a

24            communication by a lawyer.

1              MR. McCORMICK:  Let me

2         rephrase the question.

3    BY MR. McCORMICK:

4         Q.    How did you keep your files related to

5    the Truro project, Mr. Timberlake?

6         A.    I had a project file for it.

7         Q.    How large was the project file?

8         A.    I don't know, sir.  It was extensive.

9         Q.    Did you have it broken down inside the

10   file by certain areas within the project?

11        A.    Yes.

12        Q.    What were some of those folders or

13   breakdowns?

14        A.    I had an engineering section.  There

15   was proposals.  That's all that really comes to

16   mind.  There are other sections.

17        Q.    And you gave all of these documents to

18   your attorney?

19        A.    I did.

20        Q.    At the present time who are the owners

21   of MLEA, Incorporated?

22        A.     Well, along with myself, Ted DelGaizo

23   is the largest owner, Fred Grasberry, Keith

24   Michael, Ray Stanzewski, and Manny Menendez.  Is

GEORGE TIMBERLAKE

Page 9

1   that six?

2        Q.    Yes, it is.

3        A.    That would be it.

4        Q.    Including you.  Before you became a

5   partial owner in MLEA, Incorporated what was your

6   previous job before that?

7        A.    I was a partial owner in Engineered Gas

8   Systems, LLP.

9        Q.    Is Engineered Gas Systems the

10  predecessor to MLEA?

11                  MR. KATAUSKAS:  Object to

12          the form.

13  BY MR. McCORMICK:

14       Q.    What happened to EGS, LLP?

15       A.    Ultimately we rolled it in with Main

16  Line Engineering and made the both of them

17  together MLEA, Inc.  Actually, that's not quite

18  accurate.  We never did finish the paperwork for

19  ownership in the LLP.  It didn't really last quite

20  long enough to do that.  If it did, then I would

21  have been part owner.

22       Q.    Let's go back to 1998.  Who were you

23  employed by in 1998?

24       A.    That would be -- let's see.  I had just

1    the plant.

2         Q.    What kind of plant was it?

3         A.    It was an ASU.

4         Q.    I'm sorry, what?

5         A.    An air separation unit.

6         Q.    And forgive my ignorance, but what does

7    an air separation unit do?

8         A.    It breaks air down into its components,

9    oxygen, nitrogen and argon, which components are

10   used in various industries, and in particular this

11   one was for the steel industry.  The primary

12   product was oxygen.

13        Q.    When did you first become involved in

14   what we're referring to as the Truro project?

15        A.    I think perhaps June or July of 2000.

16        Q.    And how did you become involved?

17        A.    At that time I had completed the

18   Banatine project and I was consulting in sales for

19   Messer AGS.  And I was beating the bushes looking

20   for projects and this one came in through a Messer

21   salesman in Canada.

22        Q.    And who was that?

23        A.    Evon(ph) Mongulard.

24        Q.    Why would this proposed project come to

1   you?

2        A.    Well, at the time I was serving the

3   sole sales function for Messer AGS, Advanced Gas

4   Systems.

5        Q.    After Mr. Mongulard provided you with

6   the lead what did you do next?

7        A.    Well, he arranged a meeting in

8   Cambridge, not too far from Toronto, with

9   Jim Anderson.  It was at -- if I can remember the

10  name of that specific -- I'm sorry, it's -- he had

11  a tire recycling business there.

12       Q.    Are you trying to think of the name of

13  the business?

14       A.    Yes.

15       Q.    KTI?

16       A.    Well, it -- no.  It was a subsidiary, I

17  think, of KTI, but at the time I wasn't aware of

18  that.  I didn't know how the structure was set up

19  at all.  It was still questionable in my mind.

20       Q.    So you met with Mr. Anderson?

21       A.    Uh-huh.

22       Q.    And would this have been in that

23  June-July time period of 2000?

24       A.    Yes.  Most likely that would be in

Page 18

1      A.    He had the technical responsibility for

2  this.  And also, he was my boss as much as a

3  consultant has a boss.  And he was involved from

4  the initial inception from the technical point of

5  view.

6      Q.    At that time who did you understand the

7  customer to be?

8      A.    Well, I thought it was Mr. Anderson.

9      Q.    And who did Mr. Anderson work for?

10      A.    Well, that's where I have a lapse.  I'm

11  kind of thinking it might have been something like

12  Atlantic Recycling or something.

13      Q.    Well, how about Atlantic Recycled

14  Rubber?

15      A.    Yes, ARR.

16      Q.    Okay.

17      A.    His title was president.  So, yes, sir,

18  Mr. President, what can we do for you, sir.

19      Q.    When did Messer first make a proposal

20  to Mr. Anderson regarding the construction of this

21  plant?

