**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MLEA, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | No.  02-CV-4393 |
| | : | |
| ATLANTIC RECYCLED RUBBER, | : | |
| INC., RECOVERY TECHNOLOGIES | : | |
| GROUP, INC., AND CASELLA | : | |
| WASTE SYSTEMS, INC. | : | |
| | : | |
| Defendants. | : | |

**ATLANTIC RECYCLED RUBBER, INC. AND**
**RECOVERY TECHNOLOGIES GROUP, INC.'S**
**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiff MLEA has now filed its Response[1] to the Defendants' Atlantic Recycled Rubber, Inc. ("ARR"), Recovery Technologies Group, Inc. ("RTG") and Cassella Waste Systems, Inc., ("Cassella") Motions for Summary Judgment.   MLEA fails to offer any factual or legal basis to defeat to defeat the entry of judgment against it, and all of MLEA's claims should now be dismissed on the basis of the uncontested evidence and the clearly controlling law.[2]

I.        **INTRODUCTION**

At the heart of this case are two ARR purchase orders that were fraudulently procured by four material misrepresentations made by MLEA's salesman George Timberlake ("Salesman Timberlake"). (ARR Motion at 12-16)   In response to Defendants' Motions, MLEA has offered no affidavit or deposition testimony by Salesman Timberlake (or anyone else) either denying that

---

[1]        The opening briefs on Defendants' pending motions are cited as "ARR Motion," "RTG Motion" and "Cassella Motion." Plaintiff's Response is cited as "MLEA Response."

[2]        ARR and RTG incorporate by reference the arguments made in both the Cassella Motion as well as Cassella's Reply Brief, which is cited herein as "Cassella Reply."

he made those statements or denying that his statements were false when made.  On the contrary, at Salesman Timberlake's deposition, after much maneuvering and significant squirming, he eventually acknowledged that "his job was to get orders" and he was just trying to get ARR "to issue a purchase order for $298,000." (Exh. "D", Timberlake Tr. at 154, 164-65)[3]  His success in "coaxing" ARR to issue two purchase orders for a $298,000 down payment ultimately resulted in this unfortunate litigation and is now the basis for Defendants' Motions.

MLEA's opposition papers do <u>not</u> dispute that Salesman Timberlake's four representations were false or that he made the first three of those four misrepresentations – Salesman Timberlake's first three false statements were contained in written sales pitches penned by him.  Instead, MLEA takes issue only with the last and most notorious of Salesman Timberlake's falsehoods – that the leasing company objected to certain buy-back conditions in the two ARR purchase orders (originally procured by Salesman Timberlake's first three misrepresentations) and that ARR should therefore remove those contingencies from the already-issued purchase orders (which it did).   MLEA offers two equally feeble responses:  First, although MLEA doesn't even deny that Salesman Timberlake made the fourth false statement (the recipients of his fourth falsehood have sworn that he did and Timberlake hasn't denied it), MLEA points to Salesman Timberlake's inability to "recall" whether or not he discussed the subject matter of those statements with ARR or RTG as somehow creating a material issue of fact.  Second, MLEA contends that because of the experience in business and leasing matters possessed by one individual who was neither an ARR employee nor a recipient of Salesman Timberlake's misrepresentations, Defendants should have somehow seen through Salesman Timberlake's lies and not relied upon them – that is, ARR's reliance was not "reasonable."

---

[3]    All references to Exhibits by letters (e.g., Exh. A or Exh. C) in this Reply Brief refer to Exhibits in Appendix of Exhibits of ARR and RTG's Motions For Summary Judgment or Alternatively For Partial Summary Judgment.

MLEA essentially admits that Salesman Timberlake lied <u>but</u> argues that it should not be held liable for those lies because Defendants should have caught him!   It is MLEA's argument, not ARR's reliance, which lacks reason.

**II.**    **THE EVIDENCE OF SALESMAN TIMBERLAKE'S FRAUD IS NOT ONLY CLEAR AND CONVINCING, IT'S OVERWHELMING.**

Each of Salesman Timberlake's misrepresentations was designed to inch ARR up to and past the point of "no return" where ARR would have no choice but to go forward with MLEA's proposal to design and construct a liquid nitrogen plant[4] at ARR's tire recycling plant.  Salesman Timberlake had presented the original such proposal in August, 2000 but had been unable to obtain a purchase order for MLEA's construction of the plant.  ARR's only business was tire recycling and its only interest in considering MLEA's proposal was to obtain liquid nitrogen at the lowest possible cost.  Neither ARR nor ARR's corporate parent, non-party RTI-Canada, had any interest in entering the liquid nitrogen business or in owning a liquid nitrogen plant.   ARR had been emphatic from the outset of its dealings with Salesman Timberlake that it would only agree to some form of MLEA's proposal if and only if MLEA could arrange an operating lease under which ARR would lease and not own the liquid nitrogen plant.  Realizing that obtaining third-party financing through a leasing agreement was critical to his closing the sale, Salesman Timberlake embarked on a campaign of "bait and switch" misrepresentations designed to pressure ARR into issuing "temporary" purchase orders for the equipment required for MLEA's proposed plant without first satisfying ARR's precondition of obtaining an operating lease.