22      A.    I think the first proposal might have

23  been August, the first written proposal.  I don't

24  believe I knew enough about the requirement at

1    that first meeting to make a hard, written

2    proposal other than the concept.

3         Q.    And what was provided to you in the

4    interim that allowed you to make a proposal?

5         A.    Mr. Anderson indicated to me how big

6    the -- what the capacity should be.

7         Q.    Do you recall what that was?

8         A.    It was 30 tons.

9         Q.    Did you ever go to visit the actual

10   site where the plant would be?

11        A.    Definitely.  Twice.

12        Q.    And when were those visits?

13        A.    I can offer a reasonable guess on that.

14   Is that okay?

15        Q.    Go ahead.

16        A.    I think the first time might have been

17   in October of that year.  And the second time

18   might have been in February or something like that

19   the following year because I remember it was a --

20   there was a considerable amount of snow around and

21   a lot of ice.

22        Q.    In the summer then and earlier fall

23   2000, jumping back, when you were meeting with

24   Mr. Anderson then you were not meeting in Truro,

1    you were meeting somewhere else?

2        A.    In Cambridge.

3        Q.    And do you recall how many times you

4    met with Mr. Anderson in Cambridge?

5        A.    I don't know exactly, but there was the

6    initial meeting.  There was another meeting

7    defining the equipment a little better.  And then

8    after I became part of EGS, LLP there was a third

9    meeting.  So I believe it was three.

10       Q.    When in there did EGS, LLP form?

11       A.    On or about the 1st of January in 2001.

12       Q.    Well, during that fall of 2000 period

13   who was doing most of the negotiating with

14   Mr. Anderson?

15       A.    That would be me.

16       Q.    At that time you had only had two

17   meetings?

18       A.    Uh-huh, but many phone calls and lots

19   of e-mails.  He had other interests around the

20   world that he was working on.  So, you know, you

21   kind of caught him as you could.

22       Q.    Did Messer ever make a formal proposal

23   to Mr. Anderson during that period?

24       A.    Yes.

Page 21

1       Q.     Do you recall when that was?

2              MR. KATAUSKAS:   Objection;

3          asked and answered.

4   BY MR. McCORMICK:

5       Q.     You can answer.

6              MR. KATAUSKAS:   Answer it

7          again.

8              THE WITNESS:   In August.

9              MR. McCORMICK:   Let's mark

10         this Timberlake-1.

11                  - - -

12             (Whereupon the court reporter marked

13  Timberlake-1 for purposes of identification.)

14                  - - -

15  BY MR. McCORMICK:

16      Q.     Mr. Timberlake, just take a moment to

17  review this document.  When you're finished just

18  let me know.

19      A.     Yes, sir.

20      Q.     Have you ever seen this document

21  before, Mr. Timberlake?

22      A.     Yes.  I wrote this one.

23      Q.     Do you recall writing it in and around

24  that time period of September of 2000?

Page 43

```
1          record.
2                    MR. KATAUSKAS:  I'm sorry?
3                    MR. McCORMICK:  It's
4          previously been marked as
5          Menendez-1, which I already put
6          on the record.
7                    MR. KATAUSKAS:  I
8          understand.  It's just easier if
9          the date is also on the record.
10    BY MR. McCORMICK:
11         Q.    Mr. Timberlake, did you understand that
12    at this time in 2000, September of 2000, the
13    purchase of this plant was contingent on the
14    completion of the leasing agreement?
15         A.    I did.
16         Q.    But that leasing agreement was never
17    put in place; is that correct?
18         A.    That's correct.
19         Q.    It was also contingent on the
20    acceptance by Canadian and local authorities; is
21    that correct?
22         A.    That's what it says.
23         Q.    Was that your understanding at the
24    time?
```

1    finished let me know.

2          A.    All right, sir.

3          Q.    Mr. Timberlake, do you recall writing

4    this letter?

5          A.    Yes, sir.

6          Q.    You wrote it in or around February,

7    late February of 2001?

8          A.    Uh-huh.  Yes.

9          Q.    In the first line you refer to your

10   boss, discussed your needs with your boss.  Who

11   was your boss at that time?