---

[4]        Liquid nitrogen was one of the components used in ARR's tire recycling process.

Salesman Timberlake's scheme involved the following four material misrepresentations:

- **MISREPRESENTATION #1:**

  o In his September 13, 2000 revised proposal, Salesman Timberlake represented that he had already "**arranged a lease through National Fleet Leasing, a company that normally provides this service to our customers. ..**"  (Exh. "J");

  o **FALSE**: He had not arranged any such lease for ARR nor had he or Messer <u>ever</u> arranged any leases with National Fleet Leasing for any customers. (<u>see</u> Exh. "D", Timberlake Trans.) (<u>See</u> Exh. "G" Cohen Decl. at ¶ 5)

Timberlake's deposition testimony as to his representation unquestionably established its falsity:

Q.    Had you ever placed a lease or arranged a lease with Mr. Cohen   [of National Fleet Leasing]?
A.    No.

Q.    Am I correct that Messer did not utilize the services of National Fleet Leasing either?
A.    No.

(<u>see</u> Exh. "D", Timberlake Tr. at 102)

Q.    And Mr. Timberlake, in the first part of that sentence you say that "National Fleet Leasing, the company normally provides this service to our customers. Do you see that?
A.    Uh-huh.

Q.    That was not a true statement when you made that, was it?
A.    Well, actually it is.  . . .
            *              *              *              *              *
Q.    You had not arranged any leases with National Fleet Leasing, correct?
A.    Except for this one.

Q.    And National Fleet Leasing was not a company that provided services to Messer customers, correct?
A.    I don't know that.

Q.    It was not a company that, to your knowledge, provided services to Messer customers?

A.    That's correct.

          \*        \*        \*        \*        \*

Q.    But they never provided a lease to any of your customers?

A.    Never had the opportunity. Never got far enough.

(Exh. "D", Timberlake Tr. at 111- 114)

ARR took Salesman Timberlake's "bait" and entered into discussions and negotiations about Salesman Timberlake's proposal of obtaining an operating lease for a liquid nitrogen plant. Salesman Timberlake then began working on the "switch" to "end-run" ARR's requirement of an operating lease by pressuring ARR into issuing purchases orders for the equipment based upon false claims of inevitable delays in obtaining equipment.

- **MISREPRESENTATION #2:**

   o   In Salesman Timberlake's November 20, 2000 letter, he represented that **Messer was having difficulty getting information for the envisioned lease and that the "lease approval cycle" would take up more time.**[5]   He therefore requested that a purchase order be issued for "long lead and critical use items" in the amount of $155,000, (the total purchase price for those items) and agreed to buy back those items at the same price when the lease was approved so that the items could then be included in the lease.  (Exh. "D", Timberlake Trans. at 148-49, 153-54).

   o   **FALSE:** Salesman Timberlake had no idea what the "lease approval cycle" was nor did he have any information regarding that cycle or whether that cycle would delay ARR's projected timeline.

Timberlake testified on this point as follows:

Q.  Did you have any idea how long the approval cycle would take?
A.  No.

Q.  Did you know whether the approval cycle could be done in a day?
A.  No, I didn't know that.

Q.  You didn't know that.
A.  I didn't know that then.

---

[5]      As of November 20, 2000, Timberlake made clear that he believed that <u>ARR</u> was the customer and that <u>ARR</u> was going to be the entity that would enter into a lease for the liquid nitrogen plant. (Exh. "D", Timberlake Tr. at 150-151, 157-159)

Q. You didn't know it one way or the other?
A. No.

Q. What was it that caused you to believe that the purchase order ought to be issued?
A. Well, my job was to get orders. And since I didn't know that the approval cycle would be long or short, I would have to assume that it would be long and cause us to miss.

        *         *         *         *         *

Q. Did you, at any point in time, have any discussion with Alan Cohen or anyone from Fleet Leasing regarding the process by which this approval would work?
A. No.

(Exh. "D", Timberlake Tr. at 153-155)

In reliance on Salesman Timberlake's false representations about having difficulty getting information for the lease and delays inherent in the approval process, ARR issued purchase order #715258 on December 1, 2000, with the stipulations that: (1) the items in the purchase order would be re-purchased when the lease was approved; (2) that the purchase order would be paid from the proceeds of the lease; and (3) ARR could return the equipment for full credit in the event that ARR did not proceed with the lease. Id. (Exh. "O"; Exh. "H", Meckert Decl. at `. "I"; Riordan Decl. at 7-9).