12         A.    That would be Ted.

13         Q.    Ted DelGaizo?

14         A.    Uh-huh.  Yes, sir.

15         Q.    Was this letter your first contact with

16   Mr. Kelley?

17         A.    I don't know.  I might have had

18   conversations with him before then.

19         Q.    Do you recall having conversations with

20   Mr. Kelley before January of 2001?

21         A.    I don't know.

22         Q.    Excuse me?

23         A.    I don't recall any conversations.  That

24   doesn't necessarily mean there weren't any.

1      Q.    Do you recall any conversations with

2   Mr. Kelley in February of 2001?

3      A.    It would seem in reading this letter

4   that this is a result of questions that came up

5   and discussions that were between me and

6   Mr. Kelley.

7      Q.    Is this about the time you recall

8   Mr. Kelley becoming involved in the Truro project?

9      A.    I'm sorry, I don't recall.

10     Q.    In the middle of the second paragraph

11  you state that you -- we have, and this is a

12  quote, we have way over-committed our company well

13  beyond the value of the orders.  What do you mean

14  by that?

15     A.    We were working on the installation of

16  this system and doing engineering related to

17  installation.  We had no order for the turnkey.

18  We only had an order for the equipment.

19     Q.    Did you ever receive an order for the

20  turnkey?

21     A.    No.

22     Q.    Did you ever receive a purchase order

23  for the full value of the turnkey plant?

24     A.    No.

Page 62

 1        basis.

 2                Do you need more details?

 3    BY MR. McCORMICK:

 4        Q.    Would this lease have required EGS to

 5    own the equipment?

 6        A.    Again, referring to my limited

 7    understanding how this works, it's my

 8    understanding under this condition the equipment

 9    would be owned by EGS, would be on EGS's books

10    offset by the long-term liability.  It's something

11    like a mortgage where you own your house but you

12    still owe them money.

13                Please bear in mind I'm not a

14    financial guy, but that's my humble understanding

15    of this difficult subject.

16        Q.    But you were negotiating these terms on

17    behalf of Engineered Gas Systems at this time?

18    You were the primary --

19        A.    Yes.   Inasmuch as I'm not a financial

20    guy, I am a lot more exposed to this kind of thing

21    than Manny would be or anybody else in the

22    partnership.

23        Q.    So there was a consideration then in

24    the spring of 2001 that EGS --

GEORGE TIMBERLAKE

Page 63

1       A.    Yes.

2       Q.    -- could take ownership of this

3    equipment?

4       A.    I'm surprised that -- I thought that

5    our first offer like this was under MLEA, Inc.,

6    but clearly it was not.  It was under EGS.  That

7    surprises me.  I stand corrected.  I didn't recall

8    that.

9       Q.    If you could turn to page 4 of that

10   letter too?

11      A.    (Witness complies.)

12      Q.    You discuss conversations with

13   Mr. Cohen of National Fleet Leasing?

14      A.    Yes.

15      Q.    Were you the representative of

16   Engineered Gas Systems who was discussing these --

17      A.    Yes.

18      Q.    -- different options with Mr. Cohen?

19      A.    Yes.

20      Q.    Do you recall ever sending Mr. Cohen

21   any information, or e-mails, or correspondence at

22   this time frame regarding these new options?

23      A.    I don't know if this was all verbal or

24   if there was other discussion.  I don't know.

GEORGE TIMBERLAKE

Page 67

1    financing because I would have expected them to

2    pay cash for the thing.

3        Q.    This document has already been marked

4    as Menendez-12.  I'm not going to re-mark it right

5    away.  You can take a look at it.

6        A.    All right, sir.

7        Q.    Mr. Timberlake, did you attend a

8    meeting on May 18, 2001 with Marty Sergi?

9        A.    I attended a meeting in that time frame

10   and that could well be the date.

11       Q.    Are these your notes?

12       A.    No, these are not my notes.

13       Q.    Have you ever seen these notes before?

14       A.    No.

15       Q.    You can put it aside then.  I'm not

16   going to question you on it.

17              Other than Rick Kelley did you ever

18   deal with any other Casella employee regarding the

19   Truro project?

20       A.    When I first met Marty Sergi he was a

21   Casella employee.

22       Q.    And do you recall when Mr. Sergi first

23   became involved in this project?

24       A.    No, sir, I don't.

GEORGE TIMBERLAKE

Page 68

1       Q.    Was it in the spring of 2001?

2       A.    From the documents that I've looked at

3   here it would seem that that would be the case

4   because his name is mentioned on those.