- **MISREPRESENTATION #3:**

  o Having successfully tricked ARR into issuing one purchase order, Salesman Timberlake tried for more: In his December 11, 2000 letter, Salesman Timberlake requested that a "second temporary equipment order" be issued for a down payment of $298,000 on various identified items **because he was having difficulty getting information for the envisioned lease and the "normal lease cycle" would "jeopardize [ARR's] April target date."** (See Exh. "D", Timberlake Trans. at 160-61; December 11, 2000 letter, Exh. "P").

  o **FALSE**: As with Misrepresentations #2 above, Salesman Timberlake had no idea what the "normal lease cycle" was nor did he have any information regarding that cycle.

Timberlake testified on this point as follows:

> Q.  And in this letter you talk about the normal lease cycle. Do you see that?
> A.  Yes.
>
> Q.  And you say the normal lease cycle will jeopardize our April target date?
> A.  Uh-huh.
>
> Q.  Now, did you have any discussions with anyone from National Fleet Leasing regarding what a normal leasing cycle would be?
> A.  No.
>
> Q.  And this letter was an effort on your part to obtain a purchase order from ARR?
> A.  Yes.
>
> Q.  And you're proposing here that ARR should sign on to purchase orders for a minimum down payment?  [OBJECTIONS OF COUNSEL]
> A.  I'm proposing that someone pay a down payment.

(Exh. "D", Timberlake Tr. at 161-163)

> *          *          *          *          *
>
> Q.  So it was your intention in Timberlake No. 2 [December 11th Letter] to get whatever entity it was you were dealing with to issue a purchase order for $298,000?
> A.  Yes.

(Id. at 164-165)

In reliance on Salesman Timberlake's December 11th representations about having difficulty getting information for the lease, that the "normal lease cycle" would "jeopardize" the "April target date" and that the amount of the purchase order was limited to $298,000, ARR issued purchase orders 715260 and 715261 with the same stipulations as its earlier purchase order.  (Exh. "I", Riordan Decl. at ¶ 12; Exh. "H", Meckert Decl. at ¶ 11).  However, at approximately the same time that ARR issued those purchase orders, Salesman  Timberlake became aware that MLEA lacked the financial wherewithal to buy back the equipment on those purchase orders in the event that a lease was not obtained.  (Exh. B, DelGazio Tr. at 90)

Therefore, in order to close the deal, it was imperative that Salesman Timberlake pressure ARR

into dropping those lease contingencies.

- **MISREPRESENTATION #4:**

  - To accomplish that goal, Salesman Timberlake represented **that the leasing company had objected to the stipulation requiring a buy-back of the equipment identified in the later two purchase orders if no lease was executed and therefore requested that ARR remove the buy-back lease contingencies from the two purchase orders.** (Exh. "I", Riordan Decl. at ¶¶ 13-14; Exh. "H", Meckert Decl. at ¶¶ 12-13).

  - **FALSE**: National Fleet Leasing never objected to the Messer buy-back provision; Timberlake admitted under oath that he never even discussed any proposed buy-back conditions with National Fleet Leasing. (Exh. "G", Cohen Decl., ¶ 8-10[6]; Exh. "D", Timberlake Trans. at 167-68).

At deposition, Timberlake admitted that he never discussed the proposed buy-back/leasing

contingency with anyone from National Fleet Leasing:

> Q. . . . Did you have any discussion with anyone from National Fleet Leasing regarding Messer's willingness to buy back the equipment if the lease was not entered into?
> A. No.  See, that restriction was lifted a few days after these orders were issued.
>
> Q. Why was the restriction lifted, if you know?
> A. I don't know.

(Exh. "D", Timberlake Trans. at 167-68).

ARR representatives, John Riordan and Bill Meckert, relied upon the truthfulness of

Timberlake's representation that the leasing company objected to the buyback contingencies in

purchase orders 715260 and 715261, and asked Steve Benison, ARR's General Manager to

remove the stipulations that the equipment identified in his December 11th letter had to be bought

---

[6]        Alan Cohen, then President of National Fleet Leasing, testified that National Fleet Leasing did not object to the Messer buy-back provision and that Timberlake never even discussed any proposed purchase orders or buy-back conditions with National Fleet Leasing. (See Exh. "G", Cohen Decl., ¶ 8-10).

back from ARR in the event the lease was not consummated.  Id.  ARR acted upon that request and did, in fact, remove those stipulations.  (Id.)