5       Q.    Would it have been before or after

6   Mr. Kelley became involved?

7       A.    I don't know that answer, sir.

8       Q.    During the summer of 2001 were you

9   still negotiating with Recovery Technologies

10  regarding the Truro project?

11      A.    Yes.  We were -- as I recall, we were

12  putting together a method to turn the equipment

13  directly over to RTG during that period, yes.

14      Q.    And who were you negotiating with at

15  that time?

16      A.    Bill Meckert and Bob Wetzel.

17      Q.    During this time when the two sides

18  were discussing the 15-ton versus 30-ton plant

19  where had the idea for a 30-ton plant arisen?

20      A.    Initially?

21      Q.    Initially, I'm sorry.

22      A.    Mr. Anderson.  We have no expertise at

23  all in the -- we wouldn't have any idea what it

24  would take to do that.

Page 138

1      A.      Yes, sir.

2      Q.      Is this a document that you prepared?

3      A.      Yes.

4      Q.      And did you prepare both pages of this

5   document?

6      A.      Yes.

7      Q.      And in your first sentence you said

8   that we have designed a system specifically to

9   meet the needs of the RTG facility in Nova Scotia,

10  Canada.  What needs were you referring to?

11     A.      Thirty-tons per day, ninety-five

12  percent nitrogen.

13     Q.      And if you go down to the -- I guess

14  the second full paragraph, the fourth sentence

15  says all equipment referenced herein is in stock.

16  However, it will be necessary to skid some of the

17  equipment before shipment and, of course, install

18  and start up the system on site.

19                  Where was the equipment in stock?

20     A.      I don't know.

21     Q.      When you say all the equipment

22  referenced herein is in stock did you mean that

23  none of the equipment would be custom

24  manufactured, it would all be stock equipment?

1        A.      It would all be stock components.

2        Q.      And what did you do to determine

3   whether or not that equipment was in stock?

4        A.      I asked.

5        Q.      And who did you ask?

6        A.      That would have been Manny and Roderik

7   Alewijnse.

8        Q.      And the equipment you're referring to,

9   was that equipment that Messer then had in stock?

10       A.      Yes.

11       Q.      So it was equipment that you didn't

12   have to order from any third-party vendor;

13   correct?

14       A.      No, but it did have to be put together.

15       Q.      Now, in this case one of the things

16   that MLEA is seeking is recovery for invoices to

17   third-party vendors; correct?

18       A.      Uh-huh.

19       Q.      And rather than provide equipment that

20   MLEA had in stock it went out and ordered

21   equipment from third-party vendors?

22       A.      This stuff was sold before the deal was

23   transferred to MLEA.

24                    MR. KATAUSKAS:  I'm going

GEORGE TIMBERLAKE

Page 161

1    letter from yourself to Mr. Meckert.  Is that a

2    letter you prepared?

3         A.    Yes, sir.

4         Q.    And in this letter you talk about the

5    normal lease cycle.  Do you see that?

6         A.    Yes.

7         Q.    And you say the normal lease cycle will

8    jeopardize our April target date?

9         A.    Uh-huh.

10        Q.    Now, did you have any discussions with

11   anyone from National Fleet Leasing regarding what

12   a normal lease cycle would be?

13        A.    No.

14        Q.    And was this letter an effort on your

15   part to obtain a purchase order from ARR?

16        A.    Yes.

17        Q.    And you're proposing here that ARR

18   should sign on to purchase orders for a minimum

19   down payment?

20             MR. KATAUSKAS:  Objection.

21        That's not what this letter says.

22             MR. O'RIORDAN:  Let me ask

23        the question.  Maybe he can give

24        me the answer rather than have

GEORGE TIMBERLAKE

1    you answer for him.

2        MR. KATAUSKAS:   No.   I get

3    to object.

4        MR. O'RIORDAN:   Well, you

5    can object but don't speak.   If

6    you have an objection put the

7    objection --

8        MR. KATAUSKAS:   It doesn't

9    say ARR.   You're

10   mischaracterizing the document.

11   Don't show him a document and ask

12   him a question that's not based

13   on the document.

14       MR. O'RIORDAN:   Can we hear

15   the question back, please?

16       MR. KATAUSKAS:   You said

17   ARR.

18       MR. O'RIORDAN:   I can show

19   him a document and ask him a

20   question on anything under the

21   sun.

22       MR. KATAUSKAS:   That's

23   right, then the document is off

24   the table.