To establish its affirmative defense of  fraudulent inducement, Defendants are required to prove "(1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention by the maker that the recipient will thereby be induced to act; (4) justifiable reliance by  the  recipient on the misrepresentation and (5) damage to the recipient as the proximate result." Scaife Co. v. Rockwell-Standard Corp., 446 Pa. 280, 285 A.2d 451, 454 (1971). "Fraud is proved when it is shown that the false representation was made knowingly, or in conscious ignorance of the truth, or recklessly without caring whether it be true or false." Delahanty v. First Pennsylvania Bank, N.A., 464 A.2d 1243, 1252 (Pa. Super. 1983).  Defendants have more than met that standard here.

MLEA has not offered any response to ARR's evidence of Salesman Timberlake's first three misrepresentations or that those three misrepresentations induced ARR to initially issue the disputed two purchase orders.   Nor does MLEA deny the falsity of Timberlake's repeated misrepresentations regarding alleged delays and problems with National Fleet Leasing.  In seeking to stave off summary judgment, MLEA takes issue with only Timberlake's final falsehood – which prompted ARR to drop the leasing contingency restriction in the P.O.s.  As to that fourth false statement, MLEA argues that there are disputed issues of fact because (1) Timberlake "can't recall" whether or not he had any discussions with anyone from ARR or RTG regarding the lifting of the lease contingency; (2) the evidence allegedly fails to support a "knowing" misrepresentation; and (3) ARR's reliance on those lies was not "reasonable." (MLEA Response at 21-22, citing Exh. "D", Timberlake Trans. at 168).   MLEA's arguments are all without merit.

When, as here, the moving party has pointed to material facts tending to show there is no genuine issue for trial, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). (citations omitted).

There are no disputed issues of fact here:  The first three of Salesman Timberlake's false statements were in writing and speak for themselves.  (Exh. J, Exh. M and Exh. P)  As for the first three of his misrepresentations, Timberlake admitted that he intended to induce ARR to issue purchase orders and essentially admitted that he knew his representations were not accurate.  (Exh. D, Timberlake Tr. at 153-55, 161-63)   Meckert and Riordan's sworn testimony established that Salesman Timberlake made his last three false representations and that they relied upon them as being true.   MLEA received those Declarations stating that Timberlake made those false statements; neither MLEA nor Timberlake has denied or challenged the accuracy of the Riordan and Meckert Declarations nor have they come forward with their own affidavit denying that those statements were made.  With respect to the fourth misrepresentation, Timberlake admitted that he never had any discussions with National Fleet Leasing about the leasing contingencies in the purchase orders and Alan Cohen of National Fleet Leasing confirmed that Timberlake never raised that issue with him. As for the first three of his misrepresentations, Timberlake admitted that he intended to induce ARR to issue purchase orders and essentially admitted that he knew his representations were not accurate.  (Exh. D, Timberlake Tr. at 167-68)  MLEA's failure to deny that he made those false statements and Timberlake's lack of recall, particularly in the face of the unequivocal Riordan, Meckert and

Cohen Declarations, create nothing more than "metaphysical doubt" as to the facts; there are material issues of fact as to whether Salesman Timberlake made all four of his false statements.

Salesman Timberlake's own testimony as to his four false statements is conclusive evidence of his "conscious ignorance of the truth, or recklessly without caring whether it be true or false." Delahanty, supra, 464 A.2d at 1252.   Defendants are required to show only that the speaker knows or believes that the matter is not as he represents it to be, does not have the confidence in the accuracy of the representation that is stated or implied, or knows that there is not the basis for the representation that is stated or implied.  Brindle v. West Allegheny Hosp., 406 Pa. Super. 572, 574, 594 A.2d 766, 768 (1991), (quoting B.O. v. C.O., 404 Pa. Super. 127, 132 n. 1, 590 A.2d 313, 315 n. 1 (1991)).  Accord, Briggs v. Erie Ins. Group, 406 Pa. Super. 560, 568, 594 A.2d 761, 764 (1991).  Salesman Timberlake's own testimony demonstrates that he clearly knew what he was telling ARR was not true and, at the very least, that he knew he had no basis for making those representations.[7]

ARR relied on those misrepresentations and did exactly as Salesman Timberlake intended, it issued purchase orders and has been damaged as a result.  In arguing that ARR's reliance was not "reasonable," MLEA points to the leasing experience and knowledge of Mr.

---

[7] Section 162 of the Restatement, which frames the inquiry as to whether a misrepresentation is "knowing", provides:

> (1) A misrepresentation is fraudulent if the maker intends his assertion to induce a party to manifest his assent and the maker:
>
> > (a) knows or believes that the assertion is not in accord with the facts, or
> > (b) does not have the confidence that he states or implies in the truth of the assertion, or
> > (c) knows that he does not have the basis that he states or implies for the assertion.
>
> (2) A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so.