GEORGE TIMBERLAKE

Page 163

1          MR. O'RIORDAN:  No, it's

2      not off the table.

3          MR. KATAUSKAS:  It's done.

4          MR. O'RIORDAN:  No, it's

5      not done.

6          Can you read the question

7      back, please?

8                    - - -

9          (Whereupon the reporter read back

10   the last question.)

11                   - - -

12         MR. KATAUSKAS:  Objection;

13     mischaracterizes the document.

14         MR. O'RIORDAN:  It's a

15     question.

16         MR. KATAUSKAS:  You can

17     answer it.

18         THE WITNESS:  I'm proposing

19     that someone pay a down payment.

20  BY MR. O'RIORDAN:

21     Q.    An earlier purchase order we had talked

22  about was with ARR; correct?

23     A.    Correct.

24     Q.    And it was your understanding that you

1      A.    No.  See, that restriction was lifted a

2  few days after these orders were issued.

3      Q.    Why was the restriction lifted, if you

4  know?

5      A.    I don't know.

6      Q.    Did you have any discussion with anyone

7  from RTG or ARR regarding the lifting of that

8  restriction?

9      A.    I can't recall.

10     Q.    Did you ever have any discussion with

11  anyone from RTG or ARR including Mr. Meckert,

12  Mr. Benison, Mr. Sergi, anybody, regarding those

13  two purchase orders that we talked about being for

14  any amount above the $298,000 figure that you and

15  I just discussed?

16     A.    Yes.  This was the down payment on the

17  equipment and we were moving into the purchase of

18  the equipment.

19     Q.    And when you say we were moving in you

20  mean --

21     A.    Messer.

22     Q.    -- Messer?

23     A.    Uh-huh.

24     Q.    But you had no discussion with anyone

GEORGE TIMBERLAKE

Page 169

1    from RTG or ARR regarding any intention on their

2    part to issue purchase orders or enter into

3    agreements for amounts over and above the

4    $298,000?

5        A.    They were going to sign the lease

6    agreement for the turnkey project.

7        Q.    I'm talking strictly now about the

8    ordering of --

9        A.    Not on this.  This was a stop-gap

10    measure to allow for the lease agreement later.

11        Q.    And we can agree that that lease

12    agreement was not something that was ever signed;

13    correct?

14        A.    That's correct.

15        Q.    So other than the stop-gap measure

16    involving purchase orders for $298,000, you never

17    had any agreement or any discussion with anyone

18    from ARR or RTG about their willingness to pay any

19    amounts more than the $298,000 for the equipment

20    that was on those purchase orders?

21        A.    Yes, I did.

22        Q.    And who did you have that discussion

23    with?

24        A.    Bob Wetzel.

1          MR. KATAUSKAS:  Objection;

2      asked and answered already.  He's

3      already answered that.

4          MR. O'RIORDAN:  I just

5      asked him another question and it

6      has to do with this particular

7      point in time.  It hasn't been

8      asked and answered.

9          MR. KATAUSKAS:  It has been

10      asked and answered.  Read it

11      back, please.

12              - - -

13          (Whereupon the reporter read back

14   the last question.)

15              - - -

16          THE WITNESS:  I had a

17      letter of intent.  I had purchase

18      orders for a down payment on

19      equipment.  And I believe that

20      the equipment was sold, so.  I

21      also believed that the lease was

22      imminent.  It was represented to

23      me by RTG that the lease was

24      imminent.  The ball was in their

1          court.

2    BY MR. O'RIORDAN:

3          Q.    Let me go back.  You just said you

4    believed the equipment was sold?

5          A.    Uh-huh.

6          Q.    What equipment are you referring to?

7          A.    The list.

8          Q.    The equipment that's on the $298,000

9    purchase order?

10         A.    Yes.

11         Q.    And you believe that equipment was sold

12   to whom?

13         A.    To RTG.

14         Q.    And who sold it to RTG?

15         A.    That would be me.  The only thing I

16   didn't have was a signed turnkey agreement but I

17   did have a letter of intent.  I had down payments

18   on the equipment and I had RTG telling me that

19   they would send the information out imminently for

20   the lease.  And I knew that Casella was the parent

21   company and that these were wholly-owned

22   subsidiaries.  I had no concern with that.

23         Q.    Did you ever have any discussion with

24   anyone as to whether or not Casella was going to

1    guarantee any action by ARR or RTG?

2        A.    They were wholly-owned subsidiaries.

3        Q.    I understand.  I'm just asking about

4    any discussion you may have had?