Restatement (Second) of Contracts § 162.

Marty Sergi.   (MLEA Response at 22)   MLEA's argument that ARR should have caught

Salesman Timberlake in his lies and were not entitled to rely on the truthfulness of his

representations is absurd and contrary to controlling law.  First, whatever Mr. Sergi's experience

in the area of leasing, it has no relevance to the reasonability of ARR's reliance.  Mr. Sergi was

not an employee of ARR.  (Exh. 6 to MLEA Response, Sergi Tr. at 5-8)   Similarly, it was Mr.

Riordan and Mr. Meckert, not Mr. Sergi, who were the recipients of Salesman Timberlake's

misrepresentations; and it was Mr. Riordan and Mr. Meckert who relied on those false statements

when they requested ARR's General Manager to remove the contingencies to which Salesman

Timberlake told them the leasing company had objected. (See Exh. "H", Meckert Decl. at 12-13;

Exh. "I", Riordan Decl. at 13-14)   MLEA's invocation of Mr. Sergi's leasing experience is

merely a desperate attempt to muddy the waters in order to avoid summary judgment.

　　　　MLEA's claim that ARR "should have known better" is also not the law.   The settled

rule that intentional or wanton torts are not excused by the victim's negligence, imprudence or

want of care (e.g., Summit Fasteners, Inc. v. Harleysville Nat'l Bank, 410 Pa. Super. 56, 599

A.2d 203 (1991), appeal denied, 530 Pa. 633, 606 A.2d 902 (1992)), applies with full force to the

intentional tort of fraudulent misrepresentation.  See La Course v. Kiesel, 366 Pa. 385, 77 A.2d

577 (1951) ; Lake v. Thompson, 366 Pa. 352, 77 A.2d 364 (1951); Emery v. Third National

Bank, 314 Pa. 544, 171 A. 881 (1934); Sutton v. Morgan, 158 Pa. 204, 27 A. 894 (1893);

Ashland Towson Corp. v. Kasunic, 110 Pa. Super. 496, 168 A. 502 (1933).  See also

Restatement (Second) of Torts § 545A.

　　　　The Pennsylvania Supreme Court dealt squarely with the issue 100 years ago in Sutton v.

Morgan, where defendants had made extravagant representations about a railroad's supposed

plan to develop the farm land defendant offered to plaintiff.  Plaintiff and his financial advisor

did not investigate the representation, and he overpaid for the property.  In the ensuing fraud-in-

the-inducement case, defendants raised a defense of contributory negligence.  The Court rejected

it:

> Prudence should have led [plaintiff] and his "financial man" Sutton, to test the
> truth of the glowing statements made by Morgan and Glass, but it did not.  They
> fell easily into the trap which was set, with some skill and some effrontery, for
> them; but their neglect, or want of prudence, cannot justify the falsehood or fraud
> of those who practiced upon their credulity.  **The doctrine of contributory
> negligence cannot be invoked by the defendants to save them from liability
> for misleading their victim.  They must stand or fall on the truth, and good
> faith, of the representations that led to the sale**.

158 Pa. at 218-19 (emphasis added).

The rules for determining whether a person's reliance upon a fraudulent misrepresentation

are justifiable have been set forth in Sections 540 and 541 of the Restatement (Second) of Torts.

These Rules provide as follows:

### § 540  Duty to Investigate

The recipient of a fraudulent misrepresentation of fact is justified in
relying upon its truth, <u>although he might have ascertained the falsity of the
representation had he made an investigation.</u>

### § 541  Representation Known to Be or Obviously False

The recipient of a fraudulent misrepresentation is not justified in relying
upon its truth if he knows that it is false or its falsity is obvious to him.

The MLEA Response offers no evidence suggesting that ARR knew of the falsity of Salesman

Timberlake's statements nor does it offer any explanation as to why the falsity of those

statements was "obvious" to ARR.   Absent such evidence, ARR was entitled to rely on the

truthfulness of Salesman Timberlake's statements and its reliance is, as a matter of law, deemed

reasonable.