5        A.    No.

6        Q.    With respect to this equipment that you

7    say was sold, did anyone from RTG or ARR ever

8    agree that they would purchase the equipment as

9    opposed to paying you a down payment as you had

10   requested in your letter?

11               MR. KATAUSKAS:  Again,

12          objection; asked and answered.

13               MR. O'RIORDAN:  He just

14          raised the issue.  So I want to

15          go back and clear it up.

16               MR. KATAUSKAS:  He raised

17          the issue in response to another

18          question that was asked and

19          answered.

20               MR. O'RIORDAN:  And he's

21          bringing in ambiguity.

22               MR. KATAUSKAS:  He's

23          answered the question.

24               MR. O'RIORDAN:  Okay.

1          up.

2     BY MR. O'RIORDAN:

3          Q.    And were you referring here to

4     producing the entire 30 tons per day at any

5     particular price?

6          A.    No, sir.  It doesn't say any particular

7     price.

8          Q.    And I'm asking when you were making

9     this statement did you have in mind the inability

10    to produce 30 tons at a particular price or were

11    you just talking about a shortfall in quantity?

12         A.    I don't know what I had in mind to use

13    this.

14         Q.    Mr. Timberlake, earlier we were talking

15    about some plans, I believe two sets of plans and

16    specifications that were delivered in the late

17    summer or early fall of 2001.  Do you recall that?

18         A.    Yes, sir.

19         Q.    Did anyone from ARR or RTG ever agree

20    to pay MLEA or EGS for the preparation of those

21    plans?

22         A.    They were security -- ultimately they

23    did.  One of the invoices that Mr. Wetzel agreed

24    to pay was for that work.

Page 187

1      Q.    Prior to you doing that work did

2   anyone -- you meaning MLEA.

3      A.    Yes.

4      Q.    Did anyone from ARR or RTG agree to pay

5   for that work?

6      A.    We were assuming -- yeah.  It would

7   have been included in the lease, the engineering

8   wise.  And it was our feeling that they -- that

9   RTG was sincere and that it would follow from

10  here.  And we'd go to the lease, and then we'd go

11  to the equipment, and the engineering, and the

12  start-up, and all that's necessary to put together

13  the plans.

14     Q.    I understand your feeling and I

15  appreciate your views of someone else's sincerity.

16  But did anyone from RTG or ARR ever agree to pay

17  for those plans before you actually worked on

18  those plans?

19     A.    Only in the letter of intent.

20     Q.    Where in the letter of intent does it

21  say that they're going to pay for any plans?

22     A.    It says that they're going to buy a

23  plant.  You don't have a plant without plans.

24     Q.    And is there a price that they were

1    the power company, was met.  And the second

2    condition was met to the extent that the ball was

3    in RTG's court.

4         Q.    At what point in time did you believe

5    that EGS had a binding order to build a plant, if

6    at all?

7         A.    I didn't believe that we had an order

8    for a turnkey plant.  I believe we had an order

9    for equipment that was binding and that's pretty

10   much it.

11        Q.    When you say you had an order for

12   equipment do you mean beyond the down payment, the

13   $298,000?

14        A.    Yeah.  It became obvious later on that,

15   in fact, RTG intended to construct the plant from

16   the equipment that we were supplying.

17        Q.    When you say it became obvious from the

18   equipment that you were buying, are you referring

19   to anything other than those purchase orders that

20   we discussed earlier?

21        A.    Yes.  I'm referring to the agreement

22   with Mr. Wetzel, who wanted to take possession of

23   the equipment.  Now, why would he want to do that

24   if he didn't intend to build a plant from it?

GEORGE TIMBERLAKE

Page 207

1      A.    What he said he wanted was all the

2  invoices.

3      Q.    That's not my question.  My question is

4  a simple one.

5            Had you and Mr. Wetzel, prior to you

6  sending those invoices over, discussed at all the

7  possibility of Mr. Wetzel paying EGS's engineering

8  fees?

9      A.    No, but we didn't discuss the

10 possibility of him paying for the compressor

11 either.

12     Q.    And was the compressor on one of the

13 earlier purchase orders?

14     A.    It was.

15     Q.    I'm sorry?

16     A.    Yes.

17     Q.    But the engineering fees were not;

18 correct?

19     A.    Yes, they were.

20     Q.    The engineering fees were on one of the

21 earlier purchase orders?

22     A.    They're on one of the -- what there is

23 here is a list of invoices.

24     Q.    Why don't we make it somewhat easier?