**III.    MLEA Has Failed To Produce Any Evidence Warranting The Piercing Of The Corporate Veil To Impose Liability On RTG For ARR's Alleged Breach Of Contract.**

As demonstrated in the Cassella Reply, MLEA has failed to produce evidence that would permit the imposition of liability on RTG or Cassella based on ARR's alleged breach of contract. (Cassella Reply at 5-16)  Rather than repeat those well-stated arguments, RTG joins in those arguments and adds the following few points:

In support of its veil-piercing claim, MLEA argues that ARR was grossly-undercapitalized and was unable to pay for the purchase orders at issue here.  However, MLEA misstates the evidence by claiming that RTG was supposed to pay the ARR invoices.  (MLEA Response at 27)  ARR's General Manager specifically testified that ARR, not RTG, was going to pay the amount of the purchase orders with monies borrowed from RTG in the form of inter-company loans. (Bennison Tr. at 116, 119, attached as Exh. 1)  There is no evidence of undercapitalization nor does the making of inter-company loans from a corporate grandparent to a "twice-removed" subsidiary provide any basis to disregard ARR's corporate form.

MLEA also suggests that the corporate form should be disregarded because it was the victim of a "bait and switch" scheme in which MLEA was tricked into dealing with ARR as opposed to RTG as a result of a last minute switch. (MLEA Response at 28-30)  Lacking evidence of such a scheme, MLEA makes the incredible assertion that RTG "**coaxed** Messer into agreeing to place orders for highly expensive equipment." (MLEA Response at 28; emphasis added)  Nothing could be further from the truth.

First, the only "coaxing" to place orders for that equipment was done by Salesman Timberlake, whose "coaxing" methods were nothing more than outright lies.   Second, as of November 20, 2000 when Salesman Timberlake first proposed that "temporary" purchase orders

be issued, he knew that ARR, not RTG, was the entity that would be entering into the lease, and

knew that ARR was the customer which would be purchasing the equipment in the proposed

purchase orders; it made "no difference" to him whether or not ARR was a startup company.

(Exh. "D", Timberlake at 150-51, 157).  Moreover, attorney DelGazio was emphatic that all of

the  representations MLEA relied upon in placing its orders for the equipment were made on or

before January 19, 2001. (Exh. "B", DelGazio at 105)  Attorney DelGazio testified that, as of

January 19, 2001, he knew that the purchase orders were ARR purchase orders, not RTG

purchase orders and knew that all financial and commercial terms would be with ARR. (Exh.

"B", DelGazio at 101-103)   He knew all of this <u>before</u> MLEA performed any of its engineering

services and <u>before</u> MLEA ordered any of the equipment for which MLEA now seeks damages.

(<u>Id.</u>)  The only "bait and switch" that took place here was the pervasive pattern of

misrepresentation by Salesman Timberlake.

Finally, that same pattern of misrepresentation serves as an independent bar to MLEA's

attempted veil-piercing.  As discussed in Cassella's Reply, the doctrine of piercing the corporate

veil is an equitable remedy and, as such, MLEA is barred from obtaining equity because MLEA

appears with the unclean hands of Salesman Timberlake.[8]  <u>See</u> <u>Keystone Driller Co. v. General</u>

<u>Excavator Co.</u>, 290 U .S. 240, 245 (1933) (party cannot be awarded equitable remedy where it

has gained an advantage by fraud or deceit); <u>In re New Valley Corp.</u>, 181 F.3d 517, 525 (3d Cir.

1999) (same).

### IV.    <u>There Are No Material Issues As To Plaintiff's Breach of Contract Claim.</u>

Plaintiff's breach of contract claim is based on two purchase orders in the amount of

$298,000.  Plaintiff nonetheless seeks to recover damages well in excess of that amount based

---

[8]     MLEA's unclean hands applies with equal force to bar its equitable claims for promissory estoppel and unjust enrichment.

upon the purchase price assessed to MLEA by its suppliers and cancellation charges paid by or allegedly assessed to MLEA by those suppliers for the equipment identified in the two ARR purchase orders. MLEA also seeks payment for engineering plans that Plaintiff claims were necessary to order that equipment.

Defendants' seek summary judgment as to Plaintiff's contract claim on two bases. First, as demonstrated above, the purchase orders on which MLEA sues was induced by fraud and all of its claims should therefore be dismissed in their entirety.[9] Second, the undisputed facts demonstrate that the fraudulently induced purchase orders were for $298,000, no more. In its Brief, MLEA argues that there are issues of fact because the $298,000 "down payment" implicitly meant that ARR would also pay the unidentified remainder of the purchase price. (MLEA Response at 15)    MLEA's argument might be plausible if the parties had discussed or negotiated who would pay the remainder. That is not the case.

Salesman Timberlake testified that, prior to the ARR's issuance of those purchase orders, he never discussed ARR's willingness to pay any amount other the $298,000 for the equipment on the purchase orders. (Exh. "D", Timberlake at 168-169)   Indeed, Salesman Timberlake specifically said that those purchase orders were "a stop-gap measure to allow for the lease agreement later." (Exh. "D", Timberlake at 168-169). There are no disputed factual issues – payment of any additional amount beyond the $298,000 was neither discussed nor contemplated. Therefore, Defendants request entry of partial summary judgment as to Plaintiff's claims for any amounts in excess of $298,000.

---

[9]     Defendants' affirmative defense of fraudulent inducement applies equally to Plaintiff's claims for promissory estoppel and unjust enrichment because all of Plaintiff's claims arise from the fraudulently induced issuance of the two purchase orders. See The Maccabees v. Cappas, 64 A.2d 513, 514 (Pa. Super. 1949) ("fraud vitiates everything that it touches")

**V.    MLEA's Quasi-Contract Claims - Promissory Estoppel And Unjust Enrichment - Fail.**

MLEA urges that its claims for promissory estoppel and unjust enrichment these counts be sustained because, according to MLEA, there is an issue of fact as to whether the parties' "equipment contract covers the Plans" or covers the full purchase price of the equipment identified in the two ARR purchase orders.  (MLEA Response at 18-20 )  MLEA argues that in the event that those items are beyond the "scope" of the contract, they should be recoverable under its quasi-contract theories.  (Id.)   However, MLEA's promissory estoppel and unjust enrichment claims cannot survive since MLEA admits that a contract exists between the parties covering the same subject as MLEA's equitable claims.  Pennsylvania law is clear - the existence of a contract precludes the right to seek additional compensation based on a quasi-contract theory. Township of Horsham v. Weiner, 255 A.2d 126, 130-31 (Pa. 1969); Third Nat. Bank & Trust Co. of Scranton v. Lehigh Valley Coal Co., 44 A.2d 571, 574 (Pa. 1945)(principle of quasi-contract not applicable to agreements deliberately entered into by the parties); Iversen Baking Co. v. Weston Foods, Ltd., 874 F. Supp. 96, 102 (E.D.Pa. 1995)(dismissing promissory estoppel claim seeking recovery beyond the scope of the parties' contract).

The parties here dispute the terms of the contract; they do not contest that one was formed (albeit a fraudulently induced contract).  Claims of promissory estoppel and restitution are not cognizable where the parties have a contract. See Carlson v. Arnot-Ogden Mem. Hosp., 918 F.2d 411, 416 (3d Cir. 1990) (promissory estoppel only invoked "where the formal requirements of contract formation have not been satisfied and where justice would be served by enforcing a promise"); Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 999 (3d Cir. 1987) (holding unjust enrichment "inapplicable when the relationship between the parties is founded on a written agreement"); Constar, Inc. v. National Distribution Ctrs., Inc., 101 F. Supp.

2d 319, 323 (E.D. Pa., 2000) (applying Pennsylvania law and dismissing promissory estoppel

claim where express contract existed).   "Promissory estoppel. . . is not designed to protect

parties who do not adequately memorialize their contracts in writing." Iversen Baking Co., Inc.

v. Weston Foods, Ltd., 874 F. Supp. 96,  (E.D. Pa. 1995). Restitution is similarly unavailable

where a contract fixes the amount of compensation due. See Hershey Food Corp., 828 F.2d at

999.

Here, it is undisputed that the only item discussed between Salesman Timberlake and ARR was

the payment of $298,000 for various equipment specified in the two purchase orders.  MLEA

surely knew when it was pressuring ARR for the two purchase orders that (a) someone had to

pay the remainder of the full purchase price after ARR had tendered the $298,00 down payment;

and (b) MLEA would have to develop engineering plans and specifications before placing orders

for that equipment.  For reasons made obvious by Salesman Timberlake's fraudulent scheme,

MLEA never discussed or obtained any agreement from ARR to pay the full purchase price or to

pay for MLEA's engineering services.  The remainder purchase amount for the equipment and

the engineering services necessary to order that equipment clearly relate to the same subject

matter of the two purchase orders for that equipment.  MLEA's assertion that the purchase

amount and attendant services are somehow beyond the "scope" of the purchase orders is absurd.

MLEA had an ample opportunity to protect its expectations through express contract terms and

cannot now rely on consideration substitutes and quasi-contract theory to salvage those

expectations on a post hoc basis.  MLEA's claims for promissory estoppel and unjust enrichment

should therefore be dismissed.

### A. MLEA's Unjust Enrichment Claim Fails Because There Was No Benefit Conferred.

MLEA attempts to rescue its unjust enrichment claim by creating a "benefit" where none exists. MLEA bases its unjust enrichment claim on MLEA's delivery of "foundation" plans to RTG as security for RTG's promissory notes of $150,000. MLEA claims that "Defendants actually installed the foundations at the Truro site, which could not have been accomplished without the foundation plans produced and delivered by MLEA." (MLEA Response at 19, citing DelGazio Affidavit, ¶ 8) However, the evidence MLEA cites to support its statement is not evidence, it is the inadmissible and self-serving "understanding" of DelGazio. (See Fed. R. Civ.P. 56(e)). Contrary to the mandate of Rule 56(e), MLEA fails to provide the basis for DelGazio's "understanding" nor does it provide any information as to why that "understanding" should be admitted as evidence. The Court should strike that portion of the DelGazio Affidavit and give it no consideration in determining Defendants' Motions.

As pointed out in the Cassella Reply, two ARR representatives have submitted Declarations stating that "the foundations that were the subject of MLEA's foundation drawings were never constructed." (Exh. H, Meckert Decl., ¶ 18; Exh. F, Anderson Decl., ¶ 15-16). Because neither ARR nor RTG received any benefit from MLEA, there was no enrichment. Moreover, in light of MLEA's high-pressure and misleading sales tactics that led to ARR's issuance of its purchase orders, it is ARR, not MLEA, which has been the victim of injustice.

### B. MLEA's Promissory Estoppel Fails For Lack Of Any Promise

In their Motions, Defendants demonstrated that MLEA's promissory estoppel claim was devoid of any "promise" to either pay the remainder of the purchase price for the equipment or pay for MLEA's plans. (ARR Motion at 18-20-21; Cassella Reply at 19-20) In response,

MLEA claimed that ARR's General Manager "testified that defendants **expressly promised to pay MLEA** for the equipment ordered."  (MLEA Response at 20; emphasis added)  MLEA completely misstates Mr. Bennison's testimony, which fails to save its promissory estoppel claim from summary judgment.

Bennison's testimony pertained to his understanding as a businessman and not to any promise he made to pay MLEA.   Furthermore, ARR does not dispute that (but for the fraud of which it was then unaware) it owed MLEA $298,000 for the equipment on the two purchase orders.  Bennison's testimony is completely consistent with that obligation.   Moreover, as pointed out in the Cassella Reply, Bennison's testimony makes clear that he never expected the delivery of any equipment prior to the execution of a lease. (Exh. 10 to MLEA Response at 139-40; "We obviously had to have a signed deal before anybody was going to release that equipment.")  Finally, Bennison's testimony makes no mention of any engineering plans or even of any understanding that ARR "owed" MLEA for any such plans.

In contrast to the assertions made in the MLEA Response, the testimony is undisputed that MLEA never proposed to ARR or RTG that they should pay for the engineering services and plans that were allegedly required to order the equipment in the two purchase orders or that they should pay any amounts beyond the $298,000 amount stated on those purchase orders.  All three MLEA witnesses, Salesman Timberlake, Lawyer DelGazio and Engineer Menendez, testified that there was never any agreement by ARR or RTG to pay for MLEA's engineering plans or drawings.  (ARR Brief at 6, 21)  The doctrine of promissory estoppel "applies only to enforce a promise when there has been no consideration; when, as here, there is no proof of a promise, it clearly cannot apply." Permenter v. Crown Cork & Seal Co., Inc., 38 F. Supp. 2d 372, 379 n.10

(E.D. Pa. 1999) (citing <u>Holewinski v. Children's Hosp. of Pittsburgh</u>, 437 Pa. Super. 174, 649

A.2d 712, 714 (Pa. Super. Ct. 1994)).  MLEA's promissory estoppel claims must be dismissed.

## VI.    <u>CONCLUSION</u>

For all of the foregoing reasons, Defendants ARR and RTG respectfully request

that summary judgment be entered in their favor and against Plaintiff MLEA, dismissing all of

MLEA's claims against them with prejudice.


Dated:  December 6, 2004                    Respectfully submitted,

                                                        ECKERT SEAMANS CHERIN
                                                          & MELLOTT, LLC

                              By:    _____
                                                        John F. O'Riordan, Esquire
                                                        Heather E. Rennie, Esquire
                                                        Attorney I.D. Nos. 59311 & 69715
                                                        1515 Market Street, Ninth Floor
                                                        Philadelphia, PA  19102
                                                        (215) 851-8400

                                                        Attorneys for Defendant Atlantic Recycled
                                                        Rubber, Inc. and Recovery Technologies, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I, John F. O'Riordan, Esquire, hereby certify that on December 6, 2004, I served a true

and correct copy of the foregoing Defendants, Atlantic Recycled Rubber, Inc. and RTG's Reply

Brief via first-class mail upon the following:

Philip J. Katauskas, Esquire
Pepper Hamilton LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103-2799

Brian J. McCormick, Jr., Esquire
Buchanan Ingersoll
Professional Corporation
Eleven Penn Center, 14th Floor
1835 Market Street
Philadelphia, PA 19103

_____
John F. O'Riordan, Esquire